1                    **UNITED STATES DISTRICT COURT**
                   **FOR THE DISTRICT OF NEW JERSEY**

2

3  _____

   UNIFORMED FIRE OFFICERS          CIVIL ACTION NUMBERS:
4  ASSOCIATION FAMILY
   PROTECTION PLAN LOCAL 854        3:21-cv-12061-ZNQ-RLS
5  and UNIFORMED FIRE OFFICERS      3:21-cv-12747-ZNQ-RLS
   ASSOCIATION FOR RETIRED FIRE     3:21-cv-10309-ZNQ-RLS
6  OFFICERS FAMILY PROTECTION
   PLAN,                            ORAL ARGUMENT
7
        Plaintiffs,
8
        v.
9
   AMARIN PHARMA, INC., AMARIN
10 PHARMACEUTICALS IRELAND
   LIMITED, AMARIN CORPORATION
11 PLC, BASF AMERICAS
   CORPORATION, BASF
12 CORPORATION, BASF PHARMA
   (CALLANISH) LTD., BASF USA
13 HOLDING LLC, CHEMPORT, INC.,
   NISSHIN PHARMA, INC.,
14 NOVASEP LLC, NOVASEP, INC.,
   GROUPE NOVASEP SAS, AND
15 FINORGA SAS,

16      Defendants.
   _____
17      Clarkson S. Fisher Building & U.S. Courthouse
        402 East State Street
18      Trenton, New Jersey  08608
        September 27, 2022
19      Commencing at 11:00 a.m.

20 B E F O R E:              THE HONORABLE ZAHID N. QURAISHI,
                            UNITED STATES DISTRICT JUDGE
21

22

23         Megan McKay-Soule, Official Court Reporter
                  megansoule430@gmail.com
24                    (215) 779-6437

25 Proceedings recorded by mechanical stenography; transcript
        produced by computer-aided transcription.

```
 1   A P P E A R A N C E S:

 2        CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.
          BY:   JAMES E. CECCHI, ESQUIRE
 3        5 Becker Farm Road
          Roseland, NJ 07068
 4        For the Plaintiff Indirect Purchasers

 5        HAGENS BERMAN SOBOL SHAPIRO, LLP
          BY: THOMAS M. SOBOL, ESQUIRE
 6             LAUREN BARNES, ESQUIRE
          1 Faneuil Hall Square, 5th Floor
 7        Boston, MA 02109
          For the Plaintiff Indirect Purchasers
 8
          WILSON SONSINI GOODRICH & ROSATI
 9        BY:   CHUL PAK, ESQUIRE
               SETH SILBER, ESQUIRE
10             CHRISTINA CLEMENS, ESQUIRE
          1301 Avenue of the Americas, 40th Floor
11        New York, NY 10019
          For the Plaintiff Dr. Reddy's Labs
12
          WILSON SONSINI GOODRICH & ROSATI
13        BY:   BRENDAN J. COFFMAN, ESQUIRE
          1700 K Street NW
14        Washington, D.C. 20006
          For the Plaintiff Dr. Reddy's Labs
15
          WINDELS MARX
16        BY:   FRANK RODRIGUEZ, ESQUIRE
          One Giralda Farms
17        Madison, NJ 07940
          For the Plaintiff Dr. Reddy's Labs
18
          ROBERTS LAW FIRM, P.A.
19        BY:   MIKE ROBERTS, ESQUIRE
          20 Rahling Circle
20        Little Rock, Arkansas 72223
          Liason Counsel for DPPs
21
          COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP
22        BY:   MATTHEW F. GATELY, ESQUIRE
          Park 80 West-Plaza One
23        250 Pehle Avenue
          Suite 401
24        Saddle Brook, NJ 07663
          Liason Counsel for the DPPs
25
```

1    **A P P E A R A N C E S  CONT'D:**

2

3        NUSSBAUM LAW GROUP, P.C.
         BY:  LINDA P. NUSSBAUM, ESQUIRE
4        1211 Avenue of the Americas
         40th Floor
5        New York, NY 10036
         Liason Counsel for the DPPs

6        COVINGTON & BURLING LLP
         BY:  ASHLEY E. BASS, ESQUIRE
7             TIMOTHY C. HESTER, ESQUIRE
         850 10th Street NW
8        Washington, D.C. 20268
         For the Defendant Amarin

9

10

         SAUL EWING ARNSTEIN & LEHR LLP
11       BY:  WILLIAM C. BATON, ESQUIRE
         One Riverfront Plaza
12       1037 Raymond Boulevard
         Suite 1520
13       Newark, NJ 07102
         For the Defendant Amarin

14

15

16

17

18

19

20

21

22

23

24

25

1          (PROCEEDINGS held in open court before The Honorable

2    ZAHID N. QURAISHI, United States District Judge, on September

3    27, 2022, at 11:00 a.m.)

4               THE DEPUTY COURT CLERK:  All rise.

5               THE COURT:  You may be seated.  Thank you.

6          Today we are on the record for oral argument on a

7    motion to dismiss -- actually, it's three matters; so let me

8    just put those on the record and then I'll have appearances

9    from counsel.  But we've got *DRL v. Amarin*; that's docket

10   number 21-10309.  We've got *IPP v. Amarin*; that's docket

11   number 21-12061.  And a third related case, docket number

12   21-12747, which is the *Direct Purchaser, Plaintiffs v. Amarin*.

13         Let me get appearances from counsel, beginning with the

14   plaintiffs.  Why don't you go in order.

15         I'll start with DRL, then IPP, then DPP, and then I

16   will hear from Amarin.

17          MR. PAK:  Good morning, Your Honor.

18         This is Chul Pak from the Wilson Sonsini firm appearing

19   on behalf of Dr. Reddy's Labs.

20          MR. RODRIGUEZ:  Your Honor, also for Dr. Reddy's, Frank

21   Rodriguez, from the firm of Windels Marx, and we have with us

22   from the Washington D.C. office --

23              THE COURT:  Get closer to the microphone.  I'm having

24   difficulty hearing, which means I think my court reporter is

25   going to have difficulty.

```
 1          MR. RODRIGUEZ:  Also from the Washington D.C. office
 2   of Wilson Sonsini Goodrich & Rosati we have Seth Silber and
 3   Christina Clemens.
 4          THE COURT:  Welcome all.  Good morning.
 5          MR. CECCHI:  Good morning, Your Honor.
 6      James Cecchi, Carella Byrne, on behalf of the Indirect
 7   Purchasers.  I'll let my colleague, Tom Sobol, introduce
 8   himself.
 9          MR. SOBOL:  Good morning, Your Honor.  Tom Sobol,
10   Hagens Berman Sobol Shapiro, LLP, for the Indirect Purchasers.
11   With me is my partner Lauren Barnes.
12          THE COURT:  Good morning to all of you as well.
13          MR. GATELY:  Good morning, Your Honor.
14      Matthew Gately, Cohn Lifland Pearlman Herrmann & Knopf,
15   LLP.  We are liaison counsel for the DPPs.  Also with me is
16   Linda P. Nussbaum and Michael L. Roberts, who are co- and term
17   lead counsel.
18          THE COURT:  Good morning, Mr. Gately, and all of you.
19      Let me hear from Amarin as well.
20          MR. BATON:  Good morning, Your Honor.
21      Bill Baton of the Saul Ewing law firm, New Jersey
22   counsel for the Amarin defendants.  With me today is Tim
23   Hester and Ashley Bass from Covington & Burling.
24          THE COURT:  Good morning to all of you as well.
25      I know you guys have discussed a bit about timing and
```

1    how you wanted to go with argument, but I mean, it's your

2    motion, Amarin.  Are you guys going to address your motion

3    first?

4           Before you do, I just want to clarify -- well, two

5    things I want to clarify on the record.  The first is the

6    briefs, including the motion, the opposition reply, were all

7    sealed, but I just want to confirm on the record that this

8    hearing, this oral argument is not sealed and that that is

9    amenable to all the parties.

10          Is that correct from the plaintiffs?

11          MR. PAK:  Your Honor, that is correct, with the

12   exception that permission to review the transcript, to make

13   sure there's nothing in there that is highly confidential and

14   we might have to ask for a redaction.  Otherwise, we can

15   proceed in open court, Your Honor.

16          THE COURT:  I intend to direct that the transcript be

17   sealed until the parties have had an opportunity to review it.

18          I presume that's without objection from Amarin,

19   Mr. Baton.

20          MR. BATON:  No objection.

21          THE COURT:  I have one other issue I just want to

22   clarify.  I have a separate timetable, timeline of key facts,

23   and it talks about -- well, I have this PowerPoint piece of

24   paper here.  I have no idea who provided it.  So can we put on

25   the record where this originated?  I want to make sure that

1  all the attorneys actually have this and this isn't something

2  that I'm holding onto.

3       Is this from DRL?

4       MR. PAK:  It is collectively from all the plaintiffs,

5  DRL plus the class plaintiffs.  We worked on it together.  We

6  submitted to Your Honor Friday evening.

7       THE COURT:  This is from all the plaintiffs

8  collectively.  That's fine.  I presume Amarin has a copy of

9  this?

10       MR. BATON:  They provided us a copy yesterday.

11       THE COURT:  All right.  It's only two pages, correct?

12  I have a front and back, but that's the entirety of the

13  document?

14       MR. PAK:  It is, Your Honor.  Frankly, I doubt that

15  we'll reference it, but just because dates are confusing, we

16  provided it simply for that purpose.

17       THE COURT:  That's fine.  Well, then is there

18  anything further from the plaintiffs regarding housekeeping

19  before I hear from Amarin, or --

20       MR. CECCHI:  No, Your Honor.

21       THE COURT:  Mr. Baton, who is speaking on behalf of

22  the team over there?

23       MR. BATON:  Ms. Bass will be.

24       THE COURT:  Ms. Bass, it's your opportunity.  You've

25  got the microphone.

1          MS. BASS:  Good morning, Your Honor.

2          Ashley Bass on behalf of the Amarin defendants.  One

3   small housekeeping matter.  I think I'll go first and then the

4   plaintiffs will have an opportunity then to go.  So if I could

5   reserve maybe 15 to 20 minutes for rebuttal time at the end,

6   that would be greatly appreciated.

7          THE COURT:  That's fine by me.

8          MS. BASS:  Thank you.

9          Your Honor, I would like to first focus on the DRL

10  complaint.  The IPP and DPP complaints are simply derivatives

11  of DRL's complaint, meaning that if the DRL complaint fails to

12  state a claim, the IPP and DPP complaints should be dismissed

13  as well.

14         DRL claims that Amarin has locked up the supply for API

15  for Vascepa® to prevent generic competition.  DRL's own

16  allegations demonstrate that this is simply not the case.

17  Those allegations show that generic competitors lined up

18  supply, including from suppliers that were not supplying

19  Amarin, and that generic competitors have launched and are

20  currently selling generic Vascepa® in the marketplace.

21         THE COURT:  Let me ask you this only because -- and

22  I'm happy to hear everything you want to put on the record,

23  but to educate me, is it Amarin's position that there's no

24  circumstance whatsoever where you can have a violation of the

25  antitrust laws when you have exclusive agreements with all

1   suppliers?

2        Let me give you an example.  Say Amarin locked with

3   exclusive agreements every supplier of the API knowing full

4   well they don't even need that volume of the ingredient and

5   the sole purpose is to prevent competition against your drug.

6   Under that circumstance -- and I'm not saying it's true -- but

7   is it your position that even then you can't have a violation

8   of the antitrust laws?  Or are you saying, no, Judge, there is

9   circumstances where you could have a violation, but it didn't

10  happen here?

11            MS. BASS:  It's the latter, Judge.

12            THE COURT:  Okay.

13            MS. BASS:  And that is based on the fact that DRL

14  itself has alleged in its own complaint.  So here DRL has

15  failed to allege any anticompetitive effects or antitrust

16  injury because its own allegations show that Amarin did not

17  prevent generic competition in the generic competitor's lined

18  up API supply.

19       As a result, there's no need for this case to proceed

20  into discovery on Amarin's supply arrangements or the

21  reasons --

22            THE COURT:  Now, I'm going to go back to what I

23  asked.

24       Isn't DRL alleging that you did -- maybe not exactly my

25  hypothetical, but aren't they alleging you did something like

1    that?  That you guys locked in exclusively suppliers of this

2    particular active ingredient for the purpose of preventing

3    competition so that they could never launch their generic drug

4    properly because you have locked in these suppliers?  And on

5    top of that, you didn't even need the volume.

6          Again, I'm not saying that that's accurate, but isn't

7    that what DRL's alleging?

8            MS. BASS:  Well, two things, Your Honor.

9          Their own facts allege that they actually received FDA

10   approval in August of 2020 and that they had two suppliers

11   lined up by September of 2020.  And, indeed, one of those

12   suppliers that they alleged that they lined up potentially

13   could have been KD Pharma, but they didn't line up KD Pharma

14   because they actually turned down the price offer from KD

15   Pharma.

16         So this is a situation where even though DRL makes

17   allegations that it claims that we've locked up supply, their

18   own allegations show otherwise with respect to DRL's own

19   ability to line up supply.  And, indeed, Hikma launched as

20   soon as the patent case was resolved and was immediately

21   supplying API --

22           THE COURT:  Well, I mean, Hikma is not a party to the

23   litigation, correct?

24           MS. BASS:  Correct.

25           THE COURT:  And I don't know all the details on

```
 1   Hikma, but at least the plaintiffs -- or at least one of the
 2   plaintiffs alleges that Hikma launched, but they didn't launch
 3   properly, meaning they didn't even have sufficient supply of
 4   the API when they launched; so they launched with a lower
 5   volume of it.  And even that necessarily wasn't a proper
 6   launch.
 7        But they're not a party.  How do I know what happened
 8   with Hikma?  How do I compare that?
 9          MS. BASS:  Well, Your Honor, Hikma launched -- and I
10   can go through the timeline of when they launched to show that
11   there was no delay.  And the point here then is that under the
12   legal standard the plaintiffs need to be able to show
13   substantial foreclosure and that there was a significant
14   impairment on competition in the marketplace.
15        And if Hikma launched and they got access to API, and
16   it was not from an Amarin supplier, then it makes the
17   allegation that there's been some sort of lockup by Amarin
18   completely implausible here.
19        Because with your indulgence, Your Honor, if I could
20   walk through just seven key dates that show that there was no
21   delay in terms of generic competition gaining access to the
22   market here.
23          THE COURT:  Go ahead.  That may be helpful.  I'm
24   happy to hear from you.
25          MS. BASS:  Here's the key dates.  On March 30th,
```

1    2020, the trial court rules that Amarin's patents were

2    invalid.

3         On May 21st, 2020, Hikma received final FDA approval

4    for its product.  So Hikma did not have FDA approval until May

5    of 2020.

6         DRL received final FDA approval on August 7th of 2020.

7    Again, DRL did not have the ability to sell its product in the

8    marketplace until August of 2020.

9         On September 3rd of 2020, the federal circuit affirmed

10   the district court opinion.  By September of 2020, DRL's own

11   allegations indicate that they have lined up two suppliers.

12   So only one month after they received FDA approval, they had

13   two suppliers lined up.  Those suppliers included BASF.

14        According to their own allegations, BASF was a supplier

15   with sufficient capacity to support a timely and full

16   commercial launch and it was a world leader in this space.

17   And they also engaged another supplier that they reference but

18   do not name in their complaint that they lined up by September

19   of 2020.

20        On November 4th, 2020, the federal circuit denies

21   rehearing in the patent case.  November 4th.  November 5th,

22   Hikma launches the next day.

23        Clearly Hikma had supply --

24           THE COURT:  Who supplied Hikma?

25           MS. BASS:  Apparently it was from a supplier not

1   related to Amarin, because DRL doesn't make any sort of an

2   allegation that Amarin did anything to impact the supply that

3   Hikma lined up and launched with the day after rehearing was

4   denied in the federal circuit appeal.

5          So what do these facts tell us?  It tells us that DRL

6   could not have launched before August of 2020, and they had

7   two suppliers lined up by September.

8          DRL itself alleges that one of those suppliers had

9   sufficient capacity to support a timely commercial launch, and

10  DRL doesn't even allege that the other supplier that they

11  lined up was working with Amarin.

12         DRL acknowledges that Hikma lined up supply and

13  launched the day after the resolution of the patent case at

14  the federal circuit level.  DRL even admits in their complaint

15  that they did not start reaching out to suppliers until the

16  April to May 2020 time frame; yet they had suppliers lined up

17  by September of 2020.

18         So what conclusions do we draw from these facts?  The

19  conclusions that we draw is that there has been no foreclosure

20  here.  Hikma launched the day after the federal circuit denied

21  rehearing, and DRL itself quickly lined up two suppliers to

22  support its launch.

23         These pleaded facts cannot meet the legal standard to

24  show that there was any sort exclusive dealing arrangement

25  here that causes concern under the antitrust laws.

1          THE COURT:  Ms. Bass, let me ask you this.  I

2    actually have one specific question and one that's much more

3    general.

4          My specific question is, on the four suppliers that you

5    had exclusive agreements with, is it your position, or do you

6    disagree that those four suppliers were the primary suppliers

7    of the active pharmaceutical ingredient for the generic drug,

8    or are they just the same as any of these suppliers that are

9    not really part of this discussion?

10          MS. BASS:  I have two answers to that.

11          The first, Your Honor, is that for purposes of this

12    Rule 12 motion, we have accepted DRL's allegation that we have

13    exclusive supply arrangements with our suppliers.  But for

14    what it's worth, that clearly isn't the case because they

15    lined up BASF, which is one of the suppliers that they claim

16    has an exclusive agreement with us.  That's number one.

17          Number two, obviously Hikma was able to line up supply,

18    receive FDA approval, and launch with a supplier that is not

19    an Amarin supplier.  So there clearly are numerous other

20    suppliers that are available in the marketplace, and indeed

21    DRL makes extensive allegations regarding the fact that supply

22    is available and it is easy to switch the production of

23    official products over to this API.

24          So this is not a situation where there's only one

25    provider of the API or, to Your Honor's point, as they might

1    allege, you know, four key providers.  There's clearly many,

2    and Hikma found one and launched.

3         So we're turning to the legal standard; if the Third

4    Circuit has recognized --

5              THE COURT:  Sorry.  I have a more general question

6    now.  I'm going to get both my questions in.

7         Plaintiffs' counsel, don't worry, your time is coming.

8         Let me take a step back at this stage of the

9    litigation.  I want to tell you what I'm hearing and what I

10   see in the briefs, and then you can explain to me why at this

11   stage I should be considering granting your motion.

12        So intertwined with the antitrust claims and the

13   tortious interference claims are a lot of factual disputes,

14   right?  For example, Amarin says the plaintiffs didn't do

15   their due diligence, right?  They didn't start early enough to

16   secure suppliers, knowing that if they were going to win that

17   fight and your patent was going to be invalid and they were

18   going to be able to launch their generic drug at the time they

19   were going to, they didn't do what they were supposed to do.

20        Plaintiffs say that's not true.  Right?  We did what we

21   were supposed to do.  Seven years prior to the launch we were

22   securing suppliers and doing all these things, and but for

23   Amarin's misconduct, we wouldn't have had the rug taken out

24   from under us and prevented from getting our generic drug out

25   timely and also in the way that we should have been able to

1    put it out because we ended up buying API.  By the way, that's

2    only one.

3         Also intertwined with these legal issues is an argument

4    that the plaintiffs make about Amarin, that you didn't even

5    need these suppliers, that your sole purpose for securing

6    these suppliers of the API at the time that you did was

7    primarily to prevent competition.

8         Your position is very different.  It's no, we're

9    global.  This was a drug that was being marketed not just

10   domestically, but internationally.  And so the suppliers that

11   we secured were necessary not only for the volume of product

12   that we were putting out on the market, but we were looking to

13   expand.  So there again is another, I would argue, factual

14   dispute between the parties.

15        And then let me just put out one more example.  Well,

16   no, I'll use those two examples, or those two and a half

17   examples there.

18        So we're at the motion to dismiss stage, right?

19   There's been no discovery done to really determine a few

20   things.  One is what really was behind Amarin's securing these

21   suppliers.  Was it to somehow prevent competition, or were you

22   doing what you guys have argued in your papers, which is

23   there's nothing that's illegal or impermissible about having

24   exclusive agreements with suppliers to assist us in getting

25   our products manufactured and marketed?  That's one.  That

1    there's no discovery being done.

2         Also, there's no discovery on the other issue that I

3    raised.  Not just, you know, on I guess the plaintiffs' due

4    diligence, right?  What did DRL do?

5         They argue that they spent a significant amount of time

6    trying to secure these suppliers, and but for the actions of

7    Amarin, they would have been good to go at the time of launch.

8    And you guys say they didn't do their due diligence.  Again,

9    no discovery done and another factual dispute.

10        So my broad question for Amarin is this:  How at the

11   motion to dismiss stage am I authorized to grant that motion

12   when these factual disputes are intertwined with both legal

13   claims?  And isn't this more ripe -- well, maybe more ripe for

14   summary judgment, although I'm not so sure about that, because

15   if you have material facts that are in dispute, by the end of

16   this rainbow, nobody's granting summary judgment, since that

17   would be a primary reason to deny it.  But then I would say,

18   if not at that stage, aren't these issues ripe after discovery

19   and then battled in the well of a courtroom at trial?

20        MS. BASS:  I understand your question, Your Honor.

21   And we would submit that there are plausibility issues with

22   certain of the facts that you just pointed to as being in

23   dispute.  But luckily you can set all of that aside because

24   the issue here is that there is no anticompetitive effect.

25   When Your Honor considers reaching a decision on a motion to

1    dismiss, the seven key dates that I pointed out at the

2    beginning of the argument are the ones that drive the

3    decision.

4         Those dates demonstrate that there was no

5    anticompetitive effect here because there was no exclusion.

6    And that meets with the legal standard.  So that's something

7    that we haven't yet discussed today, but it's worth us pausing

8    on for a minute.

9         So in terms of exclusive dealing arrangements in the

10   Third Circuit -- and there's nothing inherently unlawful in

11   the Third Circuit's view of exclusive dealing arrangements.

12   Indeed, the Third Circuit has recognized that exclusive

13   dealing arrangements are frequently upheld and found to be

14   completely lawful.  This is because they are often highly

15   efficient and create a lot of benefit for the parties in terms

16   of price, stability, and outlets, and often pose --

17        THE COURT:  I don't necessarily disagree with that

18   law, but at the beginning of this argument we discussed that

19   Amarin would concede, though, there are circumstances where

20   you can have exclusive agreements with suppliers and you could

21   violate the antitrust laws, right?

22        In other words, although there's nothing inherently

23   improper about having exclusive agreements with suppliers, and

24   that is something that's been held by the Third Circuit, in

25   this circumstance and other circumstances there are scenarios

1    where these exclusive agreements are solely done to prevent

2    competition and you can fold them into a different pool,

3    right?  You can then have conduct that's a violation of the

4    antitrust laws.

5         So I just want to make sure that we're clear.  I don't

6    necessarily agree with Amarin's general position on the law of

7    exclusive agreements, but this is a lot more specific.  The

8    plaintiffs aren't saying you violated the antitrust laws

9    because you had exclusive agreements with suppliers of the

10   API.  They're saying you've done much more than that, and that

11   the sole purpose in what you were doing was really to prevent

12   competition, not to do what Amarin is claiming, which is, hey,

13   we have a drug.  We need supply for the active ingredient, and

14   so we went to the suppliers, like any other business would do

15   in order to get it.

16        So how are the plaintiffs wrong there?  That they're

17   alleging much more than just exclusive agreements for

18   suppliers of the API?

19         MS. BASS:  Under the Third Circuit law, the point

20   that I was -- the next point that is very relevant is that

21   because we all agree that there are certain circumstances

22   where these agreements can be lawful, the Third Circuit then

23   has described when they can be problematic, and that's really

24   the focus of what we're looking at here today.

25        And these types of exclusive dealing arrangements can

1    potentially be problematic if there is substantial foreclosure

2    that prevents meaningful competition in the marketplace.  So

3    the Third Circuit has been clear that the test is whether the

4    agreement bars a substantial number of rivals, or severely

5    restricts the market's standing.

6         So that's what we're looking for.  We're looking for

7    something substantial, something -- it has a very strong

8    impact on the marketplace.  And, indeed, in the *Jefferson*

9    *Parish Hospital* case, which is a Supreme Court case, the

10   concurring opinion there said it well: that what you're

11   looking at is, are people frozen out?  Has there been a

12   freezing out of competitors?

13        And here the issue is that DRL and the other plaintiffs

14   cannot show that there has been any substantial foreclosure or

15   any anticompetitive effect from these agreements because Hikma

16   launched the day after the federal circuit resolved the patent

17   case and DRL itself lined up two suppliers by one month after

18   they received FDA approval.

19        THE COURT:  Are you saying they can't show it or they

20   didn't plead it?  Because those are very different statements

21   to make.  You keep saying "can't show" and I'm saying we're at

22   the motion to dismiss stage; so how can they show me anything

23   when they've had no discovery?  But are you saying they didn't

24   properly plead that?

25        MS. BASS:  Your Honor, it's a very good point,

```
 1   because actually the point is that these are things that are
 2   pled in DRL's own complaint.  They have pled themselves out of
 3   the case here because they have pled that Hikma did launch
 4   once the federal circuit case was resolved, and they have
 5   alleged and they go through in detail that they lined up
 6   suppliers by September of 2020.
 7        And, indeed, they even allege that they could have
 8   lined up KD Pharma, but they rejected a price from KD Pharma.
 9   These are all allegations in their own complaint.
10        THE COURT:  So is it Amarin's position that if a
11   generic manufacturer can launch -- and we'll use that term
12   pretty broadly.  The launch is equal no matter what type of
13   launch it is, right?
14        So if the generic drug launches, but they only have a
15   limited supply of API and so they're not really marketing the
16   drug in the manner in which they intended to launch it because
17   they don't have enough supply, are you saying in Amarin's
18   position, hey, it's a launch?  And for them to have had a
19   better legal position, at least at this stage of the
20   litigation, they shouldn't have done anything?
21        Because I guess my point is, should the plaintiffs be
22   penalized for trying to launch their generic drug, not in the
23   volume and manner they wanted to, but now they have a worse
24   legal position for it?  As opposed to saying, well, because we
25   have a limited API supply, because we don't have a supply
```

1    because Amarin cut us off, we might as well not launch at all

2    because that will give us a better legal posture in federal

3    court.

4        I don't know if that's the right message to send.  Just

5    because a plaintiff has launched the generic drug doesn't mean

6    that's equivalent to launching it in the manner that they

7    believed they should've been entitled to but for the conduct

8    of Amarin.

9        So do you see a difference there?  Or are you saying a

10   launch is a launch?  They shouldn't have launched the drug and

11   then claim that they were injured here.

12       MS. BASS:  I think here based off of their own

13   allegations, the launch is important.  We're not saying a

14   launch is a launch.  But here, Hikma launched.  And they made

15   just a very passing statement that it was in some sort of a

16   limited quantity, but there's two very key pieces of

17   information with respect to that absolutely-not-supported

18   allegation that is made in the complaint.

19       Number one, Hikma did find supply and did launch,

20   clearly.  Number two, this is a drug --

21       THE COURT:  We don't know -- but then going back to

22   that.  If you agree with me that a launch is not a launch, and

23   there's a difference between it, what information do I have

24   about Hikma's launch?  How can I even compare it, because

25   they're not a party to the case.  There's no information other

1   than the plaintiffs are saying, look, Hikma launched, but not

2   in the way they intended.  They had a launch with much lower

3   volume of API because they were hindered, similarly to DRL.

4   But I don't have that before me.

5           So how can I even use Hikma as a factor in anything

6   when I don't know what it means when they've launched the

7   generic?

8           MS. BASS:  I think, Your Honor, that it shows that

9   the allegations are not plausible.  It's DRL's responsibility

10  to set forth plausible allegations that there has been

11  substantial foreclosure.

12          If Hikma has launched and they want to try to make an

13  argument that it was limited in some way, it was their burden

14  to support that.  Now, the only piece of information that they

15  tried to point to to try to argue that it was limited is the

16  concept that Hikma received 15 percent of sales six months

17  after launch.

18          First off, 15 percent is a good bit.  Second off, the

19  very important part about this drug is that Hikma and DRL are

20  only approved for the first indication of the drug.  They do

21  not have FDA approval for the second indication of the drug.

22  That's what DRL tries to plead, is some sort of a limited

23  launch is completely plausible as to what one would expect for

24  a generic competition, a competitor like Hikma, to launch when

25  they only have approval for the first and smallest indication

1    associated with the drug.

2         Again, these are all facts that are alleged in the

3    complaint, that both Hikma and DRL carved out the second

4    approval from their label and only launched with the first

5    indication.

6         So, Your Honor, I would submit to you that Hikma is

7    very relevant here, because if DRL wants to try to claim that

8    there was some sort of a limited launch by Hikma, then they

9    have to plead plausible facts to support that.  And not only

10   that there was some sort of a limited launch in DRL's eyes,

11   but that Amarin did something to impact that launch.

12        Clearly Hikma has lined up a supplier that is not an

13   Amarin supplier.  So there's no plausible allegations that

14   Amarin did anything in order to impact the ability of Hikma

15   to --

16          THE COURT:  When you say they secured a supplier, I

17   don't know if that's the right word, but I'll just use the

18   word "secured."  Hikma secured a supplier.  When you say that,

19   it sounds like if they found a supplier, they're good to go.

20   You had four suppliers.

21        So this idea that one supplier necessarily makes it

22   sufficient that they're going to get the volume of ingredients

23   to manufacture drugs, I'm not so sure that that's accurate.

24   Because why did you need more than one supplier?  Why did

25   Amarin need more than one supplier if securing a supplier

1    should mean that you're fine?

2            MS. BASS:  Certainly, I think that Amarin has a very

3    long history in this marketplace and a very long history

4    investing and helping its suppliers to grow.  But the bottom

5    line is that Hikma located supply and Hikma launched.  And we

6    have no plausible, well pled allegations here that that launch

7    was limited in any way, or that it was limited by any sort of

8    conduct by Amarin.

9            I think that's the key, that allegations are ones that

10   DRL needs to make and DRL has not done so.

11           So, Your Honor, this is one of the things that I think

12   is also important to pause on is the fact that the facts here

13   are very different than the API supply cases that the

14   plaintiffs point the Court to.  In each of those cases there

15   was some sort of an absolute exclusion of generic competitors

16   from the marketplace for a substantial period of time.

17           That's not the facts we have here.  We have launches

18   and we have people lining up supply immediately upon

19   resolution of the patent case.

20           THE COURT:  Let me ask you this.  If DRL, because

21   they couldn't secure enough supply for the API and didn't

22   launch, and then they filed the lawsuit, what would you have

23   said then?

24           MS. BASS:  Well, if DRL pled in their complaint that

25   the reason they couldn't --

1          THE COURT:  I'm sure they would have pled if they

2    didn't launch.  The reason we didn't launch is because we

3    didn't have enough supply of API because of all the

4    allegations we have in this complaint.

5          So I guess what I'm saying is the only difference in

6    the complaint is, instead of launching, what DRL would say,

7    insufficiently, but they just said forget it.  We won't even

8    bother launching at all.  We're going to file this suit,

9    because why bother launching with such limited supply?  We

10   might as well just say no launch and go forward.  Would you

11   have a different position than you have now because they are

12   alleging that they were not able to launch?

13          MS. BASS:  No, Your Honor, because what DRL alleges

14   is that they went to KD Pharma in April, after the patent

15   decision occurred.  They tried to line up KD Pharma as a

16   supplier.  KD Pharma offered them a price and DRL rejected it.

17   If DRL had accepted that price, they could have launched

18   immediately.  They have no allegations that there were any

19   sort of regulatory issues with KD Pharma.

20          So, Your Honor, if there had been no launch by DRL, our

21   position would be the same based on the facts pled in the

22   complaint.

23          THE COURT:  Understood.  All right.

24          MS. BASS:  So, again, the cases that the plaintiffs

25   have pointed Your Honor to: *Geneva*, *Vyera*, *Fera*, and

1    *Fresenius*, are all cases where there was complete exclusion of

2    a competitor from the marketplace for a significant period of

3    time.

4         Indeed, in two of those cases the ANDAs were canceled

5    and no generics ever received FDA approval.  So the cases that

6    DRL has pointed the Court to are ones where there was actual

7    exclusion of competitors, complete exclusion for a significant

8    period of time.  That is not the facts that we have here.

9         So DRL offers two key rejoinders to that -- the fact

10   that there has actually been entry into this marketplace and

11   API that's available to --

12        THE COURT:  Is it Amarin's position that it has to be

13   total exclusion?  If there's limited exclusion, meaning DRL is

14   able to launch -- and again, I understand you're not agreeing

15   with the allegation -- but I'm just saying if it's limited

16   exclusion, we were able to launch, but we were limited because

17   of these violations, is that somehow different than them

18   saying we were fully excluded?

19        MS. BASS:  Well, there's no allegation that they

20   would have been launched -- limited in a launch with KD Pharma

21   if they had accepted the price.  So first off, there's no

22   allegation --

23        THE COURT:  Isn't there an allegation the reason they

24   didn't accept the price was because it was unreasonable?

25        MS. BASS:  With no well-pled facts to support that.

```
 1   And it's convenient that KD Pharma offered them --

 2          THE COURT:  Well, I'm going to have DRL have an

 3   opportunity to speak on it, but I'm putting it out there.  I

 4   didn't memorize the pleading.  That part, you're on your own.

 5   I presume DRL is going to educate me what they're pleading

 6   some of those allegations are.

 7          But I recall that there's at least some allegation from

 8   DRL that the reason why they couldn't accept that price is

 9   because it was something ridiculous.

10          Now, I don't remember all the allegations of every

11   paragraph of the complaint, but isn't there something that

12   alludes to that from DRL?

13          MS. BASS:  There is an allusion, but again there is

14   no well-pled facts to support what price was offered and why

15   it was turned down.  And if a price was offered by KD Pharma,

16   and DRL turned it down, that's the reason they're not in the

17   market today.

18          So, again, they pled that fact in their own complaint.

19   They pled the fact that KD Pharma offered them a price and

20   they rejected it, and then they went to look for other

21   suppliers at that point in time.

22          THE COURT:  Let me ask you this -- I know we are

23   going to have a lot more questions; so accepting it as true,

24   right, so say KD Pharma went to DRL and gave them this

25   ridiculous price.  Basically, it was an offer, but not really
```

1   anything.  It was just to confirm that they were not going to

2   make an arrangement.  Would that change your mind about

3   whether they received an offer from KD Pharma and they should

4   have gone forward with the supplier?

5         I mean, believing that allegation to be true, that they

6   were already supplying Amarin, is Pharma one of the four

7   suppliers that's supplying Amarin?

8         MS. BASS:  Yes.

9         THE COURT:  Right.  So they're one of the four

10  suppliers.  DRL comes to them and they say fine.  You want to

11  work with us and they give some outrageous price that no

12  company would ever accept.  In fact, it's almost insulting,

13  other than it's so obvious that they're just doing that to

14  confirm there's no relationship moving forward.

15        Under that circumstance, would you say, well, then

16  that's not really an offer that they could have accepted?

17  That makes no sense, in any business sense, and any reasonable

18  company wouldn't have done that.

19        Would that change your analysis?

20        MS. BASS:  I think, first off, there's no allegations

21  along those lines.  So even if that were the case, even if

22  Your Honor were to find that the KD Pharma offer was

23  completely unreasonable --

24        THE COURT:  I thought they did make that allegation.

25  Again, I'm going to ask them to correct me if I'm wrong, but

1    my recollection of the pleading is there is an allegation like

2    that.

3          MS. BASS:  They said that it was not economically

4    rational for them to take the price.  So, Your Honor, I mean,

5    again, this isn't a price dispute between KD Pharma and DRL as

6    to why DRL wouldn't accept the price and launch with their own

7    supplier.

8          And the thing to Your Honor is, even setting aside the

9    KD Pharma issue, DRL admits that by September 2020, they have

10   lined up another unnamed supplier and they provide no

11   information as to why they couldn't have launched with

12   adequate capacities with that supplier, other than to say,

13   well, there were regulatory issues that they needed to attend

14   to.  But they don't indicate what the timeline was for that

15   unnamed supplier.

16         And indeed with BASF, they had also lined BASF up by

17   September 2020.  And they don't provide any information about

18   why they didn't start the regulatory process sooner with BASF.

19         Bottom line is that Hikma launched.  And Hikma launched

20   with only approval for the first indication, which is assumed

21   to be a very small portion of this marketplace.  Indeed, the

22   DPPs cite a press article in their complaint where the

23   estimation is that the first indication is only for seven

24   percent of the marketplace.  Seven percent.  And Hikma got 15

25   percent in the first six months.

1      So the concept that there's some sort of a limited

2  launch here -- the word "limited" is in the complaint, but it

3  is not supported and it is belied by the other factual

4  allegations that are in this very same complaint.

5      So, Your Honor, additionally, if Your Honor wants to

6  credit that there's some sort of a transitory delay here,

7  some -- Hikma launched the day after the federal circuit

8  decision, and maybe if you want to credit that it was limited

9  in some way, or you want to credit that DRL claims their

10  launch was limited.  Here you have Hikma launching.  You have

11  DRL launching ten months later.

12      So as our briefs explain, that very limited amount of

13  time is viewed as transitory under the antitrust laws and not

14  actionable.  It is not anticompetitive effect for there to be

15  some limited, non-substantial temporary impact on competition

16  in the marketplace.  And the purported delays alleged by DRL

17  fall squarely within the cases that have found that there was

18  no anticompetitive effect under the antitrust laws.

19      So we discuss these cases in our briefs.  For example,

20  in *Adaptive Power* there was a four to ten month delay in

21  production of a competing product.

22      In *Jane Fine Chemicals* there was a five to nine month

23  delay where there was a complete absence of generic

24  competition.

25      In *Pro Caps* there was a seven month period where the

1    restraint was in place.

2         And in *Williamsburg Wax* it was a whole year.

3         And these courts found that there was no

4    anticompetitive effect in that situation, because what we're

5    looking for under the antitrust laws is something that has a

6    substantial, a market-wide impact, not an impact on the single

7    competitor: an impact on competition.

8         THE COURT:  Isn't the allegation though, Ms. Bass,

9    that it's not just delay, that they continue to be harmed

10   because they're limited in being able to compete with Amarin

11   because they can't get sufficient supply of the API?  Again,

12   I'll have DRL correct me if I'm wrong, but isn't that

13   generally part of their allegation?  That it's not just a

14   delay in any kind of launch.  It's the current state of what

15   they're able to do because they're not able to obtain

16   sufficient supply of the ingredient.

17        MS. BASS:  Well, Your Honor, they were able to line

18   up two suppliers by the point after -- one month after FDA

19   approval.  They were able to launch ten months later.  And,

20   again, we keep coming back to Hikma, but they have no answer

21   to the fact that Hikma launched the next day after the federal

22   circuit resolved the issue.

23        So, again, what we're looking for here is harm to

24   competition across the marketplace, not just harm that --

25   purported harm to DRL.  So I think that that's the key here,

1    if they hadn't made these allegations in their complaint,

2    maybe we'd be assessing a different case.

3         But their own allegations in their complaint show that

4    there is no anticompetitive effect here.  And that is what is

5    really critical.  That's why we don't need to move into

6    discovery to address the issues that we talked about at the

7    top of the argument, because with no anticompetitive effect

8    there can be no antitrust cause of action.

9         And their own facts, as pled, demonstrate that there

10   was no substantial foreclosure here and there was no

11   anticompetitive effect.

12        So what is DRL's final rejoinder?  The final rejoinder

13   is one we talked about a good bit today, that the Court

14   shouldn't decide this issue on a motion to dismiss.

15        Certainly the Third Circuit has no issue affirming

16   district court judges that find --

17        THE COURT:  We're always right.  They're not going to

18   reverse me.

19        MS. BASS:  The complaint should be dismissed when

20   they cannot make out a claim under the antitrust laws.

21   There's no issue there.

22        And certainly that was the case in the recent *Uber* case

23   where the Third Circuit affirmed the district court judge on

24   the finding of no anticompetitive conduct and no antitrust

25   injury.

1    And this is even more of the case when the legal

2  assertions that a party is making are completely belied by the

3  factual allegations in the complaint.  That is what the

4  *Schuykill* case in the Third Circuit tells us.

5    And certainly *Twombly* itself was a Supreme Court

6  affirmance of a dismissal of an antitrust claim that did not

7  cross the line from conceivable to plausible.  And *Trinko*

8  itself was also an affirmance of the dismissal of an antitrust

9  claim that was not anything problematic under the antitrust

10 laws.

11   So the bottom line here is that this is a case where

12 DRL's own allegations show that it cannot plead antitrust

13 injury or substantial foreclosure based on its own objective

14 pleaded facts.

15   Hikma lined up a supplier that was not an Amarin

16 supplier, and DRL lined up two.  Given the facts as pleaded,

17 DRL cannot demonstrate that Amarin locked up supply through

18 its supply arrangements and cannot meet its burden to

19 demonstrate that Amarin's agreements had any sort of concern

20 under the law of exclusive dealing.

21   Your Honor, I wanted to turn to tortious interference

22 and the IPPs, but I want to make sure we've covered all of

23 your questions on the core --

24     THE COURT:  No, I appreciate it.  I know I had some

25 questions, but I do appreciate you responding to them and then

1    going back to your argument.  So thank you.  Do you want to

2    switch to the other claim?

3          MS. BASS:  So that covers the antitrust claim for

4    DRL.  As I mentioned at the beginning, because that claim

5    falls, the IPP and DPP complaints fall as well.

6        So let's discuss a few other kinds of items that are

7    unique to some of the different complaints and make sure that

8    we cover those as well.

9        The first is DRL's assertion that there was tortious

10    interference here.  As we described in our papers, there are

11    multiple flaws with that theory.  The first being that DRL has

12    no plausible allegations that Amarin understood that there was

13    any sort of a contractual relationship or arrangement between

14    KD Pharma and DRL.  That's the most basic fact that needs to

15    be pled in order to plead out a tortious interference claim,

16    and it is not available here.

17        In addition, the plausibility of the allegation that a

18    contract even existed between KD Pharma and DRL is also

19    questionable on the facts as pleaded.  In the complaint, DRL

20    refers to whatever this contractual arrangement is as a term

21    sheet.  Clearly it didn't set the price, because KD Pharma

22    offered a price to DRL, but DRL rejected.  And clearly it

23    didn't set forth the capacity or amount that was to be

24    purchased, because DRL pleads in its own complaint that the

25    term sheet just said something about sufficient capacities

1   would be provided.

2         So there's a question here as to whether or not there's

3   even an actual contract between DRL and KD Pharma that could

4   have been tortiously interfered with.

5         But nonetheless, we're turning to the point I just

6   made.  The real issue here, in addition to no knowledge and in

7   addition to whether there's a contract, is a causation point.

8   Any lack of a relationship that moved forward between KD

9   Pharma and DRL is because DRL rejected the price offer from KD

10  Pharma, not because Amarin tortiously interfered with some

11  sort of a relationship between the two parties.

12        So, again, based off of their own facts pleaded in

13  DRL's complaint, they cannot make out a tortious interference

14  claim here with contract.

15        And their other claim for some sort of interference

16  with prospective economic benefit is even less well pled.  I

17  don't know who these agreements were supposed to be with.  I

18  don't know what we were supposed to have done to interfere

19  with them.  There's absolutely no facts to support that there

20  was any sort of economic benefit that was tortiously

21  interfered with that should be actionable before the Court.

22        So we wanted to just note that the tortious

23  interference claim is completely improperly pled and should

24  not survive this motion to dismiss, again, based off of DRL's

25  own facts as pleaded.

1        So turning to the IPP complaint.  I'm sure Your Honor

2   enjoyed the very lengthy briefing on the IPP state law claims.

3   I will not belabor the briefing, but there's a few key points

4   that we would like to note for the Court because the state law

5   claims obviously required a lot of paper and so we wanted to

6   touch on them for a minute.

7        I mean, the bottom line is that if the federal

8   antitrust claims fall, the IPPs have provided Your Honor with

9   no basis to think that any of their state law claims should

10  continue.  So they have state law claims under antitrust

11  statutes, consumer protection statutes, and common law unjust

12  enrichment.  Here if the federal antitrust claims fall,

13  certainly all of the those claims should fall as well.

14       In addition, as our brief has noted, there are also

15  standing issues with respect to the named plaintiffs here.

16  The plaintiffs are only entities in New York, in New Jersey,

17  yet they're trying to assert a myriad of claims across dozens

18  of states that they don't plead they have any connection to.

19  So they have a major standing problem.

20       And certainly courts within the Third Circuit have

21  noted that there's an Article III standing issue when a

22  plaintiff attempts to assert a claim in a state where it has

23  no connection to that claim.

24       Our briefing also notes that there are a number of

25  state specific type arguments with respect to the indirect

1   purchaser state law claims.  These have to do with things like

2   no allegation of nexus to the state, states not permitting

3   indirect purchaser suits, limiting rights, cause of action to

4   consumers, and states that require deceptive conduct, where

5   none is pled here.

6        I'm happy to answer any questions on the IPPs state law

7   claims, but I think we adequately covered them in our

8   briefing.

9        THE COURT:  I agree and I don't have any additional

10  questions.

11       MS. BASS:  Perfect.

12       One small note of something that was in our complaint

13  that is worth noting here: you know, the IPPs for the New

14  Jersey plaintiffs are only asserting an unjust enrichment law

15  -- claim under state law.  So they have their federal

16  injunctive relief claim, but their state law claim is only an

17  unjust enrichment claim.  And our briefs point out that once

18  they -- you know, they cannot bring a claim under New Jersey

19  law because New Jersey does not permit indirect purchasers to

20  bring suit.  So they have no statutory based claims.

21       And the cases are very clear and consistent that a

22  plaintiff cannot use unjust enrichment as an end-run against

23  that New Jersey statutory pronouncement that indirect

24  purchasers cannot sue.

25       So this is described in our brief, Your Honor, but we

1  wanted to pause on the notion that the New Jersey plaintiffs

2  here have a serious issue with respect to the causes of action

3  that they are asserting.

4        In conclusion, here Amarin submits to the Court that

5  you should dismiss this case with prejudice.  This is a case

6  where DRL has pleaded itself out of its claim.

7        THE COURT:  Well, wait.  With prejudice.  I mean,

8  most of the arguments that you are making is that they didn't

9  have enough allegations; they allege this, but they're not

10 specific enough.

11       I mean, how is that with prejudice?  Why wouldn't I

12 allow -- even if I agree with you, and I'm not saying I'm

13 there, but even if I did, why wouldn't I at least give these

14 plaintiffs an opportunity to cure their pleading?

15       MS. BASS:  Well, Your Honor, they can't take back the

16 allegations they have already pled.  I mean, those --

17       THE COURT:  No, but they can be more specific, right?

18 So, for example, where you're arguing, well, Judge, they pled

19 that the KD Pharma was unreasonable, but they don't give us

20 enough.  They don't say anything more about that, right?

21 That's part of the argument that Amarin has.  There's been

22 more than one occasion where you've taken that position.

23       So wouldn't I, at minimum, even if I agreed with

24 Amarin, allow them the opportunity to provide more specific

25 allegations in the areas that you guys have argued are

1    deficient?

2         MS. BASS:  You can't change the fact that they have

3    pled that they lined up two suppliers by September of 2020 and

4    that they had the opportunity to do -- with KD Pharma and

5    there wouldn't have been any regulatory issues but for this

6    financial issue.

7         So, Your Honor, we would submit that the facts as

8    pleaded mean that they have pled themselves out of the case

9    here, and any sort of amendment that happens will not change

10   those core facts and those core dates that we discussed at the

11   beginning, including the fact that Hikma launched the day

12   after the resolution of the federal case.

13        So because DRL cannot make out such a claim, also the

14   IPPs and the DPPs cannot.  As we discussed at the beginning of

15   the argument, their claims are simply a copycat and derivative

16   of DRL's complaint.  So if DRL's complaint falls, the IPPs and

17   the DPPs fall as well.

18        Thank you, Your Honor.

19         THE COURT:  Thank you.  I appreciate that.

20        Mr. Pak, are you coming up?

21        I mean, Amarin wants your case gone forever.  They

22   don't even want to give you a shot at trying to fix it.  So

23   you're going to try to convince me it doesn't need fixing.

24         MR. PAK:  I heard that.  With prejudice, no less.

25         THE COURT:  I will allow you to present your

1   argument, but expect I may have some questions.

2          MR. PAK:  Yes, Your Honor.  Thank you very much.

3   Chul Pak for Dr. Reddy's Laboratories.

4          Let me just start with what is probably fresh in your

5   mind, based upon some of the things that were discussed by

6   Amarin's counsel.

7          Let's first talk about this concept of launch.  You

8   actually were very astute to note there are different degrees

9   of launch.  There is launch of where you sell one pill.

10  There's a launch where you sell -- ultimately reach the

11  forecast you have of millions of pills, bottles, et cetera.

12  That's what we're talking about.  It isn't just launch.  It's

13  effective launch, plus it's delayed launch, and that's what

14  happened here.

15         Sure, September 2020 we got -- August 2020 we got ANDA

16  approval and immediately we could have started production,

17  ramping up, things like that.  But we found out our principal

18  supplier was not available to us.  And it wasn't just on

19  price, by the way.  They first told us -- and it's alleged in

20  the complaint, paragraph 67.

21         THE COURT:  We're talking about KD Pharma?

22         MR. PAK:  Yes, Your Honor.

23         THE COURT:  What's the name of the company?

24         MR. PAK:  KD Pharma.

25         THE COURT:  Let's talk about KD Pharma for a bit,

1  only because that's freshest in my mind because they were

2  addressing tortious interference.

3        First, in the complaint, where do you allege -- again,

4  I don't have your pleading memorized.  Where do you allege

5  that Amarin even knew that you had an arrangement with KD

6  Pharma?

7           MR. PAK:  It seems to me, Your Honor, there are a

8  couple of places where -- as to the tortious interference.

9  During the course of the patent litigation that Amarin

10 commenced to keep us out of the market -- we defeated that

11 finally and were able to launch -- there are references to KD

12 Pharma there.

13       Second, it's quite likely, Your Honor -- I can't prove

14 this -- but when Amarin walks into KD Pharma's door in 2019,

15 whenever they did that, they say, hey, we want 400 metric

16 tons, even though the U.S. market only demands 450 metric

17 tons, it seemed more likely than not, Your Honor -- we weren't

18 there -- that KD Pharma would have said --

19           THE COURT:  Let me ask you this.

20           MR. PAK:  We had to supply --

21           THE COURT:  Where is it pled?  We're at the motion to

22 dismiss stage.  So have you pled that Amarin was aware of the

23 arrangement that you had with KD Pharma?  I'm saying

24 arrangement, whatever word you want to use.  Contract,

25 agreement, relationship, whatever it may be, and knowing that

1    relationship, they took steps to interfere with it.  If you

2    have that, it's helpful not only for me but for my law clerk

3    to have that on the record during oral argument.  Where in the

4    pleading are you arguing you've sufficiently pled those

5    issues?  I know it's in your briefs, but where is it there?

6          MR. PAK:  If you're asking me literally off the top

7    of my head right now which paragraphs are they, I will either

8    ask my colleagues to hopefully find it during the course of

9    our discussion today, or if Your Honor would permit

10   subsequent.

11         THE COURT:  Have you identified those specific

12   paragraphs in your written submissions to the Court?

13         MR. PAK:  We did, Your Honor.

14         THE COURT:  Well then I'll rely upon that, but what

15   you're arguing is that we did plead that they were aware of

16   the relationship between DRL and KD Pharma.  So this isn't

17   something that wasn't pled in the complaint.

18         MR. PAK:  We think it is pled in the complaint, and

19   we are arguing and saying whether it's constructive notice or

20   actual notice, they knew that we had this relationship with KD

21   Pharma.

22         THE COURT:  All right.

23         MR. PAK:  That was the issue just of launch, whether

24   or not launch happened or could have happened, et cetera.  It

25   seems to me the entire case for them seems to rely on the fact

1    that Hikma and DRL ultimately did find some suppliers.

2         First of all, with respect to Hikma, we have no idea

3    how they did it or what they did, and they, too, could have

4    suffered from the same problem.

5         THE COURT:  Let's talk about your suppliers.  Let me

6    ask you this:  Before we even talk about suppliers, would you

7    concede -- and Ms. Bass identified this issue before she sat

8    down -- that there is case law out there that says delay alone

9    is not sufficient to establish the claims that you are making?

10   Would you concede that point, or you do not agree with that?

11        MR. PAK:  I do not agree with that.

12        THE COURT:  You believe that delay in and of itself

13   is sufficient, but in this case, Judge, you don't have to

14   worry about that because we have more.  We have delay plus we

15   had an insufficient launch plus we currently are in the state

16   in which we are being prevented from competing because of

17   their conduct.  Is that where you are?

18        MR. PAK:  That is correct, Your Honor.  It's alleged

19   in our compliant and their case law as well.  Remember, if I

20   may just explain a little bit, these are generic drugs.  What

21   happens in the industry when a generic drug enters?  It

22   depends on whether you're the first, second, third, fourth, et

23   cetera.  With each new generic entrant, typically prices come

24   down substantially.  And the branded company, Amarin,

25   typically loses sales because patients switch out, doctors

1    prescribe or the patients switch out their generic; they're

2    the equivalent.  So with more generic entry, prices come down.

3    It's not just about Hikma or Amarin -- I'm sorry, DRL, one or

4    the other.  With more generic entry, prices come down.  And

5    with delayed entry, that means consumers don't get the benefit

6    of those lower prices on day one.  Instead they have to wait.

7    So if we were ready in September of 2020 to launch, okay,

8    consumers would have benefited right away from Hikma with

9    lower prices.  Instead we were only able to launch starting in

10   June of 2021.  That's a ten month period.  During those ten

11   months, Amarin, remember, Amarin is the monopolist here.  We

12   allege that.  They don't dispute it.  They control the market.

13   They control all the API.  They control the drug itself

14   downstream.  And in that situation, when you're a

15   monopolist --

16          THE COURT:  Well, they don't control all the API.

17   You had two suppliers, correct?

18          MR. PAK:  Your Honor, that would be a factual issue.

19          THE COURT:  You had to launch with a supplier,

20   correct?

21          MR. PAK:  We allege, and it's in paragraph 114, Your

22   Honor.  We say that those five suppliers at that time, right,

23   were the only available suppliers who could provide API.

24   Sure.  Later, new suppliers can come in in the sense of we can

25   get FDA approval.  The FDA can go visit the factory to see if

1    they can really make the API, and that's what happened.

2            THE COURT:  I'll let you present, but I need you to

3    answer what I need to know.  So, first of all, you say five.

4    Is it five or four suppliers that Amarin secured with

5    exclusive agreements?

6            MR. PAK:  Four originally, and then they took KD

7    Pharma and it's five.

8            THE COURT:  Are you saying at the time that you

9    launched, those five, including KD Pharma, were the only

10   suppliers of the API that could do it at that time?

11           MR. PAK:  When we received approval and were hoping

12   to launch in September, those were the only five that were FDA

13   approved and ready with capacity.  And then when KD Pharma was

14   taken away from us, that is significant because when we

15   applied to the FDA, saying we're going to sell a generic, we

16   have to reference who our API supplier is going to be.  We

17   said that's going to be KD Pharma.  We've been working with

18   them since 2013.  We sent the FDA in.  The FDA approved KD

19   Pharma to be a supplier.

20           So come 2020, now we think everything's ready.  We're

21   ready to go.  We find out KD Pharma is not available to us.

22   They tell us there's no --

23           THE COURT:  Didn't KD Pharma leave DRL hanging, not

24   Amarin?

25           MR. PAK:  Well, that's because Amarin went in and

```
 1   entered into an exclusive contract, saying, hey, we're going
 2   to buy up 400 metric tons of your API.
 3         THE COURT:  Now, was it exclusive?  Because I thought
 4   the reason why you ultimately didn't go forward with KD Pharma
 5   is because they gave you an unreasonable price point that you
 6   said didn't make sense.
 7         MR. SOBOL:  Oh, no, Your Honor.  That's what they
 8   said.
 9         THE COURT:  Okay.
10         MR. PAK:  Our point is they told us they couldn't
11   sell to us.  They also didn't have capacity.  And when we
12   offered them more money, we offered them a higher price.
13         THE COURT:  They still said no.
14         MR. PAK:  They still said no, and they did come back
15   to us.  You pointed out, they came back with a price that
16   basically would have made it uncompetitive --
17         THE COURT:  So they ultimately did do that.  That's
18   what I'm trying to tack down, Mr. Pak, because you just said
19   it was their point.  My point is simply that they ultimately
20   come back to you, but they gave you a price that you said was
21   so unreasonable it was tantamount to not bothering to have any
22   agreement with you at all.
23         MR. PAK:  It's a three-point.  But, yes, Your Honor.
24   It was a three-point.  Price, way too high, unprofitable for
25   anybody to make it.  Two, they said they had no capacity to
```

1    give us API.  Three, they said we don't think we can give it

2    to you because we've got an exclusive with Amarin and there

3    are penalties associated with that.

4         THE COURT:  So at the time that you ultimately get a

5    supplier for the launch -- and, again, I need to understand.

6         So when you ultimately secure a supplier, the supplier

7    of API that you secure wasn't even FDA approved to provide the

8    API at the time that you launched.  You end up securing them

9    later because they had to go through whatever approvals and

10   all the rest of it to get it done.

11        MR. PAK:  In essence, that's correct, Your Honor.

12        If I could just --

13        THE COURT:  Yes.

14        MR. PAK:  With respect to KD Pharma, we were ready to

15   go.

16        THE COURT:  Understood.

17        MR. PAK:  And our ANDA application says we are going

18   to use KD Pharma.  KD Pharma says, no, wrong.  Can't do it.

19   Amarin came in, took your legs out, basically.  So now we have

20   to scramble to go find other suppliers.

21        When you have four -- and those are the ones that we

22   alleged at least had capacity.  But the problem is, one was

23   not FDA approved, and a couple of them -- and all of them,

24   certainly, we did not, quote-unquote, reference in our

25   application.

1       So the FDA now has to -- FDA says to us, you better go

2  find a supplier that is approved as well as the one that

3  you're going to rely on and then you can begin to get supply

4  and start launching.

5       That took months.  That's why we couldn't supply --

6  start until June 2021.  Your Honor, if they were right that

7  suppliers were readily available in September, why would we

8  have waited?  I mean, our whole point was, let's get the drug

9  into the marketplace and compete against Amarin.  That's our

10  business model.

11       If those suppliers were readily available, wouldn't it

12  have made sense for us to do it in October?  Why wait?  We had

13  to wait, though, because of these regulatory problems,

14  capacity problems, FDA problems.  We couldn't start until June

15  of 2021.

16          THE COURT:  Mr. Pak, in your complaint, do you allege

17  that, whether constructively or literally, that Amarin must

18  have been aware of the relationship that you had with KD

19  Pharma?  Because you're telling me that at the time that you

20  were in a battle with them regarding their patent, you had

21  identified KD Pharma as your supplier of API even back then

22  during that litigation.

23          MR. PAK:  Yes, Your Honor.

24          THE COURT:  So how can they say now, well, how do we

25  know they had a relationship with KD Pharma?  You are saying,

1   well, of course they knew.  They were identified as their

2   supplier when we were trying to get approval for the generic

3   drug in the first place.

4           MR. PAK:  Yes, Your Honor.  And we also believe and

5   we did plead this, when they walked into the door of KD Pharma

6   to negotiate a supply agreement, KD Pharma must have said, I'm

7   committed to DRL already.

8           THE COURT:  Because that's what they conveyed to you

9   also, right?

10          MR. PAK:  Since 2013.

11          THE COURT:  We can't move forward with you because we

12  have an exclusive arrangement with Amarin?

13          MR. PAK:  Yes.

14          THE COURT:  Okay.

15          MR. PAK:  Paragraphs 64, 67, 73, 74, 63, various

16  allegations showing that Amarin knew of our relationship with

17  KD Pharma.

18          THE COURT:  Do me a favor, though, because it's

19  helpful for my staff.  Read those paragraphs and read them

20  slower.  I know they're in your papers, but it's helpful

21  because you may have to pay for a transcript but I don't.

22          MR. PAK:  Paragraphs 62, 64, 73, 74.  Well, 63 is

23  about BASF.

24          THE COURT:  And these are paragraphs where you're

25  saying, look, we've identified in their allegations that

1    Amarin was aware of our relationship with KD Pharma and

2    interfered with it.  Those are paragraphs we should be focused

3    on.

4            MR. PAK:  Again, that's -- that's for the tortious

5    interference portion.

6            THE COURT:  No, no.  I got you.

7            MR. PAK:  Just to get to the point of launch versus

8    what's the injury here, remember, that's why it was only

9    starting in June of 2021 that we were able to start selling.

10   And even then, and through the end of 2020 -- and I realize

11   this is outside the scope of the complaint -- we're not

12   getting enough supply of API because of the pre-existing

13   exclusive contracts that Amarin has as well as capacity --

14           THE COURT:  When you said that's outside the scope of

15   the complaint, are you saying you only pled the delay?

16           MR. PAK:  No, no.  We pled the delay and we pled also

17   that our launch, even in June of 2021, was insufficient and

18   not full scale.  I'm just telling you of what I know from

19   10-Qs, 10-Ks, et cetera, from Amarin what has been happening

20   as well as our own sales since June of 2021.

21           THE COURT:  Let me ask you this, Mr. Pak.  If you had

22   KD Pharma, and I know there's a little bit of hypothetical

23   here, but I need to fully understand what at least DRL's

24   position is.  If you never lost KD Pharma and you moved

25   forward with them, even if Amarin had secured the other four

1    suppliers of API, would you have an argument here that there

2    was some problem, or you would have moved forward with your

3    drug, you got your supplier, it doesn't matter that they

4    secured four other suppliers because there was at least one

5    out there that you could work with?

6         MR. PAK:  I haven't tested that literally, Your

7    Honor, but I do believe it is true because DRL is a

8    sophisticated generic drug manufacturer.  They've done this

9    many, many times with many suppliers and other drugs.  They

10   lined up KD Pharma in 2013 and said, they look good.  They

11   have capacity.  They're going to get FDA approval, et cetera.

12   We are going to reference them in our ANDA application.

13        There's a reasonable inference I think from there that

14   KD Pharma would have been sufficient for our needs.  And if we

15   did have KD Pharma with us in September of 2020, we would have

16   launched right then and there.

17        THE COURT:  It's your position that Amarin didn't

18   need KD Pharma; they had sufficient supply of API.  The sole

19   purpose of why they also secured KD Pharma as another supplier

20   was to prevent competition when you guys were going to launch

21   your generic because you wouldn't be able to really do much

22   with it without the active ingredient?

23        MR. PAK:  That is very true, Your Honor.  And

24   remember, another component to this, it's antitrust law as

25   well, but it's also factual.  Throughout this time and leading

1    up to 2020, remember, Amarin is a one-drug company, Vascepa®,

2    the branded version.  That's the only product it has.

3         And it's telling its investors in conference calls and

4    10-Ks, we're the monopolist.  We control supply.  Now, we know

5    generic competition is going to happen some day.  But if we

6    keep API suppliers out of the hands of generic drug companies,

7    we are going to be able to delay that entry.

8         And every month or day in which Amarin is able to hold

9    on to its monopoly position means it earns monopoly profits.

10        So even those ten months, Your Honor, in which we were

11   delayed from September 2020 to June 2021, that's ten months

12   longer that Amarin earns monopoly profits.

13        THE COURT:  Now, let me ask it because, again, I

14   don't have it memorized.

15        Is that alleged in the pleading?

16        MR. PAK:  It is, Your Honor.

17        THE COURT:  All right.

18        MR. PAK:  Of course, then we talked about the law --

19   I'm sorry, they talked about the law.  And as you pointed out,

20   I don't think there's a motion to dismiss case granted,

21   particularly in a pharma case, along the allegations that

22   we've alleged here that says, you're right.  That delayed

23   generic entry, you could have done better.  It's your own

24   fault.  There's been no harm, et cetera.  Exclusive supply

25   contracts are great.  No discovery needed.  Nothing.

1          Just to the contrary.  Third Circuit, Second Circuit,

2    numerous cases talk about the problems of generic -- I'm

3    sorry, of delayed entry and the harm that exclusive contracts

4    can create.

5          And it is important to remember this, Your Honor,

6    because drugs are different from other products in this way.

7    It's -- these aren't fungible in this regard.  You need the

8    API.  Without it, you can't make the drug.  It's not like

9    upstream competition elsewhere where you can go look for

10   another supplier.  There are only a limited number of API

11   suppliers that are available to you at that time.

12         They may become available to you later, but that means

13   during that interim period, no generic competition.  That's

14   why courts really care about this area and say, Third Circuit,

15   Second Circuit, many other circuits, generic drug delayed

16   entry competition, et cetera, anything that the monopolist

17   does to delay that entry can have anticompetitive harm.

18         They said there's no antitrust injuries here.  I find

19   that hard to believe how they could say that.  We brought

20   prices down.  That's what generic drugs do.  So, of course,

21   during the time when we're not allowed to enter, there's harm

22   because but for their anticompetitive conduct, consumers would

23   have had cheaper drugs and cheaper prices.

24         Also, Your Honor, with respect to this field, pharma

25   exclusive dealing arrangements, et cetera, there's particular

1    care paid attention because of that harm.  There's very little

2    doubt within courts that these kinds of things can cause

3    anticompetitive harm and effects.

4         And that's ultimately what we're looking for in terms

5    of antitrust law: the harm to competition, the harm to

6    consumers.  It's a given that delayed generic entry causes

7    anticompetitive effects.

8         Now, in other areas outside generic drugs, you will do

9    much more of a balancing test because it's not so clear

10   whether the competitor that has been foreclosed had other

11   means of getting their product to the marketplace, thereby

12   there wouldn't be harm to competition.

13        THE COURT:  Let me switch gears.  I want to go back

14   to KD Pharma because I don't think this has been tacked down;

15   so I want to hear what you have to say about it.

16        What was the arrangement between DRL and KD Pharma?

17   Was there a contract?  Was there an agreement?  What was the

18   relationship that you're alleging there was tainted or

19   tarnished or interfered with by Amarin?

20        MR. PAK:  There was a written document, a term sheet.

21   It laid forth what the obligations were going to be.  That was

22   done in 2013.  Afterwards, we got the FDA approval --

23        THE COURT:  Let's stay there first.  So there was a

24   term sheet that had some terms on there between DRL and KD

25   Pharma.

 1          MR. PAK:  Yes.

 2          THE COURT:  And that talked about what?  Supplying

 3  API if you get your generic drug on the market?

 4          MR. PAK:  Price, quantity, yes.

 5          THE COURT:  And was pricing part of that?

 6          MR. PAK:  I'd have to look at the contract.  I

 7  thought it was, Your Honor.  And I think it's alleged that

 8  it's set forth in there with respect to price and quantity, or

 9  at least expectations, goals.

10          THE COURT:  Did you understand that to be an

11  agreement between the parties?  That's something that was

12  binding on KD Pharma?

13          MR. PAK:  Certainly, Your Honor, because we went --

14  we filed the ANDA application.  We thought we were going to go

15  to market.  When Amarin sued us for patent infringement to

16  keep us out of the market, we fought it because we wanted to

17  come into the marketplace.

18          THE COURT:  What, if any, action did DRL take against

19  KD Pharma when they decided to say, nah, we're good to go,

20  we've got another buddy over here that we're going to work

21  with?

22          I'm trying to understand the story here.  If you tell

23  me that I'm DRL and I've got a relationship with KD Pharma,

24  and then when I finally get my drug ready to launch they go,

25  sorry, we're going to go work with these guys.  I'd be pretty

1    angry about that, and I'd probably take some legal action.

2         So what I'm trying to figure out is what am I missing

3    in this story?

4         MR. PAK:  That's why I'm hesitating as to whether I

5    can reveal what happened or not because of --

6         THE COURT:  Okay.  Fair enough.  You may be

7    prohibited from disclosing that answer to my question.  Is

8    that what you're telling me?

9         MR. PAK:  Can I ask my colleague, Mr. Sobol?

10        THE COURT:  And by the way, if the answer is, Judge,

11   I want to answer your question, but I don't know if I'm able

12   to because there may be some confidentiality, just let me know

13   that.  I'm not trying to put you in hot water.  I'm --

14        MR. PAK:  That's why I'm being cautious.

15        MR. SILBER:  Your Honor, Seth Silber from Wilson

16   Sonsini.

17        As you suggested, it was a significant issue for my

18   client to raise.  We did raise it.  We did resolve it.

19        THE COURT:  Understood.  All right.  That's

20   sufficient for me.  I just want to get a picture of the story.

21        It was your position that there was an agreement that

22   they had obligations for and whether that is resolved and how

23   it is resolved is irrelevant.

24        What your position is, at least for purposes of this

25   litigation, is that Amarin was aware, that they knew of it and

1    they interfered with that relationship.  That's part of your

2    allegation.

3          At least on the tortious interference side with respect

4    to the antitrust claims, your point about that is, hey, they

5    had four and they took the fifth supplier.  And at that point,

6    they were well aware of who was in the market to supply the

7    ingredient at the time you were able to launch.  They knew it;

8    they did it for that reason; we were stuck.

9          And part of our delay was trying to find a supplier

10   that could get through all those approvals and only those five

11   suppliers had at the time of the launch.

12             MR. PAK:  That's right.  Without incurring more

13   delay.

14         And as to the point about the relationship with KD

15   Pharma and where we stood, we were ready, willing, and able to

16   enter the marketplace and launch.  We fought the patent

17   infringement suit, we got ANDA approval.  We were ready to go.

18   We had a supplier lined up, FDA approved.

19         We thought they had enough capacity.  So we were good

20   to go.  And it's because of Amarin's conduct, its exclusive

21   arrangement, that torpedoed us, cut --

22             THE COURT:  How do you allege how Amarin was able to

23   take KD Pharma from you?

24             MR. PAK:  Well, I think, Your Honor, that will be

25   part of the discovery that we would want to see, both from

1    Amarin -- we definitely want to see from Amarin's perspective.

2    Did they see growth?  Or as they said throughout their 10-Ks,

3    they were fearful of the impact of generic competition --

4            THE COURT:  I understand their position.  I guess

5    what I was trying to say, in the pleading, do you allege how

6    Amarin was in a position to do that?  Are you saying that,

7    look, because they weren't the generic drug, they had been on

8    the marketplace for some time, they were in a position to

9    offer more to KD Pharma than we were as a generic drug to

10   launch?

11           I mean, how did they get them from you?  Or is that

12   even alleged in the pleading?

13           MR. PAK:  Well, I mean, it's alleged in the sense

14   that KD Pharma -- that Amarin was afraid of generic entry.

15   They knew that API suppliers were limited and were the key.

16   And throughout their 10-Ks that's alleged in our complaint,

17   they said we've got things lined up with suppliers so that API

18   supply will be a problem for generic competition.  It's in our

19   complaint.

20           THE COURT:  No.  No.  That's their intent of why they

21   wanted KD Pharma.  I understand that.

22           Do you allege how KD Pharma ended up going to them?

23   What was the incentive for KD Pharma to walk away from you

24   guys to go to Amarin?  Or again, is counsel coming up here to

25   say you can't answer that.

1        And by the way, if that's the case, that's fine.  But

2   what I'm trying to figure out is if you're going to allege

3   Amarin interfered, how were they able to interfere?  What did

4   they do to get KD Pharma to walk away from DRL?

5            MR. PAK:  There are things like minimum purchase

6   obligations that Amarin would agree to.  In other words, we're

7   going to give you money no matter what at a certain price.

8   Those kinds of things are alleged in the complaint.  There

9   were financial inducements that Amarin provided to KD Pharma.

10           THE COURT:  Hold up.  Counsel's coming.

11           MR. PAK:  Paragraph 73.  KD Pharma disclosed to us

12   that they had a binding order for three years from Amarin.

13       By the way, Your Honor, three years exclusive supply

14   contracts, exclusive dealing agreements, if they're, like, for

15   a year, okay, they're short-term; courts might say that's not

16   harmful to competition.  Three years, that's a long time.

17       That can have a durable, harmful effect on competition.

18           THE COURT:  We're not in The Godfather.  You're

19   saying they gave KD Pharma an offer they couldn't refuse.

20           MR. PAK:  They couldn't refuse.

21           THE COURT:  All right.  I got it.

22           MR. PAK:  Paragraph 73, 74 and 75 talk about some of

23   the terms.

24           THE COURT:  All right.

25           MR. PAK:  That induced that.

1        So let me make some other points while I have the

2   stand, Your Honor, about that issue.

3        As you pointed out, we think we put forth a very

4   plausible claim with factual allegations, as the Supreme Court

5   says, within a heft to sustain this antitrust claim.  You

6   pointed out a lot of this in terms of what Amarin is saying is

7   he said-she said.

8        We state a claim of exclusive arrangements; they admit

9   these are exclusive arrangements that foreclosed competition.

10  Foreclosed not a little bit.  100 percent.  Because all the

11  API suppliers that were FDA approved and ready to go at that

12  time were locked up.  That's the allegation.

13       All right.  So that's 100 percent foreclosure.  That

14  means there's going to be harm to competition.

15            THE COURT:  How was the other company able to launch

16  then?

17            MR. PAK:  That's Hikma.  I don't know.  They --

18            THE COURT:  I know.  Just take a step back.

19       If you're going to come in here and say all of the API

20  suppliers at the time were locked up, how did that other

21  company launch, if they had no supplier?

22            MR. PAK:  Hikma may have had one of those and had a

23  small amount and therefore they had delayed entry --

24            THE COURT:  But you are saying there's no possibility

25  that there was another supplier other than those five.  In any

1   kind of logic, without knowing what Hikma did, it would have

2   to be they must have been working with one of those five?

3           MR. PAK:  I don't know.  Hikma may have had its own

4   exclusive supply contract with somebody else.  I just don't

5   know.

6           THE COURT:  But then doesn't that take away from your

7   point that these are the only five suppliers of API if you're

8   saying it's possible Hikma had a sixth?

9           MR. PAK:  But if Hikma had a sixth that was

10  exclusive, that's not available to us anymore then.  Right?

11  Amarin had five.  And those were the five that were available

12  and had capacity and we think were capable of supplying at

13  some point.

14          Now, was there a seventh, eighth, ninth, that to me,

15  Your Honor, seems like a question of fact.  But as far as we

16  knew, the only ones that had capacity and could reasonably

17  supply at some point, assuming FDA approval, it was five --

18          THE COURT:  I got it.

19          MR. PAK:  Okay.  There's a lot of this factual

20  disputes about here's our story.  They don't like our story.

21  They want to put in new sets of facts; and therefore -- but

22  that's not permissible on a motion to dismiss.

23          And if you see the law, Your Honor, lots of cases in

24  this arena are saying, for purposes of a motion to dismiss,

25  this kind of delayed entry, exclusive arrangements, you don't

1   throw out a case there.  You need discovery and you -- at

2   least into summary judgment.  And a lot of those cases also

3   say when you're a monopolist --

4          THE COURT:  You know, how -- I see that in the

5   papers, too.

6      How is this a summary judgment case?  If there's all

7   these factual disputes, they're not going to exist at the end

8   of this rainbow.  Somehow, by the end of discovery, the

9   parties will all miraculously agree on the facts.

10         MR. PAK:  Actually --

11         THE COURT:  I've never seen a case like that.  If you

12  guys want to convince me.  I mean, this is one of those cases,

13  either as a matter of law it's going away or it's very likely

14  going to be in the courtroom.  No?

15         MR. PAK:  No, Your Honor.  I think their documents,

16  their internal documents, will tell us a lot --

17         THE COURT:  All right.

18         MR. PAK:  -- as to what they were thinking, and this

19  is not about intent.  It's about their understanding of the

20  marketplace and why they decided to go after these five

21  suppliers and lock them up.  We think they knew the impact

22  that would have on competition.

23         THE COURT:  You know, Mr. Cecchi wants to go to

24  trial, and you're now saying that this case may be ripe for

25  summary judgment.

1          I'll get to you, Mr. Cecchi.  You've got a moment.

2          But you know that he's about to argue against that,

3   right?  You're all sitting at the same table.

4          I mean, he wants a trial next week and you're telling

5   me it may be ripe for summary judgment one day but not at this

6   stage.  All right.

7          MR. PAK:  I only have a sense, Your Honor, from prior

8   cases in representing both brand companies and generic

9   companies.  And I know the way they think and the way they

10  write and what is -- the dynamics of what's happening.

11         And what's very clear is that because of the harm that

12  inherently results from keeping generic drug companies out of

13  the marketplace, that's an anticompetitive effect.  There is

14  nothing procompetitive out of the marketplace, if you're

15  engaging in certain types of conduct that forecloses those

16  generic drug companies from getting access to key API.

17         THE COURT:  I appreciate that.

18         MR. PAK:  And it is the significance of knowing that

19  anticompetitive harm is likely, Your Honor, that courts tell

20  you do the discovery, let's see what happens.  Because -- a

21  lot of antitrust cases, Your Honor, it's really one competitor

22  complaining about another competitor and it's not clear that

23  there's anticompetitive harm.

24         Generic drug entry delayed is, in fact, anticompetitive

25  harm, because consumers are denied access to those cheaper

1   drugs.  And the monopolist, the branded company, has every

2   incentive to keep generic drug companies out of the

3   marketplace.  They will engage in multiple tactics to make

4   that happen.  And many courts have said, at a minimum, that's

5   for summary judgment and many have also said that's wrongful

6   conduct.

7        I think that's it for me, Your Honor, unless you have

8   certain questions.

9        THE COURT:  I appreciate that, Mr. Pak.

10        MR. PAK:  Thank you, Your Honor.

11        THE COURT:  Ms. Bass, you want to come back up, but

12   let me see because I don't know if the DPPs and the IPPs want

13   to add something.

14        So Mr. Sobol, all right.  Here we go.

15        Let me hear from them, and then obviously I will give

16   you an opportunity.

17        I will tell you all, though, before I conclude today I

18   am going to want to recess for 10 minutes.  I want to collect

19   my thoughts just to make sure that if I have any additional

20   questions, that I strike today while I've got everybody here.

21        So I will likely recess for ten minutes or so, collect

22   my thoughts with my notes with my staff, make sure I don't

23   have anything outstanding that I want to raise with either of

24   the parties.  And that way I get a full experience from your

25   argument as well as you guys.

1          So just to give you a heads-up, we'll take a break

2     probably soon, but I don't want to cut off Mr. Sobol.

3          MR. SOBOL:  Thank you, Your Honor.  Mr. Sobol for the

4     indirect purchasers.

5          I'm going to try to make this fairly quick, but I first

6     want to see what I can do to give a little bit of generic

7     entry 101, if I may.  A paragraph or maybe a paragraph and a

8     half.

9          And the reason I do that is because the issue before

10    you in large part is what's substantial foreclosure of the

11    market?  Right.  Well, obviously, substantial foreclosure of a

12    market might be different for automobiles that are new or old;

13    it might be tuna on the dock in Gloucester.  And it's

14    certainly different for pharmaceuticals.

15         And since you have acknowledged in other situations

16    that you may not be as familiar with this, let me just give

17    this very brief background.

18         THE COURT:  Sure.

19         MR. SOBOL:  Okay.  So there's -- the reason you see

20    so many of these drug cases is that there's a phenomenon

21    called "monopoly to commodity" overnight here.

22         So the way that the statutory and the regulatory system

23    and the economics work is that there are periods of

24    exclusivities that are given to brand companies.

25    Exclusivities might be a patent exclusivity.  It might be a

1    new chemical exclusivity where you developed a new active

2    pharmaceutical ingredient so that you are allowed to be on the

3    market for a period of time there.

4         It might be pediatric exclusivity.  There are all these

5    government-created periods of time during which there's the

6    potential for monopoly power given to the brand company.  And

7    then it's supposed to end.  That's on the brand side.

8         What's also interesting here is that the generics have

9    a product which by law is the same as the brand drug.

10   Literally the same as.  And, therefore, because you've got

11   these two dynamics and you've got overlay on that, other

12   things, like automatic substitution by the state laws, that

13   kind of thing.  When a drug goes generic, even if it's only

14   one generic, that drug goes from monopoly to commodity in

15   months, 80 percent.  And we plead that.  We plead all this

16   boring stuff at the beginning of the regulatory section of our

17   complaint, but it's important to understand.

18        And so not only do you see, then, when even just one

19   generic comes on the market that there's this huge movement

20   over from the branded company to the -- to the generic

21   within -- you know, many drugs, even within a month, right.

22        Then you also see prices.  So the brand price is up

23   here.  When the first generic comes on, if they're the only

24   generic come on, well, they'll dip it down somewhat, but

25   they're going to milk it for a period of time.  Once you get

1  multiple generics, the price is down here.  And that's just

2  what happens.

3        So now that's the first thing I wanted to identify.

4        The second thing regulatory-wise is that in order for

5  the generic to enter the market, the generic has to have an

6  active pharmaceutical ingredient supplier that has an approved

7  drug master file, an approved DMF, and that that DMF is

8  attached to their ANDA.  Pretty straightforward.

9        Now, what do we allege, therefore, happened here by way

10  of foreclosure, just so that we can make sure it is clear that

11  there is, in our view, from our allegation, substantial

12  foreclosure.

13        As to Hikma, paragraphs 139 through 144 of our

14  complaint, they were delayed from May 2020 to November 2020

15  completely.  And then, even by July of 2021, so that's another

16  eight months or thereabouts, but it's a full year after there

17  has been generic -- there should have been generic entry.

18  Hikma only had nine percent of the market by way of unit sales

19  rather than 80 percent.  So the delta there is 71 percent.

20  That sounds like substantial foreclosure to me.

21        As to DRL, paragraphs 145 through 150, we allege that

22  DRL should have and would have gotten onto the market in

23  August of 2021, when it got its final FDA approval, but

24  instead was completely blocked until June of 2021.  And we

25  also allege that even as late as August of 2021, with both of

 1   those generics now on the market, there's only 12 percent

 2   penetration when there should have been 80 percent.  And

 3   that's why we say that there was substantial foreclosure.

 4          Now, if I were a busy Article III judge, and I hope

 5   never to be one, I would --

 6          THE COURT:  I don't know where this is going; so I'll

 7   caution you now, but I'm going to let you finish that

 8   sentence.

 9          MR. SOBOL:  I would try to find the one-stop shopping

10   where the law is laid out that would help --

11          THE COURT:  I thought you were going to say dismiss

12   the case, and that's one case off the docket.  You should go

13   sit next to Mr. Baton and Ms. Bass over there.

14          MR. SOBOL:  I would say mark the case up for trial

15   because you'd want to see Mr. Hester as defense lawyer

16   handling things.  He's quite good.

17          So I would go to the *Fresenius* case that's been cited

18   by the parties, 841 Federal Appendix 399 at Footnote 12, and

19   Footnote 12 provides you all the case law you need because it

20   cites all the prior Third Circuit cases.  And this is a

21   footnote in the Third Circuit case and it tells you what

22   substantial foreclosure is.  It tells you what we have to

23   prove: three things, substantial foreclosure number one, which

24   I'll trim back to in a second.  Second, likely or actual

25   anticompetitive effects.  Well, that we have absolutely writ

1    large, because as Mr. Pak pointed out, if you delay generics

2    even a day, you have your delay substantial -- that's a

3    substantial price effect.  And third, if the conduct is by a

4    monopolist, that's uncontested here.

5           So then going back to what this footnote tells us, what

6    we look at, what are the things that we look at for this

7    particular decision?  One is look at industry practices.

8    Well, we plead in our complaint that a brand company lines up

9    two suppliers and that exporting, if it alines up, five.

10          Second, you look at whether generics have bona fide

11   opportunities to be able to enter the market.  Here we plead

12   that the known DMFs that were approved at the time of the

13   final approvals for each of these two generic companies have

14   been hoarded by the defendant Amarin because of the approved

15   DMFs.

16          We also plead that it takes time to be able to either

17   have somebody else get an approved DMF, and/or even if they

18   have an approved DMF, get that DMF attached to your ANDA.

19          That footnote also says that there are lots of wildly

20   factual disputes in these things, particularly about the

21   viability of other sources.  That's the word it uses.  It then

22   cites the *Geneva* Second Circuit case, which was a case much

23   like this one, showing where the Second Circuit reversed a

24   grant of summary judgment for a defendant because there were

25   factual issues.  The Third Circuit points to that case and

1    said in that case, I'll point out, had a period of delay that

2    was only one year.  Here we have pled that the lasting effects

3    because this market is completely depressed.

4         To conclude, this is housekeeping.

5         THE COURT:  Okay.

6         MR. SOBOL:  The remarks -- there have been several

7    remarks that were under seal that have been before you.

8    They're all the good, interesting stuff, like, you know, what

9    happened with the supplier right on the eve of DRL,

10   particularly DRL's paragraphs 73, 74, the discussions

11   regarding the buying up the metric tons, i.e., buying up 90

12   percent of the market from one manufacturer, even though you

13   already have four other DMFs lined up.  So there will have to

14   be some cleaning up of the record, Your Honor.  These are my

15   remarks.

16        THE COURT:  I think for now we agree that the

17   transcript of today's proceedings will be sealed.  Counsel can

18   review and confer and circle back.  I appreciate your

19   comments, Mr. Sobol.

20        MR. ROBERTS:  Your Honor, Hi.  I'm Michael Roberts.

21   I represent KDH and the Direct Purchaser.  Thank you.

22        THE COURT:  Good to see you.

23        MR. ROBERTS:  Nice to be here.

24        THE COURT:  Do you like this strategy I have?  That

25   in the middle of lunch I'm pushing you guys through without

1  eating or taking a break.  I will last longer than you, I

2  promise.  I don't even eat.  We're machines over here.  I see

3  some eyes fading.  It doesn't bother me at all.  We're going

4  to push right through this argument.  Then we're going to

5  recess.  I'm going to see you back in ten minutes if I have

6  questions.  Then I'm going to let you all go home.

7        Go ahead, Mr. Roberts.

8        MR. ROBERTS:  Your Honor, I have about 45 minutes and

9  I'd like to reserve 15 on the end.

10        THE COURT:  Woah.

11        MR. ROBERTS:  Just kidding.  About five minutes, Your

12  Honor.

13        THE COURT:  Of course.  I'm happy to hear from you.

14  I don't want to cut you off.  I do know there's a lot of

15  overlapping issues.  To the extent you want to highlight

16  anything in particular for your particular plaintiffs, let me

17  know.  I know there's a lot of overlap.

18        MR. ROBERTS:  Your Honor, I will not touch any of

19  the issues that have already been discussed other than to say

20  that I agree with my colleagues.

21        There is one issue that is unique to KPH and that is

22  that of standing.  The defendants raise that in their motion

23  to dismiss, and briefly I'd like to address it.

24        Your Honor, there's no dispute that KPH has standing,

25  Article III standing, to bring this lawsuit.  Even the

1   defendants don't dispute that.  What they are trying to do is

2   conflate the language of the assignment, the assignment which

3   is attached to Mr. Baton's declaration.  That assignment is

4   between KPH and McKesson.  McKesson is the assignor, KPH is

5   the assignee.

6        If you look very closely at that language, which they

7   -- which they emphasize in their brief, you see very clearly

8   that the language does not indicate or say what they want it

9   to say.  Paragraph one of page two of that assignment, Your

10  Honor, states -- and I'm just going to read it to you, if

11  that's okay, Your Honor.

12        THE COURT:  I'm happy for you to do it, and that will

13  be helpful for me and my folks.

14        MR. ROBERTS:  Here it goes:  McKesson hereby conveys,

15  assigns, and transfers to customer 100 percent of all rights,

16  title, and interest, and to any antitrust cause of action it

17  may have against manufacturers, suppliers, and under the laws

18  of the United States or any state:  A, so long as the cause of

19  action is the manufacturer's -- is that the manufacturer

20  unlawfully delayed or frustrated the introduction or sale of

21  generic Vascepa®.  And, B -- this is the operative language --

22  only to the extent that the cause of action arises from

23  McKesson's purchases of Vascepa® that were subsequently resold

24  to customer during the period from November 1st, 2013, through

25  the date of this assignment.

1      Subparagraph B of that paragraph 1, Your Honor,

2   highlights -- or limits the assignment only to the extent that

3   the cause of action arose during the time period that the two

4   parties were doing business.  At no place in this assignment,

5   especially this paragraph, do the parties limit the relief

6   that could be brought.  For example, here's a hypothetical.

7   You take a personal injury plaintiff who's involved in a car

8   wreck, has brain injury.  Of course the cause of injury

9   occurred on that date, but the relief is not limited.  It's

10  the exact same in this particular instance, Your Honor.

11      And that's the plain language of the assignment, Your

12  Honor.  They're trying to conflate the language.  If it had

13  said -- if it had said only to the extent that the relief

14  arose during that time period from November 13 through the

15  date of this assignment, which was in June of '21, that would

16  be a whole different story.  But it didn't say that.  They're

17  trying to rewrite the assignment.

18      So, Your Honor, that's my point on the assignment.  Of

19  course, we have Article III standing.  Of course, the case law

20  that we've cited in our brief allows for amendments, even if

21  you were to adopt their argument.  But I don't think you even

22  have to get there, Your Honor.  The assignment is clear.

23  That's all I have.

24      THE COURT:  Thank you, Mr. Roberts.  I appreciate

25  your time.

1          MR. ROBERTS:  Thank you.

2          THE COURT:  Anyone else from plaintiffs' side of

3    things, or anything we're missing?  We're okay?

4          MR. CECCHI:  We're done.

5          Judge, in the spirit of Mr. Sobol's one-stop shopping

6    on the state law issues, which were very briefly mentioned by

7    Amarin, I would just refer Your Honor to Judge Linares'

8    decision in *Liquid Aluminum Sulfate*.  I would ask Your Honor

9    not to tell Judge Linares that I referred to one of his cases.

10   Thank you.

11         THE COURT:  All right.  I presume that's in the

12   brief, too?

13         MR. CECCHI:  It is.

14         THE COURT:  I appreciate you identifying it on the

15   record.

16         Ms. Bass?  I apologize.  I may have called you Ms.

17   Barns earlier.  I want to apologize for that.  I can't read my

18   own handwriting sometimes.  You guys want a little bit of

19   rebuttal on some of these points, and I will hear from you so

20   you can complete your record.

21         MS. BASS:  Thank you.  So, Your Honor, there's four

22   points that I would like to address on rebuttal.  So to begin

23   with, in the DRL presentation and also in the IPPs

24   presentation, there was a good bit of discussion about this

25   conception of monopoly to commodity overnight and Amarin being

1    a monopolist and the benefits of generic drug competition in

2    the United States.  But there's a couple of facts, as pled in

3    the complaint, that demonstrate that this case is not like

4    most cases.

5         And the first is that the generics here only have

6    approval for Amarin's first indication.  That is a small

7    fraction of the marketplace.  The generics DRL and Hikma

8    didn't have approval for the second indication.  They carved

9    it out of their label.  So this concept that once the generics

10   entered they should have taken some vast amount of the

11   marketplace, I think 80 percent was the number that was

12   suggested, simply on the basis of studies that had been

13   published before and other experiences that do not translate

14   here based off of the actual facts as alleged in the

15   complaint.

16        As I mentioned before when I was up here, in the DPP

17   complaint, at paragraph 87, at footnote 84, there's an article

18   where the amount of the first indication is estimated to be

19   seven percent of the Vascepa® sales.

20        So, again, I think based off the complaint, the facts

21   as pleaded in the complaint and this press article that was

22   cited in their own complaint, it's very important to

23   contextualize that this case is not like a normal generic

24   competition case.

25        We also take issue with the concept that the generics

1    have somehow driven price competition here.  They didn't plead

2    anything about their own pricing, the generics pricing in the

3    complaint.  Certainly there's no comparison of net-to-net

4    pricing or anything of that nature.  And the cases where they

5    have pointed you to where they claim that there were issues

6    with supply agreements are ones where there was extreme price

7    increases that were taken.  In the *Fera* case the price was

8    increased by a thousand percent.  In the *Fresenius Kabi* case

9    the price was increased by 26,000 percent.

10         So the concept here that there's monopoly pricing, or

11   something of that nature, is not supported by the factual

12   allegations.  So that's one thing, Your Honor.  There were

13   various times where various things were said in the arguments

14   before you, but when you check the facts in the complaint

15   they're not there to support that notion.  Indeed, there's no

16   allegation that DRL brought the price down because when DRL

17   filed their complaint they hadn't even yet launched.

18         So the second point that I wanted to discuss was the

19   concept that there are differing kinds of launches.  That's

20   where we started out with the DRL discussion.  And maybe

21   launches can be limited and maybe they won't be kind of the

22   full launch that a generic competitor might desire.  One thing

23   that wasn't touched on in that argument is BASF.  BASF is one

24   of the competitors that they claim that we locked up.  Yet

25   with BASF, DRL's own complaint, at paragraph 114, said that

1    BASF has sufficient capacity to support a timely launch

2    without having first to expand capacity.

3        So, again, the concept that there's some sort of a

4    limitation on the launchability here is belied by their own

5    allegations that are in the complaint.  BASF is a supplier

6    that agreed to supply DRL in September of 2020, and their own

7    allegations say that there was no limitation on the amount

8    that BASF could provide in a launch.  So there's no allegation

9    of some sort of a limited supply issue with BASF.

10        The third issue is the KD Pharma knowledge issue.  I

11   wanted to go back to that.  What's actually pled in the

12   complaint is that the information was known to Amarin that

13   there was a contractual relationship between KD Pharma and

14   Amarin because of documents that were produced in the patent

15   case.  Now, it won't surprise Your Honor that there was a

16   protective order in place in the patent case and that any such

17   references would have been limited in the patent case to only

18   certain individuals and that information could only be used

19   for the purpose of the patent case.  DRL makes no well-pled

20   allegations of who at Amarin supposedly violated the

21   protective order and translated that information over to the

22   commercial group so the commercial group could go launch

23   this --

24        THE COURT:  Let me ask you this.  Is it Amarin's

25   position that you came to an agreement with KD Pharma and had

 1   no clue that KD Pharma and DRL had a relationship?  Is that

 2   the position of Amarin?

 3          MS. BASS:  There are no well-pled facts.

 4          THE COURT:  I'm asking.  Your position is that, or

 5   your position is they didn't plead that?

 6          MS. BASS:  It's both, Your Honor.  So the allegation

 7   here is that there was some sort a breach of information in

 8   the patent case and that that information then was used to

 9   then disrupt the relationship with KD Pharma and with DRL.

10   That's not plausible and it didn't happen.

11          THE COURT:  They alleged that you were aware of the

12   relationship.  I guess let me ask it a different way because I

13   think I confused myself.  They allege that Amarin was aware of

14   the relationship that they have with KD Pharma before you guys

15   entered into whatever arrangement you did with that company.

16   Is it Amarin's position that that's not true?  Although we're

17   at this stage, don't you have to accept that as a true

18   allegation regardless because we're at the pleading stage?

19   Don't you have to say, look, they've alleged that we were

20   aware of the relationship?  For purposes of our motion to

21   dismiss, Judge, we don't agree with it but we'll accept it as

22   true for today's purposes.

23          MS. BASS:  The basis of that is the documents were

24   disclosed in the patent action and that the individuals that

25   got the documents violated a protective order and transmitted

1    that information to someone at Amarin.  So --

2         THE COURT:  Mr. Pak, is that your position, that they

3    violated a court protective order and that's how they learned?

4    That seems like a pretty strong allegation to make.

5         I don't mean to cut you off, Ms. Bass, but I want to

6    tack that down.

7         In the pleadings, how are you alleging Amarin is aware

8    of the relationship that DRL previously had with KD Pharma?

9         MR. PAK:  Your Honor, two ways.  Again, that

10   information being out there during the course of the patent

11   litigation.  But also paragraph 74, I was looking at it again.

12   It says:  Finally on September 11, 2020, KD Pharma confirmed

13   in a call with DRL that Amarin is the customer that had placed

14   the binding order and had blocked all of KD Pharma's capacity

15   for the API.

16        THE COURT:  So where in paragraph 74 does it say when

17   they did that with KD Pharma they were aware that KD Pharma

18   had a previous relationship with DRL?

19        MR. PAK:  Your Honor, that specific fact is not --

20        THE COURT:  That paragraph says they went to a

21   company they're working with and said, hey, just so we're

22   clear, when you work with us, you don't get to work with

23   anybody else.  But that paragraph doesn't say, by the way, we

24   know you had a prior relationship with DRL.  They're done.

25        So what I'm trying to figure out -- and Ms. Bass is

1    making this point; so I want to tack it down.  Are you

2    alleging that Amarin learned of the relationship solely

3    because of the patent litigation, which they would have been

4    in violation of a court order?

5              MR. PAK:  I don't think -- Your Honor, in terms of

6    what's pled, yes, it's part of that.  We don't claim any kind

7    of breach of confidentiality.  We don't know what happened

8    there.  But it seems to me not much of a stretch to infer from

9    the allegation that KD Pharma told us that it was Amarin who

10   had locked them up for the next three years, that KD Pharma

11   did not tell Amarin we have a contract since 2013 to supply

12   DRL.  I'm not in the room, Your Honor.  Again, seems to me

13   discovery would show whether or not that was true or not.

14             THE COURT:  I don't want my record muddied up.

15   Correct me if I'm wrong: there's no allegation that someone

16   violated a protective order --

17             MR. PAK:  No.

18             THE COURT:  -- in learning of a relationship between

19   DRL and KD Pharma, correct?

20             MR. PAK:  There's no suggestion.

21             THE COURT:  Ms. Bass, the only reason why I

22   interrupted is because I didn't want that in the record if

23   that's not the position they're taking because I don't see why

24   we would have an allegation like that, which would be more

25   problematic than what we're discussing.

1          I appreciate that, Mr. Pak.  I'm going to let Ms. Bass

2    continue.  I wanted to tack that down.

3          So it's my understanding, at least from the

4    representation made by DRL now, they're not alleging any

5    violation of a protective order, but I'll let you continue.  I

6    know Mr. Hester has something because he just handed it to

7    you.

8          MS. BASS:  Well, paragraph 171 is the paragraph that

9    says, through discovery and Amarin's patent litigation with

10   DRL, Amarin is aware of DRL's reference of KD Pharma's DMF and

11   its ANDA and its contractual relationship with KD Pharma.

12         That would have been a breach of the protective order,

13   and that's the basis upon which they claim we tortiously

14   interfered with whatever relationship existed between KD

15   Pharma and DRL.  So counsel can say that they're not alleging

16   that there was a breach of a protective order, but that's the

17   allegation upon which they base their tortious interference

18   claim.

19         THE COURT:  So let me ask you this.  They have that

20   statement in the pleading.  You accept it as true that you've

21   learned of it at least through that.  I guess what's your

22   argument?

23         MS. BASS:  The point we made in the papers, that it's

24   not plausible that that's a factual allegation that someone at

25   Amarin breached a protective order, gave the information to

1   someone in the commercial group --

2          THE COURT:  How is that before me, the protective

3   order and what the breach would be?  Is that part of the

4   pleading?  Because I don't have any evidence of that.  I don't

5   know, based on that paragraph and based on the pleading, that

6   everything you're saying is even part of that narrative.

7          MS. BASS:  You have the fact that counsel just said

8   they have no basis to believe that the protective order was

9   violated.  So they made an allegation --

10          THE COURT:  I don't have the protective order.  How

11  do I know what it protects?  You're saying the protective

12  order specifically protects that KD Pharma was a supplier of

13  API for DRL, correct?

14          MS. BASS:  Yes.  The --

15          THE COURT:  We're arguing facts outside of the

16  pleading because I have no idea about that.

17          MS. BASS:  Your Honor, in order for them to make out

18  a tortious interference claim, they need to plead that someone

19  at Amarin, an actual person, had knowledge.

20          THE COURT:  They do.  They plead Amarin was aware of

21  the relationship and we plead that they interfered with it.

22  And we also spoke to KD Pharma and they told us Amarin said

23  this to them.

24          MS. BASS:  They said they entered into a contract

25  with us.  There's nothing that says KD Pharma said to say, oh,

1   we told Amarin that we were working with DRL, and on that

2   basis then Amarin said, okay, we want to enter into a supply

3   agreement for the next X number of years.

4          THE COURT:  They do allege that you guys were aware

5   of the relationship through the discovery of the patent

6   litigation.

7          MS. BASS:  Yes, Your Honor, but there's cases that

8   say that a Court will not take lightly the inference that in

9   order to make out a claim there has been a violation of a

10  protective order, and we cite cases to that effect in our

11  papers.

12         THE COURT:  How do I know that's the position they

13  take if I don't know the scope of the protective order?

14         MS. BASS:  The protective order -- it's an ECF docket

15  number that's referenced in our papers.

16         Again, there's just -- based off of the allegations

17  that are in the complaint there are no well-pled factual

18  allegations, plausible allegations that Amarin knew of a

19  relationship between KD Pharma and between DRL and -- the

20  whole point of a tortious interference claim is that you have

21  to have that knowledge and then you go and act on it in order

22  to interfere with a contractual relationship.  The facts as

23  alleged do not support that and they don't support the broader

24  antitrust allegations as well.

25         On the last point, on this issue about foreclosure.  So

1    here, again, Hikma was in the market.  So, again, this concept

2    that there's generic competition that has been deprived from

3    patients and things of that nature, Hikma was in.  Hikma

4    launched.  Hikma was selling in the marketplace with the

5    approval for the first indication.  So there has been no

6    foreclosure here under the cases that they pointed you to,

7    even the *Fresenius Kabi* case that we went through in some

8    detail in the Third Circuit.  The allegation there was that

9    the competitor was completely foreclosed such that they could

10   not file an FDA application.  There was never even an FDA

11   application that was filed.  They claim that there were supply

12   arrangements that were entered into such that the applicant

13   could not even file an application with the FDA to get

14   approved.

15        The *Fresenius Kabi* case is one where there was no

16   filing with the FDA, no approval, no launch.  Absolute

17   foreclosure.  That is not what we have here at all.  They want

18   to try to say the delay somehow equals substantial

19   foreclosure, but that's not the case under the facts as they

20   pled them.  Hikma launched the day after the federal circuit

21   resolved the issues.  There's no allegation that Hikma

22   would've launched any earlier.  They launched the second that

23   the federal circuit resolved the issues.  And similarly, with

24   respect to the timelines that we've been talking about for

25   DRL, they had full ability to line up, for example, BASF who

1   was not limited in capacity in any way and signed them up as a

2   provider.  Here they did launch within ten months of being

3   able to line up supply.  So they lined up two suppliers the

4   month after approval, and they launched in the marketplace

5   within ten months.  So the facts of this case are just very,

6   very different than the ones that counsel has pointed you to,

7   like *Geneva*, *Vyera*, *Fera*, and *Fresenius* where there was no

8   entry, or at least entry for an extremely long period of time.

9   For example, in *Geneva* it was a year.  No entry for a year.

10  Hikma's there, DRL's there within ten months.

11       So, Your Honor, I'm happy to answer any other

12  questions, but those are the four points.

13        THE COURT:  I have one for Mr. Pak.  He's not off the

14  hook.  I'll still give you the last microphone, if you need

15  it.

16       I need to understand on this tortious interference.

17  Where in the pleading do you allege that the defendant was

18  aware of your prior relationship with KD Pharma, other than

19  they would have learned it through the discovery in the patent

20  litigation?  Is that the only place where it's pled that they

21  have knowledge of that prior relationship?  Because the other

22  paragraph you identify only has a communication between the

23  defendant and KD Pharma, and I don't think there's an

24  inference in that paragraph that says that they were made

25  aware of your prior relationship.  So I need to know, where in

1    the pleading do you have that?

2          MR. PAK:  Your Honor, I think it's a reasonable

3    inference --

4          THE COURT:  I don't necessarily agree.  I'm not going

5    to make that finding today, but I have concerns about it.

6          MR. PAK:  I understand, Your Honor.  We talked about

7    this other action against KD Pharma, and I think discovery

8    will show that, in fact --

9          THE COURT:  You have to plead it first.  You only get

10    to discovery if you sufficiently pled the claim.  You have to

11    at least make a claim that they were aware of the prior

12    relationship.  How could they interfere with your arrangement

13    with KD Pharma if you haven't pled they knew about it?  You

14    guys pled, hey, we spoke to KD Pharma, and they told us why

15    don't you ask them?  You must have conveyed to the defendant

16    that we had a prior relationship, right?  Yes.  Then you could

17    have pled it.  If you had the first information, why not swing

18    at the second?

19          MR. PAK:  Your Honor, the law on tortious

20    interference in New Jersey says it's not literally direct

21    knowledge.  It could be constructive knowledge.

22          THE COURT:  Your constructive knowledge is based on a

23    patent litigation where I'm going to go look at a protective

24    order, and you're telling me on the record that you're not

25    alleging any violation of the protective order.  So if we

1    remove that, where in the pleading do you have them having

2    knowledge of the prior relationship?  If it's the patent

3    litigation and there's a protective order and the protective

4    order would've covered that relationship, and you on the

5    record are telling me we're not alleging a violation of that

6    order, then you have zero pleading.  You have zero allegation

7    in the pleading where it says they knew about the

8    relationship.  So that's why I'm trying to figure out from you

9    all, is there anything more?

10              MR. PAK:  If you would permit, I'm going to go back

11   to --

12              THE COURT:  Did you understand?  Are you following my

13   logic?

14              MR. PAK:  100 percent.

15              THE COURT:  You guys are saying it's coming from the

16   litigation.  We're not saying they violated anything.  And now

17   Ms. Bass is telling me that has to be the allegation because

18   that's the only thing they're alleging we knew of them.  How

19   do you get around that?

20              MR. PAK:  I'm going to go back and --

21              THE COURT:  Okay.

22              MR. PAK:  If it's there, it's there.  If it's not

23   there, it's not there.  But there's a point that I want to

24   make about this.  That's the tortious interference claim.

25              THE COURT:  I know.  By the way, I said, I only want

1    to talk about tortious interference.  I don't want to go back.

2    We're not going back in time, everybody.  I'm very specific on

3    this.  Although, I'll give Ms. Bass the last word if you come

4    back with something out of that complaint.  Somebody should be

5    looking at that pleading and telling me where in there is your

6    tortious interference claim going to survive?  Because that's

7    a glitch.

8         Now, I will tell you, if you don't have it, there's

9    going to be a problem.  So let me know.

10        MR. PAK:  Understood, Your Honor.

11        THE COURT:  Ms. Bass, you don't have anything more

12   based on what I'm asking plaintiffs' counsel to do, correct?

13        MS. BASS:  No, Your Honor.

14        THE COURT:  All right.

15        MR. SOBOL:  We're all set.

16        THE COURT:  What do you mean we're all set?  Are you

17   guys coming back with something?

18        MR. SOBOL:  No.  We're waiting for you to stand up

19   and say, "I'll be back in ten minutes."

20        THE COURT:  So there's nothing more?

21        MR. PAK:  We were waiting for the ten minutes, Your

22   Honor.

23        THE COURT:  You want to do it on my break?

24        MR. PAK:  Yes.

25        THE COURT:  I was going to make you do it right this

```
 1  second.  Fair enough.

 2          MR. CECCHI:  I'm ready for the opening, just so you

 3  know.

 4          THE COURT:  I don't want to go back in time.  We

 5  don't need to talk about antitrust claims, but I do want to

 6  hear from you on tortious interference.  I only know that's

 7  one part of it.  That one we need to tack down before you

 8  leave today.

 9      Why don't we all do this?  Take a break, whether

10  restroom or otherwise.  Do you want longer than ten minutes?

11          MR. CECCHI:  No.

12          THE COURT:  We're going to do ten minutes.  I'll be

13  back on the bench and we'll continue this discussion.  Thank

14  you all.

15          (A short recess occurred.)

16          THE DEPUTY COURT CLERK:  All rise.

17          THE COURT:  You guys may be seated.  Thank you.

18      What do we have from plaintiff's side?  Mr. Pak, do you

19  have anything more?

20          MR. PAK:  After the question, Your Honor, on that

21  issue of tortious interference claim knowledge, I'm looking at

22  paragraphs 74 and 56 of our complaint.

23          THE COURT:  74 and 56.  Since there are not that many

24  paragraphs, what does 74 say?

25          MR. PAK:  Let me start with 56, which is Amarin's
```

1    investor call statements during 2020.  They say, quote, We

2    have heard from various suppliers that they have been

3    approached regarding supplying API for generic use.  The

4    suppliers informed us that they turned down such approaches

5    for various reasons, including that they don't have excess

6    capacity.

7            Your Honor, literally it does not mention DRL.

8            THE COURT:  That's obvious.  Okay.

9            MR. PAK:  There's the inference, I think a reasonable

10   suggestion that they were -- Amarin was in communications with

11   suppliers and consistent with our view that they were entering

12   into exclusives.

13           THE COURT:  Before I ask you, let's go to 74 so I

14   know the totality of it.

15           MR. PAK:  74 is talking about the relationship and

16   the communications they've had between DRL and KD Pharma upon

17   finding out that they weren't going to supply us.  KD Pharma

18   tells us that if Amarin cancels the orders over the next 36

19   months, Amarin would seek very significant damages under the

20   contractual penalty such that KD Pharma had no capacity to

21   supply DRL.

22           Seems to us, Your Honor, if someone is entering into a

23   minimum purchase requirement covering 36 months, that means

24   there was another supplier -- another entity that was out

25   there that was ready to buy from KD Pharma, and that's why

 1    Amarin --

 2            THE COURT:  Even if I agree with you, which I don't

 3    necessarily do, this other entity, it has to be you guys.  It

 4    has to be DRL, not some other person might have been out

 5    there.  I guess what I'm really confused by, if you had the

 6    information you have, and I feel like you have more

 7    information than you pled, why don't you just plead KD Pharma

 8    told us that they made the defendant aware of our prior

 9    relationship and then this is what was told to them?  Why am I

10    like trying to pull teeth to find it in the complaint?  That's

11    all you've got, 56 and 74?

12            MR. PAK:  Yes, Your Honor.

13            THE COURT:  Look, I'm not making a decision today,

14    but I'm telling you I'm more concerned about your tortious

15    interference claim because I'm not so sure you sufficiently

16    pled it.  Ms. Bass makes a strong point about it.  I'm not so

17    sure I read that inference there, although it's probably

18    curable, and I'm not going to make a call today.  I'm going to

19    have to think about it.  I have to tell you, I appreciate you

20    guys identifying the paragraphs.  I'm not so sure why you guys

21    couldn't have done more, unless you're telling me that's all

22    we know, but it seems like you're privy to information from KD

23    Pharma and other sources, that you could have just pled KD

24    Pharma advised us that they made the defendant aware of our

25    prior relationship.  Then they told them three-year

1   relationship, no "this," exclusivity, you can't go to anybody

2   else.  It just seems like it would have been easy for you guys

3   to do that.

4        I'm going to consider what you have.  I'll consider

5   paragraphs 56 and 74.  I'm not making a decision today on the

6   bench, but I will tell you I've got serious concerns.  That

7   being said, if I end up going that way and agreeing with the

8   defense on your tortious interference claim, you'll have an

9   opportunity to amend on that.  I'm letting you know that's

10  where I am.

11       Ms. Bass, anything further, though only on tortious

12  interference and only on the issue I let Mr. Pak address since

13  I want you to have the last word?

14       MS. BASS:  No, Your Honor.

15       THE COURT:  Anything else from any of the plaintiffs'

16  counsel?

17       MR. CECCHI:  No, Your Honor.

18       THE COURT:  I will just briefly say it's days like

19  today that I think we should have more oral argument.  One, I

20  just want to thank the counsel for what I thought was

21  excellent advocacy on behalf of all your clients.  This is

22  another reason why I have my term law clerk here.  I think

23  it's fantastic when you get to have younger attorneys have the

24  opportunity to see experienced lawyers really argue their

25  motions or their cases.

1          I will hold to what I said earlier off the record,

2    which this does not mean you should request oral argument in

3    every case.  That being said, you really give me some pause on

4    maybe having an opportunity to do this a bit more.  It also

5    clarifies some of the issues for me, and I think it's

6    beneficial to counsel and your clients to have an opportunity

7    to see what the Court is concerned with and what questions I

8    have.

9          I want to thank defense counsel and all the plaintiffs'

10   counsel that spoke.  I know there's a lot of attorneys here

11   also appearing.  I do appreciate your time.  I know I kept you

12   here a little bit longer than you anticipated, but I think it

13   was worth it.  Your motion is on my radar.  I will get to it

14   sooner rather than later.  Thank you all.  This matter

15   adjourned.

16              THE DEPUTY COURT CLERK:  All rise.

17              (Court concludes at 1:19 p.m.)

18

19

20

21

22

23

24

25

1        FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE.

2          - - - - - - - - - - - - - - - - - - - - - -

3

4      I certify that the foregoing is a correct transcript from

5   the record of proceedings in the above-entitled matter.

6

7

8      I

9

10

11  /S/ Megan McKay-Soule, RMR, CRR     September 28, 2022

12          Court Reporter                          Date

13

14

15

16

17

18

19

20

21

22

23

24

25

**'** 

**'21** [1] - 74:15

---

**/**

**/S** [1] - 95:11

---

**0**

**02109** [1] - 2:7
**07068** [1] - 2:3
**07102** [1] - 3:13
**07663** [1] - 2:24
**07940** [1] - 2:17
**08608** [1] - 1:18

---

**1**

**1** [2] - 2:6, 74:1
**10** [1] - 65:18
**10-Ks** [4] - 51:19, 53:4, 59:2, 59:16
**10-Qs** [1] - 51:19
**100** [4] - 61:10, 61:13, 73:15, 88:14
**10019** [1] - 2:11
**10036** [1] - 3:4
**101** [1] - 66:7
**1037** [1] - 3:12
**10th** [1] - 3:7
**11** [1] - 80:12
**114** [2] - 45:21, 77:25
**11:00** [2] - 1:19, 4:3
**12** [4] - 14:12, 69:1, 69:18, 69:19
**1211** [1] - 3:3
**13** [1] - 74:14
**1301** [1] - 2:10
**139** [1] - 68:13
**144** [1] - 68:13
**145** [1] - 68:21
**15** [5] - 8:5, 23:16, 23:18, 30:24, 72:9
**150** [1] - 68:21
**1520** [1] - 3:12
**1700** [1] - 2:13
**171** [1] - 82:8
**1:19** [1] - 94:17
**1st** [1] - 73:24

---

**2**

**20** [2] - 2:19, 8:5
**20006** [1] - 2:14
**2002** [1] - 1:18
**2013** [6] - 46:18, 50:10, 52:10, 55:22, 73:24, 81:11
**2019** [1] - 42:14

**2020** [31] - 10:10, 10:11, 12:1, 12:3, 12:5, 12:6, 12:8, 12:9, 12:10, 12:19, 12:20, 13:6, 13:16, 13:17, 21:6, 30:9, 30:17, 40:3, 41:15, 45:7, 46:20, 51:10, 52:15, 53:1, 53:11, 68:14, 78:6, 80:12, 91:1
**2021** [11] - 45:10, 49:6, 49:15, 51:9, 51:17, 51:20, 53:11, 68:15, 68:23, 68:24, 68:25
**2022** [2] - 4:3, 95:11
**20268** [1] - 3:8
**21-10309** [1] - 4:10
**21-12061** [1] - 4:11
**21-12747** [1] - 4:12
**215** [1] - 1:24
**21st** [1] - 12:3
**250** [1] - 2:23
**26,000** [1] - 77:9
**27** [2] - 1:18, 4:3
**28** [1] - 95:11

---

**3**

**30th** [1] - 11:25
**36** [2] - 91:18, 91:23
**399** [1] - 69:18
**3:21-cv-10309-ZNQ-RLS** [1] - 1:5
**3:21-cv-12061-ZNQ-RLS** [1] - 1:4
**3:21-cv-12747-ZNQ-RLS** [1] - 1:5
**3rd** [1] - 12:9

---

**4**

**400** [2] - 42:15, 47:2
**401** [1] - 2:23
**402** [1] - 1:17
**40th** [2] - 2:10, 3:4
**45** [1] - 72:8
**450** [1] - 42:16
**4th** [2] - 12:20, 12:21

---

**5**

**5** [1] - 2:3
**56** [5] - 90:22, 90:23, 90:25, 92:11, 93:5
**5th** [2] - 2:6, 12:21

---

**6**

**62** [1] - 50:22

**63** [2] - 50:15, 50:22
**64** [2] - 50:15, 50:22
**67** [2] - 41:20, 50:15

---

**7**

**71** [1] - 68:19
**72223** [1] - 2:20
**73** [5] - 50:15, 50:22, 60:11, 60:22, 71:10
**74** [13] - 50:15, 50:22, 60:22, 71:10, 80:11, 80:16, 90:22, 90:23, 90:24, 91:13, 91:15, 92:11, 93:5
**75** [1] - 60:22
**779-6437** [1] - 1:24
**7th** [1] - 12:6

---

**8**

**80** [5] - 2:22, 67:15, 68:19, 69:2, 76:11
**84** [1] - 76:17
**841** [1] - 69:18
**850** [1] - 3:7
**854** [1] - 1:4
**87** [1] - 76:17

---

**9**

**90** [1] - 71:11

---

**A**

**a.m** [2] - 1:19, 4:3
**ability** [4] - 10:19, 12:7, 24:14, 85:25
**able** [27] - 11:12, 14:17, 15:18, 15:25, 26:12, 27:14, 27:16, 32:10, 32:15, 32:17, 32:19, 42:11, 45:9, 51:9, 52:21, 53:7, 53:8, 57:11, 58:7, 58:15, 58:22, 60:3, 61:15, 70:11, 70:16, 86:3
**above-entitled** [1] - 95:5
**absence** [1] - 31:23
**absolute** [2] - 25:15, 85:16
**absolutely** [3] - 22:17, 36:19, 69:25
**absolutely-not-supported** [1] - 22:17
**accept** [7] - 27:24, 28:8, 29:12, 30:6,

79:17, 79:21, 82:20
**accepted** [4] - 14:12, 26:17, 27:21, 29:16
**accepting** [1] - 28:23
**access** [4] - 11:15, 11:21, 64:16, 64:25
**according** [1] - 12:14
**accurate** [2] - 10:6, 24:23
**acknowledged** [1] - 66:15
**acknowledges** [1] - 13:12
**act** [1] - 84:21
**ACTION** [1] - 1:3
**action** [11] - 33:8, 38:3, 39:2, 56:18, 57:1, 73:16, 73:19, 73:22, 74:3, 79:24, 87:7
**actionable** [2] - 31:14, 36:21
**actions** [1] - 17:6
**active** [6] - 10:2, 14:7, 19:13, 52:22, 67:1, 68:6
**actual** [6] - 27:6, 36:3, 43:20, 69:24, 76:14, 83:19
**Adaptive** [1] - 31:20
**add** [1] - 65:13
**addition** [4] - 35:17, 36:6, 36:7, 37:14
**additional** [2] - 38:9, 65:19
**additionally** [1] - 31:5
**address** [5] - 6:2, 33:6, 72:23, 75:22, 93:12
**addressing** [1] - 42:2
**adequate** [1] - 30:12
**adequately** [1] - 38:7
**adjourned** [1] - 94:15
**admit** [1] - 61:8
**admits** [2] - 13:14, 30:9
**adopt** [1] - 74:21
**advised** [1] - 92:24
**advocacy** [1] - 93:21
**affirmance** [2] - 34:6, 34:8
**affirmed** [2] - 12:9, 33:23
**affirming** [1] - 33:15
**afraid** [1] - 59:14
**afterwards** [1] - 55:22
**AGNELLO** [1] - 2:2
**agree** [14] - 19:6, 19:21, 22:22, 38:9, 39:12, 44:10, 44:11,

60:6, 63:9, 71:16, 72:20, 79:21, 87:4, 92:2
**agreed** [2] - 39:23, 78:6
**agreeing** [2] - 27:14, 93:7
**agreement** [10] - 14:16, 20:4, 42:25, 47:22, 50:6, 55:17, 56:11, 57:21, 78:25, 84:3
**agreements** [17] - 8:25, 9:3, 14:5, 16:24, 18:20, 18:23, 19:1, 19:7, 19:9, 19:17, 19:22, 20:15, 34:19, 36:17, 46:5, 60:14, 77:6
**ahead** [2] - 11:23, 72:7
**aided** [1] - 1:25
**alines** [1] - 70:9
**allegation** [34] - 11:17, 13:2, 14:12, 22:18, 27:15, 27:19, 27:22, 27:23, 28:7, 29:5, 29:24, 30:1, 32:8, 32:13, 35:17, 38:2, 58:2, 61:12, 68:11, 77:16, 78:8, 79:6, 79:18, 80:4, 81:9, 81:15, 81:24, 82:17, 82:24, 83:9, 85:8, 85:21, 88:6, 88:17
**allegations** [41] - 8:16, 8:17, 9:16, 10:17, 10:18, 12:11, 12:14, 14:21, 21:9, 22:13, 23:9, 23:10, 24:13, 25:6, 25:9, 26:4, 26:18, 28:6, 28:10, 29:20, 31:4, 33:1, 33:3, 34:3, 34:12, 35:12, 39:9, 39:16, 39:25, 50:16, 50:25, 53:21, 61:4, 77:12, 78:5, 78:7, 78:20, 84:16, 84:18, 84:24
**allege** [21] - 9:15, 10:9, 13:10, 15:1, 21:7, 39:9, 42:3, 42:4, 45:12, 45:21, 49:16, 58:22, 59:5, 59:22, 60:2, 68:9, 68:21, 68:25, 79:13, 84:4, 86:17
**alleged** [19] - 9:14, 10:12, 21:5, 24:2, 31:16, 41:19, 44:18, 48:22, 53:15, 53:22,

56:7, 59:12, 59:13, 59:16, 60:8, 76:14, 79:11, 79:19, 84:23

**alleges** [3] - 11:2, 13:8, 26:13

**alleging** [13] - 9:24, 9:25, 10:7, 19:17, 26:12, 55:18, 80:7, 81:2, 82:4, 82:15, 87:25, 88:5, 88:18

**allow** [3] - 39:12, 39:24, 40:25

**allowed** [2] - 54:21, 67:2

**allows** [1] - 74:20

**alludes** [1] - 28:12

**allusion** [1] - 28:13

**almost** [1] - 29:12

**alone** [1] - 44:8

**Aluminum** [1] - 75:8

**Amarin** [113] - 3:8, 3:13, 4:9, 4:10, 4:12, 4:16, 5:19, 5:22, 6:2, 6:18, 7:8, 7:19, 8:2, 8:14, 8:19, 9:2, 9:16, 11:16, 11:17, 13:1, 13:2, 13:11, 14:19, 15:14, 16:4, 17:7, 17:10, 18:19, 19:12, 22:1, 22:8, 24:11, 24:13, 24:14, 24:25, 25:2, 25:8, 29:6, 29:7, 32:10, 34:15, 34:17, 35:12, 36:10, 39:4, 39:21, 39:24, 40:21, 42:5, 42:9, 42:14, 42:22, 44:24, 45:3, 45:11, 46:4, 46:24, 46:25, 48:2, 48:19, 49:9, 49:17, 50:12, 50:16, 51:1, 51:13, 51:19, 51:25, 52:17, 53:1, 53:8, 53:12, 55:19, 56:15, 57:25, 58:22, 59:1, 59:6, 59:14, 59:24, 60:3, 60:6, 60:9, 60:12, 61:6, 62:11, 70:14, 75:7, 75:25, 78:12, 78:14, 78:20, 79:2, 79:13, 80:1, 80:7, 80:13, 81:2, 81:9, 81:11, 82:10, 82:25, 83:19, 83:20, 83:22, 84:1, 84:2, 84:18, 91:10, 91:18, 91:19, 92:1

**AMARIN** [3] - 1:9, 1:10

**Amarin's** [18] - 8:23, 9:20, 12:1, 15:23,

16:20, 19:6, 21:10, 21:17, 27:12, 34:19, 41:6, 58:20, 59:1, 76:6, 78:24, 79:16, 82:9, 90:25

**amenable** [1] - 6:9

**amend** [1] - 93:9

**amendment** [1] - 40:9

**amendments** [1] - 74:20

**Americas** [2] - 2:10, 3:3

**AMERICAS** [1] - 1:11

**amount** [7] - 17:5, 31:12, 35:23, 61:23, 76:10, 76:18, 78:7

**analysis** [1] - 29:19

**AND** [1] - 1:14

**ANDA** [8] - 41:15, 48:17, 52:12, 56:14, 58:17, 68:8, 70:18, 82:11

**ANDAs** [1] - 27:4

**angry** [1] - 57:1

**answer** [8] - 32:20, 38:6, 46:3, 57:7, 57:10, 57:11, 59:25, 86:11

**answers** [1] - 14:10

**anticipated** [1] - 94:12

**anticompetitive** [20] - 9:15, 17:24, 18:5, 20:15, 31:14, 31:18, 32:4, 33:4, 33:7, 33:11, 33:24, 54:17, 54:22, 55:3, 55:7, 64:13, 64:19, 64:23, 64:24, 69:25

**antitrust** [31] - 8:25, 9:8, 9:15, 13:25, 15:12, 18:21, 19:4, 19:8, 31:13, 31:18, 32:5, 33:8, 33:20, 33:24, 34:6, 34:8, 34:9, 34:12, 35:3, 37:8, 37:10, 37:12, 52:24, 54:18, 55:5, 58:4, 61:5, 64:21, 73:16, 84:24, 90:5

**API** [47] - 8:14, 9:3, 9:18, 10:21, 11:4, 11:15, 14:23, 14:25, 16:1, 16:6, 19:10, 19:18, 21:15, 21:25, 23:3, 25:13, 25:21, 26:3, 27:11, 32:11, 45:13, 45:16, 45:23, 46:1, 46:10, 46:16, 47:2, 48:1, 48:7, 48:8, 49:21, 51:12,

52:1, 52:18, 53:6, 54:8, 54:10, 56:3, 59:15, 59:17, 61:11, 61:19, 62:7, 64:16, 80:15, 83:13, 91:3

**apologize** [2] - 75:16, 75:17

**appeal** [1] - 13:4

**appearances** [2] - 4:8, 4:13

**appearing** [2] - 4:18, 94:11

**Appendix** [1] - 69:18

**applicant** [1] - 85:12

**application** [7] - 48:17, 48:25, 52:12, 56:14, 85:10, 85:11, 85:13

**applied** [1] - 46:15

**appreciate** [11] - 34:24, 34:25, 40:19, 64:17, 65:9, 71:18, 74:24, 75:14, 82:1, 92:19, 94:11

**appreciated** [1] - 8:6

**approached** [1] - 91:3

**approaches** [1] - 91:4

**approval** [27] - 10:10, 12:3, 12:4, 12:6, 12:12, 14:18, 20:18, 23:21, 23:25, 24:4, 27:5, 30:20, 32:19, 41:16, 45:25, 46:11, 50:2, 52:11, 55:22, 58:17, 62:17, 68:23, 76:6, 76:8, 85:5, 85:16, 86:4

**approvals** [2] - 48:9, 58:10, 70:13

**approved** [15] - 23:20, 46:13, 46:18, 48:7, 48:23, 49:2, 58:18, 61:11, 68:6, 68:7, 70:12, 70:14, 70:17, 70:18, 85:14

**April** [2] - 13:16, 26:14

**area** [1] - 54:14

**areas** [2] - 39:25, 55:8

**arena** [1] - 62:24

**argue** [5] - 16:13, 17:5, 23:15, 64:2, 93:24

**argued** [2] - 16:22, 39:25

**arguing** [5] - 39:18, 43:4, 43:15, 43:19, 83:15

**argument** [21] - 4:6, 6:1, 6:8, 16:3, 18:2, 18:18, 23:13, 33:7,

35:1, 39:21, 40:15, 41:1, 43:3, 52:1, 65:25, 72:4, 74:21, 77:23, 82:22, 93:19, 94:2

**ARGUMENT** [1] - 1:6

**arguments** [3] - 37:25, 39:8, 77:13

**arises** [1] - 73:22

**Arkansas** [1] - 2:20

**ARNSTEIN** [1] - 3:10

**arose** [2] - 74:3, 74:14

**arrangement** [12] - 13:24, 29:2, 35:13, 35:20, 42:5, 42:23, 42:24, 50:12, 55:16, 58:21, 79:15, 87:12

**arrangements** [12] - 9:20, 14:13, 18:9, 18:11, 18:13, 19:25, 34:18, 54:25, 61:8, 61:9, 62:25, 85:12

**article** [3] - 30:22, 76:17, 76:21

**Article** [4] - 37:21, 69:4, 72:25, 74:19

**ASHLEY** [1] - 3:6

**Ashley** [2] - 5:23, 8:2

**aside** [1] - 17:23, 30:8

**assert** [2] - 37:17, 37:22

**asserting** [2] - 38:14, 39:3

**assertion** [1] - 35:9

**assertions** [1] - 34:2

**assessing** [1] - 33:2

**assignee** [1] - 73:5

**assignment** [12] - 73:2, 73:3, 73:9, 73:25, 74:2, 74:4, 74:11, 74:15, 74:17, 74:18, 74:22

**assignor** [1] - 73:4

**assigns** [1] - 73:15

**assist** [1] - 16:24

**associated** [2] - 24:1, 48:3

**ASSOCIATION** [2] - 1:4, 1:5

**assumed** [1] - 30:20

**assuming** [1] - 62:17

**astute** [1] - 41:8

**attached** [3] - 68:8, 70:18, 73:3

**attempts** [1] - 37:22

**attend** [1] - 30:13

**attention** [1] - 55:1

**attorneys** [3] - 7:1, 93:23, 94:10

**August** [7] - 10:10,

12:6, 12:8, 13:6, 41:15, 68:23, 68:25

**authorized** [1] - 17:11

**automatic** [1] - 67:12

**automobiles** [1] - 66:12

**available** [13] - 14:20, 14:22, 27:11, 35:16, 41:18, 45:23, 46:21, 49:7, 49:11, 54:11, 54:12, 62:10, 62:11

**Avenue** [3] - 2:10, 2:23, 3:3

**aware** [19] - 42:22, 43:15, 49:18, 51:1, 57:25, 58:6, 79:11, 79:13, 79:20, 80:7, 80:17, 82:10, 83:20, 84:4, 86:18, 86:25, 87:11, 92:8, 92:24

## B

**background** [1] - 66:17

**balancing** [1] - 55:9

**BARNES** [1] - 2:6

**Barnes** [1] - 5:11

**Barns** [1] - 75:17

**bars** [1] - 20:4

**base** [1] - 82:17

**based** [15] - 9:13, 22:12, 26:21, 34:13, 36:12, 36:24, 38:20, 41:5, 76:14, 76:20, 83:5, 84:16, 87:22, 89:12

**BASF** [19] - 1:11, 1:11, 1:12, 1:12, 12:13, 12:14, 14:15, 30:16, 30:18, 50:23, 77:23, 77:25, 78:1, 78:5, 78:8, 78:9, 85:25

**basic** [1] - 35:14

**basis** [6] - 37:9, 76:12, 79:23, 82:13, 83:8, 84:2

**bass** [1] - 14:1

**Bass** [18] - 5:23, 7:23, 7:24, 8:2, 32:8, 44:7, 65:11, 69:13, 75:16, 80:5, 80:25, 81:21, 82:1, 88:17, 89:3, 89:11, 92:16, 93:11

**BASS** [46] - 3:6, 8:1, 8:8, 9:11, 9:13, 10:8, 10:24, 11:9, 11:25, 12:25, 14:10, 17:20, 19:19, 20:25, 22:12, 23:8, 25:2, 25:24,

26:13, 26:24, 27:19, 27:25, 28:13, 29:8, 29:20, 30:3, 32:17, 33:19, 35:3, 38:11, 39:15, 40:2, 75:21, 79:3, 79:6, 79:23, 82:8, 82:23, 83:7, 83:14, 83:17, 83:24, 84:7, 84:14, 89:13, 93:14
**Baton** [4] - 5:21, 6:19, 7:21, 69:13
**BATON** [3] - 3:11, 5:20, 6:20, 7:10, 7:23
**Baton's** [1] - 73:3
**battle** [1] - 49:20
**battled** [1] - 17:19
**Becker** [1] - 2:3
**become** [1] - 54:12
**begin** [2] - 49:3, 75:22
**beginning** [7] - 4:13, 18:2, 18:18, 35:4, 40:11, 40:14, 67:16
**behalf** [5] - 4:19, 5:6, 7:21, 8:2, 93:21
**behind** [1] - 16:20
**belabor** [1] - 37:3
**belied** [3] - 31:3, 34:2, 78:4
**bench** [2] - 90:13, 93:6
**beneficial** [1] - 94:6
**benefit** [4] - 18:15, 36:16, 36:20, 45:5
**benefited** [1] - 45:8
**benefits** [1] - 76:1
**BERMAN** [1] - 2:5
**Berman** [1] - 5:10
**better** [4] - 21:19, 22:2, 49:1, 53:23
**between** [20] - 16:14, 22:23, 30:5, 35:13, 35:18, 36:3, 36:8, 36:11, 43:16, 55:16, 55:24, 56:11, 73:4, 78:13, 81:18, 82:14, 84:19, 86:22, 91:16
**Bill** [1] - 5:21
**binding** [3] - 56:12, 60:12, 80:14
**bit** [12] - 5:25, 23:18, 33:13, 41:25, 44:20, 51:22, 61:10, 66:6, 75:18, 75:24, 94:4, 94:12
**blocked** [2] - 68:24, 80:14
**bona** [1] - 70:10
**boring** [1] - 67:16

**Boston** [1] - 2:7
**bother** [3] - 26:8, 26:9, 72:3
**bothering** [1] - 47:21
**bottles** [1] - 41:11
**bottom** [4] - 25:4, 30:19, 34:11, 37:7
**Boulevard** [1] - 3:12
**brain** [1] - 74:8
**brand** [7] - 64:8, 66:24, 67:6, 67:7, 67:9, 67:22, 70:8
**branded** [1] - 44:24, 53:2, 65:1, 67:20
**breach** [5] - 79:7, 81:7, 82:12, 82:16, 83:3
**breached** [1] - 82:25
**break** [4] - 66:1, 72:1, 89:23, 90:9
**BRENDAN** [1] - 2:13
**brief** [6] - 37:14, 38:25, 66:17, 73:7, 74:20, 75:12
**briefing** [4] - 37:2, 37:3, 37:24, 38:8
**briefly** [3] - 72:23, 75:6, 93:18
**briefs** [6] - 6:6, 15:10, 31:12, 31:19, 38:17, 43:5
**bring** [3] - 38:18, 38:20, 72:25
**broad** [1] - 17:10
**broader** [1] - 84:23
**broadly** [1] - 21:12
**BRODY** [1] - 2:2
**Brook** [1] - 2:24
**brought** [3] - 54:19, 74:6, 77:16
**buddy** [1] - 56:20
**Building** [1] - 1:17
**burden** [2] - 23:13, 34:18
**Burling** [1] - 5:23
**BURLING** [1] - 3:6
**business** [4] - 19:14, 29:17, 49:10, 74:4
**busy** [1] - 69:4
**buy** [2] - 47:2, 91:25
**buying** [3] - 16:1, 71:11
**BY** [10] - 2:2, 2:5, 2:9, 2:13, 2:16, 2:19, 2:22, 3:3, 3:6, 3:11
**Byrne** [1] - 5:6
**BYRNE** [1] - 2:2

**C**

**CALLANISH** [1] - 1:12
**canceled** [1] - 27:4
**cancels** [1] - 91:18
**cannot** [12] - 13:23, 20:14, 33:20, 34:12, 34:17, 34:18, 36:13, 38:18, 38:22, 38:24, 40:13, 40:14
**capable** [1] - 62:12
**capacities** [2] - 30:12, 35:25
**capacity** [19] - 12:15, 13:9, 35:23, 46:13, 47:11, 47:25, 48:22, 49:14, 51:13, 52:11, 58:19, 62:12, 62:16, 78:1, 78:2, 80:14, 86:1, 91:6, 91:20
**Caps** [1] - 31:25
**car** [1] - 74:7
**care** [2] - 54:14, 55:1
**CARELLA** [1] - 2:2
**Carella** [1] - 5:6
**carved** [2] - 24:3, 76:8
**case** [63] - 4:11, 8:16, 9:19, 10:20, 12:21, 13:13, 14:14, 20:9, 20:17, 21:3, 21:4, 22:25, 25:19, 29:21, 33:2, 33:22, 34:1, 34:4, 34:11, 39:5, 40:8, 40:12, 40:21, 43:25, 44:8, 44:13, 44:19, 53:20, 53:21, 60:1, 63:1, 63:6, 63:11, 63:24, 69:12, 69:14, 69:17, 69:19, 69:21, 70:22, 70:25, 71:1, 74:19, 76:3, 76:23, 76:24, 77:7, 77:8, 78:15, 78:16, 78:17, 78:19, 79:8, 85:7, 85:15, 85:19, 86:5, 94:3
**cases** [24] - 25:13, 25:14, 26:24, 27:1, 27:4, 27:5, 31:17, 31:19, 38:21, 54:2, 62:23, 63:2, 63:12, 64:8, 64:21, 66:20, 69:20, 75:9, 76:4, 77:4, 84:7, 84:10, 85:6, 93:25
**causation** [1] - 36:7
**causes** [3] - 13:25, 39:2, 55:6
**caution** [1] - 69:7
**cautious** [1] - 57:14

**Cecchi** [3] - 5:6, 63:23, 64:1
**CECCHI** [9] - 2:2, 2:2, 5:5, 7:20, 75:4, 75:13, 90:2, 90:11, 93:17
**certain** [6] - 17:22, 19:21, 60:7, 64:15, 65:8, 78:18
**certainly** [10] - 25:2, 33:15, 33:22, 34:5, 37:13, 37:20, 48:24, 56:13, 66:14, 77:3
**CERTIFICATE** [1] - 95:1
**certify** [1] - 95:4
**cetera** [8] - 41:11, 43:24, 44:23, 51:19, 52:11, 53:24, 54:16, 54:25
**change** [4] - 29:2, 29:19, 40:2, 40:9
**cheaper** [3] - 54:23, 64:25
**check** [1] - 77:14
**chemical** [1] - 67:1
**Chemicals** [1] - 31:22
**CHEMPORT** [1] - 1:13
**CHRISTINA** [1] - 2:10
**Christina** [1] - 5:3
**CHUL** [1] - 2:9
**Chul** [2] - 4:18, 41:3
**circle** [1] - 71:18
**Circle** [1] - 2:19
**Circuit** [21] - 15:4, 18:10, 18:12, 18:24, 19:19, 19:22, 20:3, 33:15, 33:23, 34:4, 37:20, 54:1, 54:14, 54:15, 69:20, 69:21, 70:22, 70:23, 70:25, 85:8
**circuit** [11] - 12:9, 12:20, 13:4, 13:14, 13:20, 20:16, 21:4, 31:7, 32:22, 85:20, 85:23
**Circuit's** [1] - 18:11
**circuits** [1] - 54:15
**circumstance** [4] - 8:24, 9:6, 18:25, 29:15
**circumstances** [4] - 9:9, 18:19, 18:25, 19:21
**cite** [2] - 30:22, 84:10
**cited** [3] - 69:17, 74:20, 76:22
**cites** [2] - 69:20, 70:22
**CIVIL** [1] - 1:3

**claim** [42] - 8:12, 14:15, 22:11, 24:7, 33:20, 34:6, 34:9, 35:2, 35:3, 35:4, 35:15, 36:14, 36:15, 36:23, 37:22, 37:23, 38:15, 38:16, 38:17, 38:18, 39:6, 40:13, 61:4, 61:5, 61:8, 77:5, 77:24, 81:6, 82:13, 82:18, 83:18, 84:9, 84:20, 85:11, 87:10, 87:11, 88:24, 89:6, 90:21, 92:15, 93:8
**claiming** [1] - 19:12
**claims** [21] - 8:14, 10:17, 15:12, 15:13, 17:13, 31:9, 37:2, 37:5, 37:8, 37:9, 37:10, 37:12, 37:13, 37:17, 38:1, 38:7, 38:20, 40:15, 44:9, 58:4, 90:5
**clarifies** [1] - 94:5
**clarify** [3] - 6:4, 6:5, 6:22
**Clarkson** [1] - 1:17
**class** [1] - 7:5
**cleaning** [1] - 71:14
**clear** [9] - 19:5, 20:3, 38:21, 55:9, 64:11, 64:22, 68:10, 74:22, 80:22
**clearly** [9] - 12:23, 14:14, 14:19, 15:1, 22:20, 24:12, 35:21, 35:22, 73:7
**CLEMENS** [1] - 2:10
**Clemens** [1] - 5:3
**CLERK** [3] - 4:4, 90:16, 94:16
**clerk** [2] - 43:2, 93:22
**client** [1] - 57:18
**clients** [2] - 93:21, 94:6
**closely** [1] - 73:6
**closer** [1] - 4:23
**clue** [1] - 79:1
**co** [1] - 5:16
**COFFMAN** [1] - 2:13
**Cohn** [1] - 5:14
**COHN** [1] - 2:21
**colleague** [2] - 5:7, 57:9
**colleagues** [2] - 43:8, 72:20
**collect** [2] - 65:18, 65:21
**collectively** [2] - 7:4,

7:8

**coming** [7] - 15:7, 32:20, 40:20, 59:24, 60:10, 88:15, 89:17

**commenced** [1] - 42:10

**Commencing** [1] - 1:19

**comments** [1] - 71:19

**commercial** [5] - 12:16, 13:9, 78:22, 83:1

**committed** [1] - 50:7

**commodity** [3] - 66:21, 67:14, 75:25

**common** [1] - 37:11

**communication** [1] - 86:22

**communications** [2] - 91:10, 91:16

**companies** [4] - 53:6, 64:8, 64:9, 64:12, 64:16, 65:2, 66:24, 70:13

**company** [13] - 29:12, 29:18, 41:23, 44:24, 53:1, 61:15, 61:21, 65:1, 67:6, 67:20, 70:8, 79:15, 80:21

**compare** [2] - 11:8, 22:24

**comparison** [1] - 77:3

**compete** [2] - 32:10, 49:9

**competing** [2] - 31:21, 44:16

**competition** [34] - 8:15, 9:5, 9:17, 10:3, 11:14, 11:21, 16:7, 16:21, 19:2, 19:12, 20:2, 23:24, 31:15, 31:24, 32:7, 32:24, 52:20, 53:5, 54:9, 54:13, 54:16, 55:5, 55:12, 59:3, 59:18, 60:16, 60:17, 61:9, 61:14, 63:22, 76:1, 76:24, 77:1, 85:2

**competitor** [8] - 23:24, 27:2, 32:7, 55:10, 64:21, 64:22, 77:22, 85:9

**competitor's** [1] - 9:17

**competitors** [6] - 8:17, 8:19, 20:12, 25:15, 27:7, 77:24

**complaining** [1] - 64:22

**complaint** [59] - 8:10, 8:11, 9:14, 12:18,

13:14, 21:2, 21:9, 22:18, 24:3, 25:24, 26:4, 26:6, 26:22, 28:11, 28:18, 30:22, 31:2, 31:4, 33:1, 33:3, 33:19, 34:3, 35:19, 35:24, 36:13, 37:1, 38:12, 40:16, 41:20, 42:3, 43:17, 43:18, 49:16, 51:11, 51:15, 59:16, 59:19, 60:8, 67:17, 68:14, 70:8, 76:3, 76:15, 76:17, 76:20, 76:21, 76:22, 77:3, 77:14, 77:17, 77:25, 78:5, 78:12, 84:17, 89:4, 90:22, 92:10

**complaints** [4] - 8:10, 8:12, 35:5, 35:7

**complete** [4] - 27:1, 27:7, 31:23, 75:20

**completely** [10] - 11:18, 18:14, 23:23, 29:23, 34:2, 36:23, 68:15, 68:24, 71:3, 85:9

**compliant** [1] - 44:19

**component** [1] - 52:24

**computer** [1] - 1:25

**computer-aided** [1] - 1:25

**concede** [3] - 18:19, 44:7, 44:10

**conceivable** [1] - 34:7

**concept** [9] - 23:16, 31:1, 41:7, 76:9, 76:25, 77:10, 77:19, 78:3, 85:1

**conception** [1] - 75:25

**concern** [2] - 13:25, 34:19

**concerned** [2] - 92:14, 94:7

**concerns** [2] - 87:5, 93:6

**conclude** [2] - 65:17, 71:4

**concludes** [1] - 94:17

**conclusion** [1] - 39:4

**conclusions** [2] - 13:18, 13:19

**concurring** [1] - 20:10

**conduct** [11] - 19:3, 22:7, 25:8, 33:24, 38:4, 44:17, 54:22, 58:20, 64:15, 65:6, 70:3

**confer** [1] - 71:18

**conference** [1] - 53:3

**confidential** [1] - 6:13

**confidentiality** [2] - 57:12, 81:7

**confirm** [3] - 6:7, 29:1, 29:14

**confirmed** [1] - 80:12

**conflate** [2] - 73:2, 74:12

**confused** [2] - 79:13, 92:5

**confusing** [1] - 7:15

**connection** [2] - 37:18, 37:23

**consider** [2] - 93:4

**considering** [1] - 15:11

**considers** [1] - 17:25

**consistent** [2] - 38:21, 91:11

**constructive** [3] - 43:19, 87:21, 87:22

**constructively** [1] - 49:17

**consumer** [1] - 37:11

**consumers** [6] - 38:4, 45:5, 45:8, 54:22, 55:6, 64:25

**CONT'D** [1] - 3:1

**contextualize** [1] - 76:23

**continue** [5] - 32:9, 37:10, 82:2, 82:5, 90:13

**contract** [11] - 35:18, 36:3, 36:7, 36:14, 42:24, 47:1, 55:17, 56:6, 62:4, 81:11, 83:24

**contracts** [4] - 51:13, 53:25, 54:3, 60:14

**contractual** [6] - 35:13, 35:20, 78:13, 82:11, 84:22, 91:20

**contrary** [1] - 54:1

**control** [5] - 45:12, 45:13, 45:16, 53:4

**convenient** [1] - 28:1

**conveyed** [2] - 50:8, 87:15

**conveys** [1] - 73:14

**convince** [2] - 40:23, 63:12

**copy** [2] - 7:8, 7:10

**copycat** [1] - 40:15

**core** [3] - 34:23, 40:10

**CORPORATION** [3] - 1:10, 1:11, 1:12

**correct** [6] - 6:10, 6:11, 7:11, 10:23, 10:24, 29:25, 32:12,

44:18, 45:17, 45:20, 48:11, 81:15, 81:19, 83:13, 89:12, 95:4

**counsel** [18] - 4:9, 4:13, 5:15, 5:17, 5:22, 15:7, 41:6, 59:24, 71:17, 82:15, 83:7, 86:6, 89:12, 93:16, 93:20, 94:6, 94:9, 94:10

**Counsel** [3] - 2:20, 2:24, 3:5

**counsel's** [1] - 60:10

**couple** [3] - 42:8, 48:23, 76:2

**course** [10] - 42:9, 43:8, 50:1, 53:18, 54:20, 72:13, 74:8, 74:19, 80:10

**court** [10] - 4:1, 4:24, 6:15, 12:1, 12:10, 22:3, 33:16, 33:23, 80:3, 81:4

**Court** [15] - 1:23, 20:9, 25:14, 27:6, 33:13, 34:5, 36:21, 37:4, 39:4, 43:12, 61:4, 84:8, 94:7, 94:17, 95:12

**COURT** [167] - 1:1, 4:4, 4:5, 4:23, 5:4, 5:12, 5:18, 5:24, 6:16, 6:21, 7:7, 7:11, 7:17, 7:21, 7:24, 8:7, 8:21, 9:12, 9:22, 10:22, 10:25, 11:23, 12:24, 14:1, 15:5, 18:17, 20:19, 21:10, 22:21, 24:16, 25:20, 26:1, 26:23, 27:12, 27:23, 28:2, 28:22, 29:9, 29:24, 32:8, 33:17, 34:24, 38:9, 39:7, 39:17, 40:19, 40:25, 41:21, 41:23, 41:25, 42:19, 42:21, 43:11, 43:14, 43:22, 44:5, 44:12, 45:16, 45:19, 46:2, 46:8, 46:23, 47:3, 47:9, 47:13, 47:17, 48:4, 48:13, 48:16, 49:16, 49:24, 50:8, 50:11, 50:14, 50:18, 50:24, 51:6, 51:14, 51:21, 52:17, 53:13, 53:17, 55:13, 55:23, 56:2, 56:5, 56:10, 56:18, 57:6, 57:10, 57:19, 58:22, 59:4, 59:20,

60:1, 60:18, 60:21, 60:24, 61:15, 61:18, 61:24, 62:6, 62:18, 63:4, 63:11, 63:17, 63:23, 64:17, 65:9, 65:11, 66:18, 69:6, 69:11, 71:5, 71:16, 71:22, 71:24, 72:10, 72:13, 73:12, 74:24, 75:2, 75:11, 75:14, 78:24, 79:4, 79:11, 80:2, 80:16, 80:20, 81:14, 81:18, 81:21, 82:19, 83:2, 83:10, 83:15, 83:20, 84:4, 84:12, 86:13, 87:4, 87:9, 87:22, 88:12, 88:15, 88:21, 88:25, 89:11, 89:14, 89:16, 89:20, 89:23, 89:25, 90:4, 90:12, 90:16, 90:17, 90:23, 91:8, 91:13, 92:2, 92:13, 93:15, 93:18, 94:16, 95:1

**Courthouse** [1] - 1:17

**courtroom** [2] - 17:19, 63:14

**courts** [7] - 32:3, 37:20, 54:14, 55:2, 60:15, 64:19, 65:4

**cover** [1] - 35:8

**covered** [3] - 34:22, 38:7, 88:4

**covering** [1] - 91:23

**covers** [1] - 35:3

**COVINGTON** [1] - 3:6

**Covington** [1] - 5:23

**create** [2] - 18:15, 54:4

**created** [1] - 67:5

**credit** [3] - 31:6, 31:8, 31:9

**critical** [1] - 33:5

**cross** [1] - 34:7

**CRR** [1] - 95:11

**curable** [1] - 92:18

**cure** [1] - 39:14

**current** [1] - 32:14

**customer** [3] - 73:15, 73:24, 80:13

**cut** [5] - 22:1, 58:21, 66:2, 72:14, 80:5

## D

**D.C** [4] - 2:14, 3:8, 4:22, 5:1

**damages** [1] - 91:19

**date** [3] - 73:25, 74:9, 74:15

**Date** [1] - 95:12
**dates** [6] - 7:15, 11:20, 11:25, 18:1, 18:4, 40:10
**days** [1] - 93:18
**dealing** [8] - 13:24, 18:9, 18:11, 18:13, 19:25, 34:20, 54:25, 60:14
**deceptive** [1] - 38:4
**decide** [1] - 33:14
**decided** [2] - 56:19, 63:20
**decision** [8] - 17:25, 18:3, 26:15, 31:8, 70:7, 75:8, 92:13, 93:5
**declaration** [1] - 73:3
**defeated** [1] - 42:10
**Defendant** [2] - 3:8, 3:13
**defendant** [7] - 70:14, 70:24, 86:17, 86:23, 87:15, 92:8, 92:24
**defendants** [4] - 5:22, 8:2, 72:22, 73:1
**Defendants** [1] - 1:16
**defense** [3] - 69:15, 93:8, 94:9
**deficient** [1] - 40:1
**definitely** [1] - 59:1
**degrees** [1] - 41:8
**delay** [20] - 11:11, 11:21, 31:6, 31:20, 31:23, 32:9, 32:14, 44:8, 44:12, 44:14, 51:15, 51:16, 53:7, 54:17, 58:9, 58:13, 70:1, 70:2, 71:1, 85:18
**delayed** [12] - 41:13, 45:5, 53:11, 53:22, 54:3, 54:15, 55:6, 61:23, 62:25, 64:24, 68:14, 73:20
**delays** [1] - 31:16
**delta** [1] - 68:19
**demands** [1] - 42:16
**demonstrate** [6] - 8:16, 18:4, 33:9, 34:17, 34:19, 76:3
**denied** [3] - 13:4, 13:20, 64:25
**denies** [1] - 12:20
**deny** [1] - 17:17
**depressed** [1] - 71:3
**deprived** [1] - 85:2
**DEPUTY** [3] - 4:4, 90:16, 94:16
**derivative** [1] - 40:15

**derivatives** [1] - 8:10
**described** [3] - 19:23, 35:10, 38:25
**desire** [1] - 77:22
**detail** [2] - 21:5, 85:8
**details** [1] - 10:25
**determine** [1] - 16:19
**developed** [1] - 67:1
**difference** [3] - 22:9, 22:23, 26:5
**different** [15] - 16:8, 19:2, 20:20, 25:13, 26:11, 27:17, 33:2, 35:7, 41:8, 54:6, 66:12, 66:14, 74:16, 79:12, 86:6
**differing** [1] - 77:19
**difficulty** [2] - 4:24, 4:25
**diligence** [3] - 15:15, 17:4, 17:8
**dip** [1] - 67:24
**Direct** [2] - 4:12, 71:21
**direct** [2] - 6:16, 87:20
**disagree** [2] - 14:6, 18:17
**disclosed** [2] - 60:11, 79:24
**disclosing** [1] - 57:7
**discovery** [19] - 9:20, 16:19, 17:1, 17:2, 17:9, 17:18, 20:23, 33:6, 53:25, 58:25, 63:1, 63:8, 64:20, 81:13, 82:9, 84:5, 86:19, 87:7, 87:10
**discuss** [3] - 31:19, 35:6, 77:18
**discussed** [7] - 5:25, 18:7, 18:18, 40:10, 40:14, 41:5, 72:19
**discussing** [1] - 81:25
**discussion** [5] - 14:9, 43:9, 75:24, 77:20, 90:13
**discussions** [1] - 71:10
**dismiss** [15] - 4:7, 16:18, 17:11, 18:1, 20:22, 33:14, 36:24, 39:5, 42:22, 53:20, 62:22, 62:24, 69:11, 72:23, 79:21
**dismissal** [2] - 34:6, 34:8
**dismissed** [2] - 8:12, 33:19
**dispute** [8] - 16:14, 17:9, 17:15, 17:23, 30:5, 45:12, 72:24,

73:1
**disputes** [5] - 15:13, 17:12, 62:20, 63:7, 70:20
**disrupt** [1] - 79:9
**district** [3] - 12:10, 33:16, 33:23
**District** [1] - 4:2
**DISTRICT** [3] - 1:1, 1:1, 1:20
**DMF** [6] - 68:7, 70:17, 70:18, 82:10
**DMFs** [3] - 70:12, 70:15, 71:13
**dock** [1] - 66:13
**docket** [5] - 4:9, 4:10, 4:11, 69:12, 84:14
**doctors** [1] - 44:25
**document** [2] - 7:13, 55:20
**documents** [5] - 63:15, 63:16, 78:14, 79:23, 79:25
**domestically** [1] - 16:10
**done** [16] - 16:19, 17:1, 17:9, 19:1, 19:10, 21:20, 25:10, 29:18, 36:18, 48:10, 52:8, 53:23, 55:22, 75:4, 80:24, 92:21
**door** [2] - 42:14, 50:5
**doubt** [2] - 7:14, 55:2
**down** [18] - 10:14, 28:15, 28:16, 44:8, 44:24, 45:2, 45:4, 47:18, 54:20, 55:14, 67:24, 68:1, 77:16, 80:6, 81:1, 82:2, 90:7, 91:4
**downstream** [1] - 45:14
**dozens** [1] - 37:17
**DPP** [5] - 4:15, 8:10, 8:12, 35:5, 76:16
**DPPs** [8] - 2:20, 2:24, 3:5, 5:15, 30:22, 40:14, 40:17, 65:12
**Dr** [6] - 2:11, 2:14, 2:17, 4:19, 4:20, 41:3
**draw** [2] - 13:18, 13:19
**drive** [1] - 18:2
**driven** [1] - 77:1
**DRL** [111] - 4:9, 4:15, 7:3, 7:5, 8:9, 8:11, 8:14, 9:13, 9:14, 9:24, 10:16, 12:6, 12:7, 13:1, 13:5, 13:8, 13:10, 13:12,

13:14, 13:21, 14:21, 17:4, 20:13, 20:17, 23:3, 23:19, 23:22, 24:3, 24:7, 25:10, 25:20, 25:24, 26:6, 26:13, 26:16, 26:17, 26:20, 27:6, 27:9, 27:13, 28:2, 28:5, 28:8, 28:12, 28:16, 28:24, 29:10, 30:5, 30:6, 30:9, 31:9, 31:11, 31:16, 32:12, 32:25, 34:16, 34:17, 35:4, 35:11, 35:14, 35:18, 35:19, 35:22, 35:24, 36:3, 36:9, 39:6, 40:13, 43:16, 44:1, 45:3, 46:23, 50:7, 52:7, 55:16, 55:24, 56:18, 56:23, 60:4, 68:21, 68:22, 71:9, 75:23, 76:7, 77:16, 77:20, 78:6, 78:19, 79:1, 79:9, 80:8, 80:13, 80:18, 80:24, 81:12, 81:19, 82:4, 82:10, 82:15, 83:13, 84:1, 84:19, 85:25, 91:7, 91:16, 91:21, 92:4
**DRL's** [21] - 8:11, 8:15, 10:7, 10:18, 12:10, 14:12, 21:2, 23:9, 24:10, 33:12, 34:12, 35:9, 36:13, 36:24, 40:16, 51:23, 71:10, 77:25, 82:10, 86:10
**drug** [41] - 9:5, 10:3, 14:7, 15:18, 15:24, 16:9, 19:13, 21:14, 21:16, 21:22, 22:5, 22:10, 22:20, 23:19, 23:20, 23:21, 24:1, 44:21, 45:13, 49:8, 50:3, 52:3, 52:8, 53:1, 53:6, 54:8, 54:15, 56:3, 56:24, 59:7, 59:9, 64:12, 64:16, 64:24, 65:2, 66:20, 67:9, 67:13, 67:14, 68:7, 76:1
**drugs** [9] - 24:23, 44:20, 52:9, 54:6, 54:20, 54:23, 55:8, 65:1, 67:21
**due** [3] - 15:15, 17:3, 17:8
**durable** [1] - 60:17
**during** [13] - 42:9,

43:3, 43:8, 45:10, 49:22, 54:13, 54:21, 67:5, 73:24, 74:3, 74:14, 80:10, 91:1
**dynamics** [2] - 64:10, 67:11

**E**

**early** [1] - 15:15
**earns** [2] - 53:9, 53:12
**East** [1] - 1:17
**easy** [2] - 14:22, 93:2
**eat** [1] - 72:2
**eating** [1] - 72:1
**ECF** [1] - 84:14
**economic** [2] - 36:16, 36:20
**economically** [1] - 30:3
**economics** [1] - 66:23
**educate** [2] - 8:23, 28:5
**effect** [13] - 17:24, 18:5, 20:15, 31:14, 31:18, 32:4, 33:4, 33:7, 33:11, 60:17, 64:13, 70:3, 84:10
**effective** [1] - 41:13
**effects** [5] - 9:15, 55:3, 55:7, 69:25, 71:2
**efficient** [1] - 18:15
**eight** [1] - 68:16
**eighth** [1] - 62:14
**either** [4] - 43:7, 63:13, 65:23, 70:16
**elsewhere** [1] - 54:9
**emphasize** [1] - 73:7
**end** [10] - 8:5, 17:15, 38:22, 48:8, 51:10, 63:7, 63:8, 67:7, 72:9, 93:7
**end-run** [1] - 38:22
**ended** [2] - 16:1, 59:22
**engage** [1] - 65:3
**engaged** [1] - 12:17
**engaging** [1] - 64:15
**enjoyed** [1] - 37:2
**enrichment** [4] - 37:12, 38:14, 38:17, 38:22
**enter** [5] - 54:21, 58:16, 68:5, 70:11, 84:2
**entered** [5] - 47:1, 76:10, 79:15, 83:24, 85:12
**entering** [2] - 91:11,

91:22
**enters** [1] - 44:21
**entire** [1] - 43:25
**entirety** [1] - 7:12
**entities** [1] - 37:16
**entitled** [2] - 22:7, 95:5
**entity** [2] - 91:24, 92:3
**entrant** [1] - 44:23
**entry** [19] - 27:10, 45:2, 45:4, 45:5, 53:7, 53:23, 54:3, 54:16, 54:17, 55:6, 59:14, 61:23, 62:25, 64:24, 66:7, 68:17, 86:8, 86:9
**equal** [1] - 21:12
**equals** [1] - 85:18
**equivalent** [2] - 22:6, 45:2
**especially** [1] - 74:5
**ESQUIRE** [14] - 2:2, 2:5, 2:6, 2:9, 2:9, 2:10, 2:13, 2:16, 2:19, 2:22, 3:3, 3:6, 3:7, 3:11
**essence** [1] - 48:11
**establish** [1] - 44:9
**estimated** [1] - 76:18
**estimation** [1] - 30:23
**et** [8] - 41:11, 43:24, 44:22, 51:19, 52:11, 53:24, 54:16, 54:25
**eve** [1] - 71:9
**evening** [1] - 7:6
**evidence** [1] - 83:4
**Ewing** [1] - 5:21
**EWING** [1] - 3:10
**exact** [1] - 74:10
**exactly** [1] - 9:24
**example** [8] - 9:2, 15:14, 16:15, 31:19, 39:18, 74:6, 85:25, 86:9
**examples** [2] - 16:16, 16:17
**excellent** [1] - 93:21
**exception** [1] - 6:12
**excess** [1] - 91:5
**excluded** [1] - 27:18
**exclusion** [8] - 18:5, 25:15, 27:1, 27:7, 27:13, 27:16
**exclusive** [35] - 8:25, 9:3, 13:24, 14:5, 14:13, 14:16, 16:24, 18:9, 18:11, 18:12, 18:20, 18:23, 19:11, 19:7, 19:9, 19:17, 19:25, 34:20, 46:5,

47:1, 47:3, 48:2, 50:12, 51:13, 53:24, 54:3, 54:25, 58:20, 60:13, 60:14, 61:8, 61:9, 62:4, 62:10, 62:25
**exclusively** [1] - 10:1
**exclusives** [1] - 91:12
**exclusivities** [2] - 66:24, 66:25
**exclusivity** [4] - 66:25, 67:1, 67:4, 93:1
**exist** [1] - 63:7
**existed** [2] - 35:18, 82:14
**existing** [1] - 51:12
**expand** [2] - 16:13, 78:2
**expect** [2] - 23:23, 41:1
**expectations** [1] - 56:9
**experience** [1] - 65:24
**experienced** [1] - 93:24
**experiences** [1] - 76:13
**explain** [3] - 15:10, 31:12, 44:20
**exporting** [1] - 70:9
**extensive** [1] - 14:21
**extent** [4] - 72:15, 73:22, 74:2, 74:13
**extreme** [1] - 77:6
**extremely** [1] - 86:8
**eyes** [2] - 24:10, 72:3

**F**

**fact** [17] - 9:13, 14:21, 25:12, 27:9, 28:18, 28:19, 29:12, 32:21, 35:14, 40:2, 40:11, 43:25, 62:15, 64:24, 80:19, 83:7, 87:8
**factor** [1] - 23:5
**factory** [1] - 45:25
**facts** [35] - 6:22, 10:9, 13:5, 13:18, 13:23, 17:15, 17:22, 24:2, 24:9, 25:12, 25:17, 26:21, 27:8, 27:25, 28:14, 33:9, 34:14, 34:16, 35:19, 36:12, 36:19, 36:25, 40:7, 40:10, 62:21, 63:9, 76:2, 76:14, 76:20, 77:14, 79:3, 83:15, 84:22, 85:19, 86:5
**factual** [16] - 15:13,

16:13, 17:9, 17:12, 31:3, 34:3, 45:18, 52:25, 61:4, 62:19, 63:7, 70:20, 70:25, 77:11, 82:24, 84:17
**fading** [1] - 72:3
**failed** [1] - 9:15
**fails** [1] - 8:11
**fair** [2] - 57:6, 90:1
**fairly** [1] - 66:5
**fall** [6] - 31:17, 35:5, 37:8, 37:12, 37:13, 40:17
**falls** [2] - 35:5, 40:16
**familiar** [1] - 66:16
**FAMILY** [2] - 1:4, 1:6
**Faneuil** [1] - 2:6
**fantastic** [1] - 93:23
**far** [1] - 62:15
**Farm** [1] - 2:3
**Farms** [1] - 2:16
**fault** [1] - 53:24
**favor** [1] - 50:18
**FDA** [31] - 10:9, 12:3, 12:4, 12:6, 12:12, 14:18, 20:18, 23:21, 27:5, 32:18, 45:25, 46:12, 46:15, 46:18, 48:7, 48:23, 49:1, 49:14, 52:11, 55:22, 58:18, 61:11, 62:17, 68:23, 85:10, 85:13, 85:16
**fearful** [1] - 59:3
**Federal** [1] - 69:18
**federal** [16] - 12:9, 12:20, 13:4, 13:14, 13:20, 20:16, 21:4, 22:2, 31:7, 32:21, 37:7, 37:12, 38:15, 40:12, 85:20, 85:23
**FEDERAL** [1] - 95:1
**Fera** [3] - 26:25, 77:7, 86:7
**few** [3] - 16:19, 35:6, 37:3
**fide** [1] - 70:10
**field** [1] - 54:24
**fifth** [1] - 58:5
**fight** [1] - 15:17
**figure** [4] - 57:2, 60:2, 80:25, 88:8
**file** [4] - 26:8, 68:7, 85:10, 85:13
**filed** [4] - 25:22, 56:14, 77:17, 85:11
**filing** [1] - 85:16
**final** [6] - 12:3, 12:6, 33:12, 68:23, 70:13
**finally** [3] - 42:11,

56:24, 80:12
**financial** [2] - 40:6, 60:9
**fine** [6] - 7:8, 7:17, 8:7, 25:1, 29:10, 60:1
**Fine** [1] - 31:22
**finish** [1] - 69:7
**FINORGA** [1] - 1:15
**FIRE** [3] - 1:3, 1:5, 1:5
**FIRM** [1] - 2:18
**firm** [3] - 4:18, 4:21, 5:21
**first** [34] - 6:3, 6:5, 8:3, 8:9, 14:11, 23:18, 23:20, 23:25, 24:4, 27:21, 29:20, 30:20, 30:23, 30:25, 35:9, 35:11, 41:7, 41:19, 42:3, 44:2, 44:22, 46:3, 50:3, 55:23, 66:5, 67:23, 68:3, 76:5, 76:6, 76:18, 78:2, 85:5, 87:9, 87:17
**Fisher** [1] - 1:17
**five** [7] - 31:22, 45:22, 46:3, 46:4, 46:7, 46:9, 46:12, 58:10, 61:25, 62:2, 62:7, 62:11, 62:17, 63:20, 70:9, 72:11
**fix** [1] - 40:22
**fixing** [1] - 40:23
**flaws** [1] - 35:11
**Floor** [3] - 2:6, 2:10, 3:4
**focus** [2] - 8:9, 19:24
**focused** [1] - 51:2
**fold** [1] - 19:2
**folks** [1] - 73:13
**following** [1] - 88:12
**Footnote** [2] - 69:18, 69:19
**footnote** [4] - 69:21, 70:5, 70:19, 76:17
**FOR** [2] - 1:1, 1:5
**forecast** [1] - 41:11
**foreclosed** [4] - 55:10, 61:9, 61:10, 85:9
**forecloses** [1] - 64:15
**foreclosure** [20] - 11:13, 13:19, 20:1, 20:14, 23:11, 33:10, 34:13, 61:13, 66:10, 66:11, 68:10, 68:12, 68:20, 69:3, 69:22, 69:23, 84:25, 85:6, 85:17, 85:19
**foregoing** [1] - 95:4
**forever** [1] - 40:21

**forget** [1] - 26:7
**forth** [5] - 23:10, 35:23, 55:21, 56:8, 61:3
**forward** [8] - 26:10, 29:4, 29:14, 36:8, 47:4, 50:11, 51:25, 52:2
**fought** [2] - 56:16, 58:16
**four** [16] - 14:4, 14:6, 15:1, 14:20, 29:6, 29:9, 31:20, 46:4, 46:6, 48:21, 51:25, 52:4, 58:5, 71:13, 75:21, 86:12
**fourth** [1] - 44:22
**fraction** [1] - 76:7
**frame** [1] - 13:16
**Frank** [1] - 4:20
**FRANK** [1] - 2:16
**Frankly** [1] - 7:14
**freezing** [1] - 20:12
**frequently** [1] - 18:13
**Fresenius** [6] - 27:1, 69:17, 77:8, 85:7, 85:15, 86:7
**fresh** [1] - 41:4
**freshest** [1] - 42:1
**Friday** [1] - 7:6
**front** [1] - 7:12
**frozen** [1] - 20:11
**frustrated** [1] - 73:20
**full** [7] - 9:3, 12:15, 51:18, 65:24, 68:16, 77:22, 85:25
**fully** [2] - 27:18, 51:23
**fungible** [1] - 54:7

**G**

**gaining** [1] - 11:21
**GATELY** [2] - 2:22, 5:13
**Gately** [2] - 5:14, 5:18
**gears** [1] - 55:13
**general** [3] - 14:3, 15:5, 19:6
**generally** [1] - 32:13
**generic** [67] - 8:15, 8:17, 8:19, 8:20, 9:17, 10:3, 11:21, 14:7, 15:18, 15:24, 21:11, 21:14, 21:22, 22:5, 23:7, 23:24, 25:15, 31:23, 44:20, 44:21, 44:23, 45:1, 45:2, 45:4, 46:15, 50:2, 52:8, 52:21, 53:5, 53:6, 53:23,

54:2, 54:13, 54:15, 54:20, 55:6, 55:8, 56:3, 59:3, 59:7, 59:9, 59:14, 59:18, 64:8, 64:12, 64:16, 64:24, 65:2, 66:6, 67:13, 67:14, 67:19, 67:20, 67:23, 67:24, 68:5, 68:17, 70:13, 73:21, 76:1, 76:23, 77:22, 85:2, 91:3
**generics** [11] - 27:5, 67:8, 68:1, 69:1, 70:1, 70:10, 76:5, 76:7, 76:9, 76:25, 77:2
**Geneva** [4] - 26:25, 70:22, 86:7, 86:9
**Giralda** [1] - 2:16
**given** [4] - 34:16, 55:6, 66:24, 67:6
**glitch** [1] - 89:7
**global** [1] - 16:9
**Gloucester** [1] - 66:13
**goals** [1] - 56:9
**Godfather** [1] - 60:18
**GOODRICH** [2] - 2:8, 2:12
**Goodrich** [1] - 5:2
**government** [1] - 67:5
**government-created** [1] - 67:5
**grant** [2] - 17:11, 70:24
**granted** [1] - 53:20
**granting** [2] - 15:11, 17:16
**great** [1] - 53:25
**greatly** [1] - 8:6
**GROUP** [1] - 3:2
**group** [3] - 78:22, 83:1
**GROUPE** [1] - 1:14
**grow** [1] - 25:4
**growth** [1] - 59:2
**guess** [7] - 17:3, 21:21, 26:5, 59:4, 79:12, 82:21, 92:5
**guys** [23] - 5:25, 6:2, 10:1, 16:22, 17:8, 39:25, 52:20, 56:25, 59:24, 63:12, 65:25, 71:25, 75:18, 79:14, 84:4, 87:14, 88:15, 89:17, 90:17, 92:3, 92:20, 93:2

## H

**HAGENS** [1] - 2:5
**Hagens** [1] - 5:10

**half** [2] - 16:16, 66:8
**Hall** [1] - 2:6
**handed** [1] - 82:6
**handling** [1] - 69:16
**hands** [1] - 53:6
**handwriting** [1] - 75:18
**hanging** [1] - 46:23
**happy** [6] - 8:22, 11:24, 38:6, 72:13, 73:12, 86:11
**hard** [1] - 54:19
**harm** [17] - 32:23, 32:24, 32:25, 53:24, 54:3, 54:17, 54:21, 55:1, 55:3, 55:5, 55:12, 61:14, 64:11, 64:19, 64:23, 64:25
**harmed** [1] - 32:9
**harmful** [2] - 60:16, 60:17
**head** [1] - 43:7
**heads** [1] - 66:1
**heads-up** [1] - 66:1
**hear** [10] - 4:16, 5:19, 7:19, 8:22, 11:24, 55:15, 65:15, 72:13, 75:19, 90:6
**heard** [2] - 40:24, 91:2
**hearing** [3] - 4:24, 6:8, 15:9
**heft** [1] - 61:5
**held** [2] - 4:11, 18:24
**help** [1] - 69:10
**helpful** [5] - 11:23, 43:2, 50:19, 50:20, 73:13
**helping** [1] - 25:4
**hereby** [1] - 73:14
**Herrmann** [1] - 5:14
**HERRMANN** [1] - 2:21
**hesitating** [1] - 57:4
**HESTER** [1] - 3:7
**Hester** [3] - 5:23, 69:15, 82:6
**Hi** [1] - 71:20
**high** [1] - 47:24
**higher** [1] - 47:12
**highlight** [1] - 72:15
**highlights** [1] - 74:2
**highly** [2] - 6:13, 18:14
**Hikma** [63] - 10:19, 10:22, 11:1, 11:2, 11:8, 11:9, 11:15, 12:3, 12:4, 12:22, 12:23, 12:24, 13:3, 13:12, 13:20, 14:17, 15:2, 20:15, 21:3, 22:14, 22:19, 23:1,

23:5, 23:12, 23:16, 23:19, 23:24, 24:3, 24:6, 24:8, 24:12, 24:14, 24:18, 25:5, 30:19, 30:24, 31:7, 31:10, 32:20, 32:21, 34:15, 40:11, 44:1, 44:2, 45:3, 45:8, 61:17, 61:22, 62:1, 62:3, 62:8, 62:9, 68:13, 68:18, 76:7, 85:1, 85:3, 85:4, 85:20, 85:21
**Hikma's** [2] - 22:24, 86:10
**himself** [1] - 5:8
**hindered** [1] - 23:3
**history** [1] - 25:3
**hoarded** [1] - 70:14
**hold** [3] - 53:8, 60:10, 94:1
**HOLDING** [1] - 1:13
**holding** [1] - 7:2
**home** [1] - 72:6
**Honor** [114] - 4:17, 4:20, 5:5, 5:9, 5:13, 5:20, 6:11, 6:15, 7:6, 7:14, 7:20, 8:1, 8:9, 10:8, 11:9, 11:19, 14:11, 17:20, 17:25, 20:25, 23:8, 24:6, 25:11, 26:13, 26:20, 26:25, 29:22, 30:4, 30:8, 31:5, 32:17, 34:21, 37:1, 37:8, 38:25, 39:15, 40:7, 40:18, 41:2, 41:22, 42:7, 42:13, 42:17, 43:9, 43:13, 44:18, 45:18, 45:22, 47:7, 47:23, 48:11, 49:6, 49:23, 50:4, 52:7, 52:23, 53:10, 53:16, 54:5, 54:24, 56:7, 56:13, 57:15, 58:24, 60:13, 61:2, 62:15, 62:23, 63:15, 64:7, 64:19, 64:21, 65:7, 65:10, 66:3, 71:14, 71:20, 72:8, 72:12, 72:18, 72:24, 73:10, 73:11, 74:1, 74:10, 74:12, 74:18, 74:22, 75:7, 75:8, 75:21, 77:12, 78:15, 79:6, 80:9, 80:19, 81:5, 81:12, 83:17, 84:7, 86:11, 87:2, 87:6, 87:19, 89:10, 89:13, 89:22, 90:20, 91:7,

91:22, 92:12, 93:14, 93:17
**Honor's** [1] - 14:25
**Honorable** [1] - 4:1
**HONORABLE** [1] - 1:20
**hook** [1] - 86:14
**hope** [1] - 69:4
**hopefully** [1] - 43:8
**hoping** [1] - 46:11
**Hospital** [1] - 20:9
**hot** [1] - 57:13
**housekeeping** [3] - 7:18, 8:3, 71:4
**huge** [1] - 67:19
**hypothetical** [3] - 9:25, 51:22, 74:6

## I

**i.e** [1] - 71:11
**idea** [4] - 6:24, 24:21, 44:2, 83:16
**identified** [5] - 43:11, 44:7, 49:21, 50:1, 50:25
**identify** [2] - 68:3, 86:22
**identifying** [2] - 75:14, 92:20
**Ill** [4] - 37:21, 69:4, 72:25, 74:19
**illegal** [1] - 16:23
**immediately** [4] - 10:20, 25:18, 26:18, 41:16
**impact** [10] - 13:2, 20:8, 24:11, 24:14, 31:15, 32:6, 32:7, 59:3, 63:21
**impairment** [1] - 11:14
**impermissible** [1] - 16:23
**implausible** [1] - 11:18
**important** [6] - 22:13, 23:19, 25:12, 54:5, 67:17, 76:22
**improper** [1] - 18:23
**improperly** [1] - 36:23
**INC** [4] - 1:9, 1:13, 1:13, 1:14
**incentive** [2] - 59:23, 65:2
**included** [1] - 12:13
**including** [5] - 6:6, 8:18, 40:11, 46:9, 91:5
**increased** [2] - 77:8, 77:9

**increases** [1] - 77:7
**incurring** [1] - 58:12
**indeed** [9] - 10:11, 10:19, 14:20, 20:8, 21:7, 27:4, 30:16, 30:21, 77:15
**Indeed** [1] - 18:12
**indicate** [3] - 12:11, 30:14, 73:8
**indication** [10] - 23:20, 23:21, 23:25, 24:5, 30:20, 30:23, 76:6, 76:8, 76:18, 85:5
**indirect** [1] - 37:25, 38:3, 38:19, 38:23, 66:4
**Indirect** [1] - 2:4, 2:7, 5:6, 5:10
**individuals** [2] - 78:18, 79:24
**induced** [1] - 60:25
**inducements** [1] - 60:9
**indulgence** [1] - 11:19
**industry** [2] - 44:21, 70:7
**infer** [1] - 81:8
**inference** [6] - 52:13, 84:8, 86:24, 87:3, 91:9, 92:17
**information** [18] - 22:17, 22:23, 22:25, 23:14, 30:11, 30:17, 78:12, 78:18, 78:21, 79:7, 79:8, 80:1, 80:10, 82:25, 87:17, 92:6, 92:7, 92:22
**informed** [1] - 91:4
**infringement** [2] - 56:15, 58:17
**ingredient** [9] - 9:4, 10:2, 14:7, 19:13, 32:16, 52:22, 58:7, 67:2, 68:6
**ingredients** [1] - 24:22
**inherently** [3] - 18:10, 18:22, 64:12
**injunctive** [1] - 38:16
**injured** [1] - 22:11
**injuries** [1] - 54:18
**injury** [7] - 9:16, 33:25, 34:13, 51:8, 74:7, 74:8
**instance** [1] - 74:10
**instead** [4] - 26:6, 45:6, 45:9, 68:24
**insufficient** [2] - 44:15, 51:17
**insufficiently** [1] -

26:7
**insulting** [1] - 29:12
**intend** [1] - 6:16
**intended** [2] - 21:16, 23:2
**intent** [2] - 59:20, 63:19
**interest** [1] - 73:16
**interesting** [2] - 67:8, 71:8
**interfere** [5] - 36:18, 43:1, 60:3, 84:22, 87:12
**interfered** [9] - 36:4, 36:10, 36:21, 51:2, 55:19, 58:1, 60:3, 82:14, 83:21
**interference** [24] - 15:13, 34:21, 35:10, 35:15, 36:13, 36:15, 36:23, 42:2, 42:8, 51:5, 58:3, 82:17, 83:18, 84:20, 86:16, 87:20, 88:24, 89:1, 89:6, 90:6, 90:21, 92:15, 93:8, 93:12
**interim** [1] - 54:13
**internal** [1] - 63:16
**internationally** [1] - 16:10
**interrupted** [1] - 81:22
**intertwined** [3] - 15:12, 16:3, 17:12
**introduce** [1] - 5:7
**introduction** [1] - 73:20
**invalid** [2] - 12:2, 15:17
**investing** [1] - 25:4
**investor** [1] - 91:1
**investors** [1] - 53:3
**involved** [1] - 74:7
**IPP** [7] - 4:10, 4:15, 8:10, 8:12, 35:5, 37:1, 37:2
**IPPs** [8] - 34:22, 37:8, 38:6, 38:13, 40:14, 40:16, 65:12, 75:23
**IRELAND** [1] - 1:10
**irrelevant** [1] - 57:23
**issue** [27] - 6:21, 17:2, 17:24, 20:13, 30:9, 32:22, 33:14, 33:15, 33:21, 36:6, 37:21, 39:2, 40:6, 43:23, 44:7, 45:18, 57:17, 61:2, 66:9, 72:21, 76:25, 78:9, 78:10, 84:25, 90:21, 93:12
**issues** [17] - 16:3,

17:18, 17:21, 26:19, 30:13, 33:6, 37:15, 40:5, 43:5, 70:25, 72:15, 72:19, 75:6, 77:5, 85:21, 85:23, 94:5
**items** [1] - 35:6
**itself** [9] - 9:14, 13:8, 13:21, 20:17, 34:5, 34:8, 39:6, 44:12, 45:13

## J

**JAMES** [1] - 2:2
**James** [1] - 5:6
**Jane** [1] - 31:22
**Jefferson** [1] - 20:8
**JERSEY** [1] - 1:1
**Jersey** [9] - 1:18, 5:21, 37:16, 38:14, 38:18, 38:19, 38:23, 39:1, 87:20
**JUDGE** [1] - 1:20
**judge** [2] - 33:23, 69:4
**Judge** [10] - 4:2, 9:8, 9:11, 39:18, 44:13, 57:10, 75:5, 75:7, 75:9, 79:21
**judges** [1] - 33:16
**judgment** [8] - 17:14, 17:16, 63:2, 63:6, 63:25, 64:5, 65:5, 70:24
**July** [1] - 68:15
**June** [9] - 45:10, 49:6, 49:14, 51:9, 51:17, 51:20, 53:11, 68:24, 74:15

## K

**Kabi** [3] - 77:8, 85:7, 85:15
**KD** [111] - 10:13, 10:14, 21:8, 26:14, 26:15, 26:16, 26:19, 27:20, 28:1, 28:15, 28:19, 28:24, 29:3, 29:22, 30:5, 30:9, 35:14, 35:18, 35:21, 36:3, 36:8, 36:9, 39:19, 40:4, 41:21, 41:24, 41:25, 42:5, 42:11, 42:14, 42:18, 42:23, 43:16, 43:20, 46:6, 46:9, 46:13, 46:17, 46:18, 46:21, 46:23, 47:4, 48:14, 48:18, 49:18, 49:21,

49:25, 50:5, 50:6, 50:17, 51:1, 51:22, 51:24, 52:10, 52:14, 52:15, 52:18, 52:19, 55:14, 55:16, 55:24, 56:12, 56:19, 56:23, 58:14, 58:23, 59:9, 59:14, 59:21, 59:22, 59:23, 60:4, 60:9, 60:11, 60:19, 78:10, 78:13, 78:25, 79:1, 79:9, 79:14, 80:8, 80:12, 80:14, 80:17, 81:9, 81:10, 81:19, 82:10, 82:11, 82:14, 83:12, 83:22, 83:25, 84:19, 86:18, 86:23, 87:7, 87:13, 87:14, 91:16, 91:17, 91:20, 91:25, 92:7, 92:22, 92:23
**KDH** [1] - 71:21
**keep** [6] - 20:21, 32:20, 42:10, 53:6, 56:16, 65:2
**keeping** [1] - 64:12
**kept** [1] - 94:11
**key** [12] - 6:22, 11:20, 11:25, 15:1, 18:1, 22:16, 25:9, 27:9, 32:25, 37:3, 59:15, 64:16
**kidding** [1] - 72:11
**kind** [6] - 32:14, 62:1, 62:25, 67:13, 77:21, 81:6
**kinds** [4] - 35:6, 55:2, 60:8, 77:19
**KNOPF** [1] - 2:21
**Knopf** [1] - 5:14
**knowing** [5] - 9:3, 15:16, 42:25, 62:1, 64:18
**knowledge** [10] - 36:6, 78:10, 83:19, 84:21, 86:21, 87:21, 87:22, 88:2, 90:21
**known** [2] - 70:12, 78:12
**KPH** [4] - 72:21, 72:24, 73:4

## L

**label** [2] - 24:4, 76:9
**Laboratories** [1] - 41:3
**Labs** [4] - 2:11, 2:14, 2:17, 4:19
**lack** [1] - 36:8

**laid** [2] - 55:21, 69:10
**language** [6] - 73:2, 73:6, 73:8, 73:21, 74:11, 74:12
**large** [2] - 66:10, 70:1
**last** [5] - 72:1, 84:25, 86:14, 89:3, 93:13
**lasting** [1] - 71:2
**late** [1] - 68:25
**latter** [1] - 9:11
**launch** [81] - 10:3, 11:2, 11:6, 12:16, 13:9, 13:22, 14:18, 15:18, 15:21, 17:7, 21:3, 21:11, 21:12, 21:13, 21:16, 21:18, 21:22, 22:1, 22:10, 22:13, 22:14, 22:19, 22:22, 22:24, 23:2, 23:17, 23:23, 23:24, 24:8, 24:10, 24:11, 25:6, 25:22, 26:2, 26:10, 26:12, 26:20, 27:14, 27:16, 27:20, 30:6, 31:2, 31:10, 32:14, 32:19, 41:7, 41:9, 41:10, 41:12, 41:13, 42:11, 43:23, 43:24, 44:15, 45:7, 45:9, 45:19, 46:12, 48:5, 51:7, 51:17, 52:20, 56:24, 58:7, 58:11, 58:16, 59:10, 61:15, 61:21, 77:22, 78:1, 78:8, 78:22, 85:16, 86:2
**launchability** [1] - 78:4
**launched** [39] - 8:19, 10:19, 11:2, 11:4, 11:9, 11:10, 11:15, 13:3, 13:6, 13:13, 13:20, 15:2, 20:16, 22:5, 22:10, 22:14, 23:1, 23:6, 23:12, 24:4, 25:5, 26:17, 27:20, 30:11, 30:19, 31:7, 32:21, 40:11, 46:9, 48:8, 52:16, 77:17, 85:4, 85:20, 85:22, 86:4
**launches** [5] - 12:22, 21:14, 25:17, 77:19, 77:21
**launching** [7] - 22:6, 26:6, 26:8, 26:9, 31:10, 31:11, 49:4
**Lauren** [1] - 5:11
**LAUREN** [1] - 2:6
**law** [32] - 5:21, 18:18,

19:6, 19:19, 34:20, 37:2, 37:4, 37:9, 37:10, 37:11, 38:1, 38:6, 38:14, 38:15, 38:16, 38:19, 43:2, 44:8, 44:19, 52:24, 53:18, 53:19, 55:5, 62:23, 63:13, 67:9, 69:10, 69:19, 74:19, 75:6, 87:19, 93:22
**LAW** [2] - 2:18, 3:2
**lawful** [2] - 18:14, 19:22
**laws** [13] - 8:25, 9:8, 13:25, 18:21, 19:4, 19:8, 31:13, 31:18, 32:5, 33:20, 34:10, 67:12, 73:17
**lawsuit** [2] - 25:22, 72:25
**lawyer** [1] - 69:15
**lawyers** [1] - 93:24
**lead** [1] - 5:17
**leader** [1] - 12:16
**leading** [1] - 52:25
**learned** [4] - 80:3, 81:2, 82:21, 86:19
**learning** [1] - 81:18
**least** [16] - 11:1, 21:19, 28:7, 39:13, 48:22, 51:23, 52:4, 56:9, 57:24, 58:3, 63:2, 82:3, 82:21, 86:8, 87:11
**leave** [2] - 46:23, 90:8
**legal** [11] - 11:12, 13:23, 15:3, 16:3, 17:12, 18:6, 21:19, 21:24, 22:2, 34:1, 57:1
**legs** [1] - 48:19
**LEHR** [1] - 3:10
**lengthy** [1] - 37:2
**less** [2] - 36:16, 40:24
**letting** [1] - 93:9
**level** [1] - 13:14
**liaison** [1] - 5:15
**Liason** [3] - 2:20, 2:24, 3:5
**Lifland** [1] - 5:14
**LIFLAND** [1] - 2:21
**lightly** [1] - 84:8
**likely** [6] - 42:13, 42:17, 63:13, 64:19, 65:21, 69:24
**limit** [1] - 74:5
**limitation** [2] - 78:4, 78:7
**limited** [29] - 21:15, 21:25, 22:16, 23:13,

23:15, 23:22, 24:8, 24:10, 25:7, 26:9, 27:13, 27:15, 27:16, 27:20, 31:1, 31:2, 31:8, 31:10, 31:12, 31:15, 32:10, 54:10, 59:15, 74:9, 77:21, 78:9, 78:17, 86:1
**LIMITED** [1] - 1:10
**limiting** [1] - 38:3
**limits** [1] - 74:2
**Linares** [1] - 75:9
**Linares'** [1] - 75:7
**LINDA** [1] - 3:3
**Linda** [1] - 5:16
**line** [12] - 10:13, 10:19, 14:17, 25:5, 26:15, 30:19, 32:17, 34:7, 34:11, 37:7, 85:25, 86:3
**lined** [28] - 8:17, 9:17, 10:11, 10:12, 12:11, 12:13, 12:18, 13:3, 13:7, 13:11, 13:12, 13:16, 13:21, 14:15, 20:17, 21:5, 21:8, 24:12, 30:10, 30:16, 34:15, 34:16, 40:3, 52:10, 58:18, 59:17, 71:13, 86:3
**lines** [2] - 29:21, 70:8
**lining** [1] - 25:18
**Liquid** [1] - 75:8
**literally** [6] - 43:6, 49:17, 52:6, 67:10, 87:20, 91:7
**litigation** [14] - 10:23, 15:9, 21:20, 42:9, 49:22, 57:25, 80:11, 81:3, 82:9, 84:6, 86:20, 87:23, 88:3, 88:16
**LLC** [2] - 1:13, 1:14
**LLP** [6] - 2:5, 2:21, 3:6, 3:10, 5:10, 5:15
**LOCAL** [1] - 1:4
**located** [1] - 25:5
**lock** [1] - 63:21
**locked** [10] - 8:14, 9:2, 10:1, 10:4, 10:17, 34:17, 61:12, 61:20, 77:24, 81:10
**lockup** [1] - 11:17
**logic** [2] - 62:1, 88:13
**look** [15] - 23:1, 28:20, 50:25, 52:10, 54:9, 56:6, 59:7, 70:6, 70:7, 70:10, 73:6, 79:19, 87:23, 92:13
**looking** [11] - 16:12,

19:24, 20:6, 20:11, 32:5, 32:23, 55:4, 80:11, 89:5, 90:21
**loses** [1] - 44:25
**lost** [1] - 51:24
**lower** [4] - 11:4, 23:2, 45:6, 45:9
**LTD** [1] - 1:12
**luckily** [1] - 17:23
**lunch** [1] - 71:25

## M

**MA** [1] - 2:7
**machines** [1] - 72:2
**Madison** [1] - 2:17
**major** [1] - 37:19
**manner** [3] - 21:16, 21:23, 22:6
**manufacture** [1] - 24:23
**manufactured** [1] - 16:25
**manufacturer** [4] - 21:11, 52:8, 71:12, 73:19
**manufacturer's** [1] - 73:19
**manufacturers** [1] - 73:17
**March** [1] - 11:25
**mark** [1] - 69:14
**market** [23] - 11:22, 16:12, 28:17, 32:6, 42:10, 42:16, 45:12, 56:3, 56:15, 56:16, 58:6, 66:11, 66:12, 67:3, 67:19, 68:5, 68:18, 68:22, 69:1, 70:11, 71:3, 71:12, 85:1
**market's** [1] - 20:5
**market-wide** [1] - 32:6
**marketed** [2] - 16:9, 16:25
**marketing** [1] - 21:15
**marketplace** [27] - 8:20, 11:14, 12:8, 14:20, 20:2, 20:8, 25:3, 25:16, 27:2, 27:10, 30:21, 30:24, 31:16, 32:24, 49:9, 55:11, 56:17, 58:16, 59:8, 63:20, 64:13, 64:14, 65:3, 76:7, 76:11, 85:4, 86:4
**MIKE** [1] - 2:19
**milk** [1] - 67:25
**millions** [1] - 41:11
**mind** [3] - 29:2, 41:5, 42:1
**minimum** [4] - 39:23, 60:5, 65:4, 91:23

**matter** [7] - 8:3, 21:12, 52:3, 60:7, 63:13, 94:14, 95:5
**matters** [1] - 4:7
**Matthew** [1] - 5:14
**MATTHEW** [1] - 2:22
**McKay** [2] - 1:23, 95:11
**McKay-Soule** [2] - 1:23, 95:11
**McKesson** [3] - 73:4, 73:14
**McKesson's** [1] - 73:23
**mean** [20] - 6:1, 10:22, 22:5, 25:1, 29:5, 30:4, 37:7, 39:7, 39:11, 39:16, 40:8, 40:21, 49:8, 59:11, 59:13, 63:12, 64:4, 80:5, 89:16, 94:2
**meaning** [3] - 8:11, 11:3, 27:13
**meaningful** [1] - 20:2
**means** [8] - 4:24, 23:6, 45:5, 53:9, 54:12, 55:11, 61:14, 91:23
**mechanical** [1] - 1:25
**meet** [2] - 13:23, 34:18
**meets** [1] - 18:6
**Megan** [2] - 1:23, 95:11
**megansoule430@ gmail.com** [1] - 1:23
**memorize** [1] - 28:4
**memorized** [2] - 42:4, 53:14
**mention** [1] - 91:7
**mentioned** [3] - 35:4, 75:6, 76:16
**message** [1] - 22:4
**metric** [4] - 42:15, 42:16, 47:2, 71:11
**Michael** [2] - 5:16, 71:20
**microphone** [3] - 4:23, 7:25, 86:14
**middle** [1] - 71:25
**might** [12] - 6:14, 14:25, 22:1, 26:10, 60:15, 66:12, 66:13, 66:25, 67:4, 77:22, 92:4

**minute** [2] - 18:8, 37:6
**minutes** [10] - 8:5, 65:18, 65:21, 72:5, 72:8, 72:11, 89:19, 89:21, 90:10, 90:12
**miraculously** [1] - 63:9
**misconduct** [1] - 15:23
**missing** [2] - 57:2, 75:3
**model** [1] - 49:10
**moment** [1] - 47:12, 60:7
**monopolist** [8] - 45:11, 45:15, 53:4, 54:16, 63:3, 65:1, 70:4, 76:1
**monopoly** [8] - 53:9, 53:12, 66:21, 67:6, 67:14, 75:25, 77:10
**month** [10] - 12:12, 20:17, 31:20, 31:22, 31:25, 32:18, 45:10, 53:8, 67:21, 86:4
**months** [15] - 23:16, 30:25, 31:11, 32:19, 45:11, 49:5, 53:10, 53:11, 67:15, 68:16, 86:2, 86:5, 86:10, 91:19, 91:23
**morning** [4] - 4:17, 5:4, 5:5, 5:9, 5:12, 5:13, 5:18, 5:20, 5:24, 8:1
**most** [3] - 35:14, 39:8, 76:4
**motion** [20] - 4:7, 6:2, 6:6, 14:12, 15:11, 16:18, 17:11, 17:25, 20:22, 33:14, 36:24, 42:21, 53:20, 62:22, 62:24, 72:22, 79:20, 94:13
**motions** [1] - 93:25
**move** [2] - 33:5, 50:11
**moved** [3] - 36:8, 51:24, 52:2
**movement** [1] - 67:19
**moving** [1] - 29:14
**MR** [118] - 4:17, 4:20, 5:1, 5:5, 5:9, 5:13, 5:20, 6:11, 6:20, 7:4, 7:10, 7:14, 7:20, 7:23, 40:24, 41:2, 41:22, 41:24, 42:7, 42:20, 43:6, 43:13, 43:18, 43:23, 44:11, 44:18, 45:18, 45:21,

46:6, 46:11, 46:25, 47:7, 47:10, 47:14, 47:23, 48:11, 48:14, 48:17, 49:23, 50:4, 50:10, 50:13, 50:15, 50:22, 51:4, 51:7, 51:16, 52:6, 52:23, 53:16, 53:18, 55:20, 56:1, 56:4, 56:6, 56:13, 57:4, 57:9, 57:14, 57:15, 58:12, 58:24, 59:13, 60:5, 60:11, 60:20, 60:22, 60:25, 61:17, 61:22, 62:3, 62:9, 62:19, 63:10, 63:15, 63:18, 64:7, 64:18, 65:10, 66:3, 66:19, 69:9, 69:14, 71:6, 71:20, 71:23, 72:8, 72:11, 72:18, 73:14, 75:1, 75:4, 75:13, 80:9, 80:19, 81:5, 81:17, 81:20, 87:2, 87:6, 87:19, 88:10, 88:14, 88:20, 88:22, 89:10, 89:15, 89:18, 89:21, 89:24, 90:2, 90:11, 90:20, 90:25, 91:9, 91:15, 92:12, 93:17
**MS** [45] - 8:1, 8:8, 9:11, 9:13, 10:8, 10:24, 11:9, 11:25, 12:25, 14:10, 17:20, 19:19, 20:25, 22:12, 23:8, 25:2, 25:24, 26:13, 26:24, 27:19, 27:25, 28:13, 29:8, 29:20, 30:3, 32:17, 33:19, 35:3, 38:11, 39:15, 40:2, 75:21, 79:3, 79:6, 79:23, 82:8, 82:23, 83:7, 83:14, 83:17, 83:24, 84:7, 84:14, 89:13, 93:14
**muddied** [1] - 81:14
**multiple** [3] - 35:11, 65:3, 68:1
**must** [4] - 49:17, 50:6, 62:2, 87:15
**myriad** [1] - 37:17

## N

**nah** [1] - 56:19
**name** [2] - 12:18, 41:23
**named** [1] - 37:15
**narrative** [1] - 83:6

**nature** [3] - 77:4, 77:11, 85:3
**necessarily** [6] - 11:5, 18:17, 19:6, 24:21, 87:4, 92:3
**necessary** [1] - 16:11
**need** [24] - 9:4, 9:19, 10:5, 11:12, 16:5, 19:13, 24:24, 24:25, 33:5, 40:23, 46:2, 46:3, 48:5, 51:23, 52:18, 54:7, 63:1, 69:19, 83:18, 86:14, 86:16, 86:25, 90:5, 90:7
**needed** [2] - 30:13, 53:25
**needs** [3] - 25:10, 35:14, 52:14
**negotiate** [1] - 50:6
**net** [2] - 77:3
**net-to-net** [1] - 77:3
**never** [5] - 10:3, 51:24, 63:11, 69:5, 85:10
**NEW** [1] - 1:1
**new** [6] - 44:23, 45:24, 62:21, 66:12, 67:1
**New** [12] - 1:18, 2:11, 3:4, 5:21, 37:16, 38:13, 38:18, 38:19, 38:23, 39:1, 87:20
**Newark** [1] - 3:13
**next** [8] - 12:22, 19:20, 32:21, 64:4, 69:13, 81:10, 84:3, 91:18
**nexus** [1] - 38:2
**nice** [1] - 71:23
**nine** [2] - 31:22, 68:18
**ninth** [1] - 62:14
**NISSHIN** [1] - 1:13
**NJ** [4] - 2:3, 2:17, 2:24, 3:13
**nobody's** [1] - 17:16
**non** [1] - 31:15
**non-substantial** [1] - 31:15
**none** [1] - 38:5
**nonetheless** [1] - 36:5
**normal** [1] - 76:23
**note** [4] - 36:22, 37:4, 38:12, 41:8
**noted** [2] - 37:14, 37:21
**notes** [2] - 37:24, 65:22
**nothing** [8] - 6:13, 16:23, 18:10, 18:22, 53:25, 64:14, 83:25, 89:20
**notice** [2] - 43:19,

43:20
**noting** [1] - 38:13
**notion** [2] - 39:1, 77:15
**NOVASEP** [3] - 1:14, 1:14
**November** [6] - 12:20, 12:21, 68:14, 73:24, 74:14
**number** [13] - 4:10, 4:11, 14:16, 20:4, 22:19, 22:20, 37:24, 54:10, 69:23, 76:11, 84:3, 84:15
**Number** [1] - 14:17
**NUMBERS** [1] - 1:3
**numerous** [4] - 14:19, 54:2
**NUSSBAUM** [2] - 3:2, 3:3
**Nussbaum** [1] - 5:16
**NW** [2] - 2:13, 3:7
**NY** [2] - 2:11, 3:4

---

**O**

**objection** [2] - 6:18, 6:20
**objective** [1] - 34:13
**obligations** [3] - 55:21, 57:22, 60:6
**obtain** [1] - 32:15
**obvious** [2] - 29:13, 91:8
**obviously** [4] - 14:17, 37:5, 65:15, 66:11
**occasion** [1] - 39:22
**occurred** [3] - 26:15, 74:9, 90:15
**October** [1] - 49:12
**OF** [1] - 1:1
**offer** [8] - 10:14, 28:25, 29:3, 29:16, 29:22, 36:9, 59:9, 60:19
**offered** [8] - 26:16, 28:1, 28:14, 28:15, 28:19, 35:22, 47:12
**offers** [1] - 27:9
**office** [2] - 4:22, 5:1
**OFFICERS** [3] - 1:3, 1:5, 1:6
**Official** [1] - 1:23
**OFFICIAL** [1] - 95:1
**official** [1] - 14:23
**often** [2] - 18:14, 18:16
**old** [1] - 66:12
**once** [4] - 21:4, 38:17, 67:25, 76:9

**One** [3] - 2:16, 2:22, 3:11
**one** [63] - 6:21, 8:2, 10:11, 11:1, 12:12, 13:8, 14:2, 14:15, 14:16, 14:24, 15:2, 16:2, 16:15, 16:20, 16:25, 20:17, 22:19, 23:23, 24:21, 24:24, 24:25, 25:11, 29:6, 29:9, 32:18, 33:13, 38:12, 39:22, 41:9, 45:3, 45:6, 48:22, 49:2, 52:4, 53:1, 61:22, 62:2, 63:12, 64:5, 64:21, 67:14, 67:18, 69:5, 69:9, 69:12, 69:23, 70:7, 70:23, 71:2, 71:12, 72:21, 73:9, 75:5, 75:9, 77:12, 77:22, 77:23, 85:15, 86:13, 90:7, 93:19
**one-drug** [1] - 53:1
**one-stop** [2] - 69:9, 75:5
**ones** [7] - 18:2, 25:9, 27:6, 48:21, 62:16, 77:6, 86:6
**open** [2] - 4:1, 6:15
**opening** [1] - 90:2
**operative** [1] - 73:21
**opinion** [2] - 12:10, 20:10
**opportunities** [1] - 70:11
**opportunity** [12] - 6:17, 7:24, 8:4, 28:3, 39:14, 39:24, 40:4, 65:16, 93:9, 93:24, 94:4, 94:6
**opposed** [1] - 21:24
**opposition** [1] - 6:6
**oral** [5] - 4:6, 6:8, 43:3, 93:19, 94:2
**ORAL** [1] - 1:6
**order** [32] - 4:14, 19:15, 24:14, 35:15, 60:12, 68:4, 78:16, 78:21, 79:25, 80:3, 80:14, 81:4, 81:16, 82:5, 82:12, 82:16, 82:25, 83:3, 83:8, 83:10, 83:12, 83:17, 84:9, 84:10, 84:13, 84:14, 84:21, 87:24, 87:25, 88:3, 88:4, 88:6
**orders** [1] - 91:18
**originally** [1] - 46:6

**originated** [1] - 6:25
**otherwise** [3] - 6:14, 10:18, 90:10
**outlets** [1] - 18:16
**outrageous** [1] - 29:11
**outside** [4] - 51:11, 51:14, 55:8, 83:15
**outstanding** [1] - 65:23
**overlap** [1] - 72:17
**overlapping** [1] - 72:15
**overlay** [1] - 67:11
**overnight** [2] - 66:21, 75:25
**own** [30] - 8:15, 9:14, 9:16, 10:9, 10:18, 12:10, 12:14, 21:2, 21:9, 22:12, 28:4, 28:18, 30:6, 33:3, 33:9, 34:12, 34:13, 35:24, 36:12, 36:25, 51:20, 53:23, 62:3, 75:18, 76:22, 77:2, 77:25, 78:4, 78:6

---

**P**

**P.A** [1] - 2:18
**P.C** [2] - 2:2, 3:2
**p.m** [1] - 94:17
**page** [1] - 73:9
**pages** [1] - 7:11
**paid** [1] - 55:1
**PAK** [88] - 2:9, 4:17, 6:11, 7:4, 7:14, 40:24, 41:2, 41:22, 41:24, 42:7, 42:20, 43:6, 43:13, 43:18, 43:23, 44:11, 44:18, 45:18, 45:21, 46:6, 46:11, 46:25, 47:10, 47:14, 47:23, 48:11, 48:14, 48:17, 49:23, 50:4, 50:10, 50:13, 50:15, 50:22, 51:4, 51:7, 51:16, 52:6, 52:23, 53:16, 53:18, 55:20, 56:1, 56:4, 56:6, 56:13, 57:4, 57:9, 57:14, 58:12, 58:24, 59:13, 60:5, 60:11, 60:20, 60:22, 60:25, 61:17, 61:22, 62:3, 62:9, 62:19, 63:10, 63:15, 63:18, 64:7, 64:18, 65:10, 80:9, 80:19, 81:5, 81:17, 81:20, 87:2,

87:6, 87:19, 88:10, 88:14, 88:20, 88:22, 89:10, 89:21, 89:24, 90:20, 90:25, 91:9, 91:15, 92:12
**Pak** [13] - 4:18, 40:20, 41:3, 47:18, 49:16, 51:21, 65:9, 70:1, 80:2, 82:1, 86:13, 90:18, 93:12
**paper** [2] - 6:24, 37:5
**papers** [7] - 16:22, 35:10, 50:20, 63:5, 82:23, 84:11, 84:15
**paragraph** [21] - 28:11, 41:20, 45:21, 60:11, 60:22, 66:7, 73:9, 74:1, 74:5, 76:17, 77:25, 80:11, 80:16, 80:20, 80:23, 82:8, 83:5, 86:22, 86:24
**paragraphs** [14] - 43:7, 43:12, 50:15, 50:19, 50:22, 50:24, 51:2, 68:13, 68:21, 71:10, 90:22, 90:24, 92:20, 93:5
**Parish** [1] - 20:9
**Park** [1] - 2:22
**part** [14] - 14:9, 23:19, 28:4, 32:13, 39:21, 56:5, 58:1, 58:9, 58:25, 66:10, 81:6, 83:3, 83:6, 90:7
**particular** [6] - 10:2, 54:25, 70:7, 72:16, 74:10
**particularly** [3] - 53:21, 70:20, 71:10
**parties** [11] - 6:9, 6:17, 16:14, 18:15, 36:11, 56:11, 63:9, 65:24, 69:18, 74:4, 74:5
**partner** [1] - 5:11
**party** [4] - 10:22, 11:7, 22:25, 34:2
**passing** [1] - 22:15
**patent** [25] - 10:20, 12:21, 13:13, 15:17, 20:16, 25:19, 26:14, 42:9, 49:20, 56:15, 58:16, 66:25, 78:14, 78:16, 78:17, 78:19, 79:8, 79:24, 80:10, 81:3, 82:9, 84:5, 86:19, 87:23, 88:2
**patents** [1] - 12:1
**patients** [3] - 44:25, 45:1, 85:3

**pause** [3] - 25:12, 39:1, 94:3
**pausing** [1] - 18:7
**pay** [1] - 50:21
**Pearlman** [1] - 5:14
**PEARLMAN** [1] - 2:21
**pediatric** [1] - 67:4
**Pehle** [1] - 2:23
**penalized** [1] - 21:22
**penalties** [1] - 48:3
**penalty** [1] - 91:20
**penetration** [1] - 69:2
**people** [2] - 20:11, 25:18
**percent** [20] - 23:16, 23:18, 30:24, 30:25, 61:10, 61:13, 67:15, 68:18, 68:19, 69:1, 69:2, 71:12, 73:15, 76:11, 76:19, 77:8, 77:9, 88:14
**perfect** [1] - 38:11
**period** [13] - 25:16, 27:2, 27:8, 31:25, 45:10, 54:13, 67:3, 67:25, 71:1, 73:24, 74:3, 74:14, 86:8
**periods** [2] - 66:23, 67:5
**permissible** [1] - 62:22
**permission** [1] - 6:12
**permit** [3] - 38:19, 43:9, 88:10
**permitting** [1] - 38:2
**person** [2] - 83:19, 92:4
**personal** [1] - 74:7
**perspective** [1] - 59:1
**pharma** [2] - 53:21, 54:24
**PHARMA** [3] - 1:9, 1:12, 1:13
**Pharma** [109] - 10:13, 10:15, 21:8, 26:14, 26:15, 26:16, 26:19, 27:20, 28:1, 28:15, 28:19, 28:24, 29:3, 29:6, 29:22, 30:5, 30:9, 35:14, 35:18, 35:21, 36:3, 36:9, 36:10, 39:19, 40:4, 41:21, 41:24, 41:25, 42:6, 42:12, 42:18, 42:23, 43:16, 43:21, 46:7, 46:9, 46:13, 46:17, 46:19, 46:21, 46:23, 47:4, 48:14, 48:18, 49:19, 49:21, 49:25, 50:5, 50:6,

50:17, 51:1, 51:22, 51:24, 52:10, 52:14, 52:15, 52:18, 52:19, 55:14, 55:16, 55:25, 56:12, 56:19, 56:23, 58:15, 58:23, 59:9, 59:14, 59:21, 59:22, 59:23, 60:4, 60:9, 60:11, 60:19, 78:10, 78:13, 78:25, 79:1, 79:9, 79:14, 80:8, 80:12, 80:17, 81:9, 81:10, 81:19, 82:11, 82:15, 83:12, 83:22, 83:25, 84:19, 86:18, 86:23, 87:7, 87:13, 87:14, 91:16, 91:17, 91:20, 91:25, 92:7, 92:23, 92:24
**Pharma's** [3] - 42:14, 80:14, 82:10
**pharmaceutical** [3] - 14:7, 67:2, 68:6
**PHARMACEUTICAL S** [1] - 1:10
**pharmaceuticals** [1] - 66:14
**phenomenon** [1] - 66:20
**picture** [1] - 57:20
**piece** [2] - 6:23, 23:14
**pieces** [1] - 22:16
**pill** [1] - 41:9
**pills** [1] - 41:11
**place** [5] - 32:1, 50:3, 74:4, 78:16, 86:20
**placed** [1] - 80:13
**places** [1] - 42:8
**plain** [1] - 74:11
**Plaintiff** [5] - 2:4, 2:7, 2:11, 2:14, 2:17
**plaintiff** [4] - 22:5, 37:22, 38:22, 74:7
**plaintiff's** [1] - 90:18
**plaintiffs** [26] - 4:14, 6:10, 7:4, 7:5, 7:7, 7:18, 8:4, 11:1, 11:2, 11:12, 15:14, 15:20, 16:4, 19:8, 19:16, 20:13, 21:21, 23:1, 25:14, 26:24, 37:15, 37:16, 38:14, 39:1, 39:14, 72:16
**Plaintiffs** [2] - 1:7, 4:12
**plaintiffs'** [6] - 15:7, 17:3, 75:2, 89:12, 93:15, 94:9
**PLAN** [2] - 1:4, 1:6
**plausibility** [2] -

17:21, 35:17
**plausible** [12] - 23:9, 23:10, 23:23, 24:9, 24:13, 25:6, 34:7, 35:12, 61:4, 79:10, 82:24, 84:18
**Plaza** [2] - 2:22, 3:11
**PLC** [1] - 1:11
**plead** [21] - 20:20, 20:24, 23:22, 24:9, 34:12, 35:15, 37:18, 43:15, 50:5, 67:15, 70:8, 70:11, 70:16, 77:1, 79:5, 83:18, 83:20, 83:21, 87:9, 92:7
**pleaded** [9] - 13:23, 34:14, 34:16, 35:19, 36:12, 36:25, 39:6, 40:8, 76:21
**pleading** [20] - 28:4, 28:5, 30:1, 39:14, 42:4, 43:4, 53:15, 59:5, 59:12, 79:18, 82:20, 83:4, 83:5, 83:16, 86:17, 87:1, 88:1, 88:6, 88:7, 89:5
**pleadings** [1] - 80:7
**pleads** [1] - 35:24
**pled** [44] - 21:2, 21:3, 25:6, 25:24, 26:1, 26:21, 27:25, 28:14, 28:18, 28:19, 33:9, 35:15, 36:16, 36:23, 38:5, 39:16, 39:18, 40:3, 40:8, 42:21, 42:22, 43:4, 43:17, 43:18, 51:15, 51:16, 71:2, 76:2, 78:11, 78:19, 79:3, 81:6, 84:17, 85:20, 86:20, 87:10, 87:13, 87:14, 87:17, 92:7, 92:16, 92:23
**plus** [4] - 7:5, 41:13, 44:14, 44:15
**point** [38] - 11:11, 14:25, 19:19, 19:20, 20:25, 21:1, 21:21, 23:15, 25:14, 28:21, 32:18, 36:5, 36:7, 38:17, 44:10, 47:5, 47:10, 47:19, 47:23, 47:24, 49:8, 51:7, 58:4, 58:5, 58:14, 62:7, 62:13, 62:17, 71:1, 74:18, 77:18, 81:1, 82:23, 84:20, 84:25, 88:23, 92:16

**pointed** [12] - 17:22, 18:1, 26:25, 27:6, 47:15, 53:19, 61:3, 61:6, 70:1, 77:5, 85:6, 86:6
**points** [6] - 37:3, 61:1, 70:25, 75:19, 75:22, 86:12
**pool** [1] - 19:2
**portion** [2] - 30:21, 51:5
**pose** [1] - 18:16
**position** [29] - 8:23, 9:7, 14:5, 16:8, 19:6, 21:10, 21:18, 21:19, 21:24, 26:11, 26:21, 27:12, 39:22, 51:24, 52:17, 53:9, 57:21, 57:24, 59:4, 59:6, 59:8, 78:25, 79:2, 79:4, 79:5, 79:16, 80:2, 81:23, 84:12
**possibility** [1] - 61:24
**possible** [1] - 62:8
**posture** [1] - 22:2
**potential** [1] - 67:6
**potentially** [2] - 10:12, 20:1
**Power** [1] - 31:20
**power** [1] - 67:6
**PowerPoint** [1] - 6:23
**practices** [1] - 70:7
**pre** [1] - 51:12
**pre-existing** [1] - 51:12
**prejudice** [4] - 39:5, 39:7, 39:11, 40:24
**prescribe** [1] - 45:1
**present** [2] - 40:25, 46:2
**presentation** [2] - 75:23, 75:24
**press** [2] - 30:22, 76:21
**presume** [4] - 6:18, 7:8, 28:5, 75:11
**pretty** [4] - 21:12, 56:25, 68:8, 80:4
**prevent** [8] - 8:15, 9:5, 9:17, 16:7, 16:21, 19:1, 19:11, 52:20
**prevented** [2] - 15:24, 44:16
**preventing** [1] - 10:2
**prevents** [1] - 20:2
**previous** [1] - 80:18
**previously** [1] - 80:8
**price** [36] - 10:14, 18:16, 21:8, 26:16, 26:17, 27:21, 27:24,

28:8, 28:14, 28:15, 28:19, 28:25, 29:11, 30:4, 30:5, 30:6, 35:21, 35:22, 36:9, 41:19, 47:5, 47:12, 47:15, 47:20, 47:24, 56:4, 56:8, 60:7, 67:22, 68:1, 70:3, 77:1, 77:6, 77:7, 77:9, 77:16
**prices** [8] - 44:23, 45:2, 45:4, 45:6, 45:9, 54:20, 54:23, 67:22
**pricing** [5] - 56:5, 77:2, 77:4, 77:10
**primarily** [1] - 16:7
**primary** [2] - 14:6, 17:17
**principal** [1] - 41:17
**privy** [1] - 92:22
**Pro** [1] - 31:25
**problem** [6] - 37:19, 44:4, 48:22, 52:2, 59:18, 89:9
**problematic** [4] - 19:23, 20:1, 34:9, 81:25
**problems** [4] - 49:13, 49:14, 54:2
**proceed** [2] - 6:15, 9:19
**proceedings** [2] - 71:17, 95:5
**PROCEEDINGS** [1] - 4:1
**Proceedings** [1] - 1:25
**process** [1] - 30:18
**procompetitive** [1] - 64:14
**produced** [2] - 1:25, 78:14
**product** [7] - 12:4, 12:7, 16:11, 31:21, 53:2, 55:11, 67:9
**production** [3] - 14:22, 31:21, 41:16
**products** [3] - 14:23, 16:25, 54:6
**profits** [2] - 53:9, 53:12
**prohibited** [1] - 57:7
**promise** [1] - 72:2
**pronouncement** [1] - 38:23
**proper** [1] - 11:5
**properly** [3] - 10:4, 11:3, 20:24
**prospective** [1] -

36:16
**PROTECTION** [2] - 1:4, 1:6
**protection** [1] - 37:11
**protective** [20] - 78:16, 78:21, 79:25, 80:3, 81:16, 82:5, 82:12, 82:16, 82:25, 83:2, 83:8, 83:10, 83:11, 84:10, 84:13, 84:14, 87:23, 87:25, 88:3
**protects** [2] - 83:11, 83:12
**prove** [2] - 42:13, 69:23
**provide** [6] - 30:10, 30:17, 39:24, 45:23, 48:7, 78:8
**provided** [6] - 6:24, 7:10, 7:16, 36:1, 37:8, 60:9
**provider** [2] - 14:25, 86:2
**providers** [1] - 15:1
**provides** [1] - 69:19
**published** [1] - 76:13
**pull** [1] - 92:10
**purchase** [2] - 60:5, 91:23
**purchased** [1] - 35:24
**purchaser** [2] - 38:1, 38:3
**Purchaser** [2] - 4:12, 71:21
**Purchasers** [4] - 2:4, 2:7, 5:7, 5:10
**purchasers** [3] - 38:19, 38:24, 66:4
**purchases** [1] - 73:23
**purported** [2] - 31:16, 32:25
**purpose** [7] - 7:16, 9:5, 10:2, 16:5, 19:11, 52:19, 78:19
**purposes** [5] - 14:11, 57:24, 62:24, 79:20, 79:22
**push** [1] - 72:4
**pushing** [1] - 71:25
**put** [8] - 4:8, 6:24, 8:22, 16:1, 16:15, 57:13, 61:3, 62:21
**putting** [2] - 16:12, 28:3

## Q

**quantity** [3] - 22:16, 56:4, 56:8

**questionable** [1] - 35:19
**questions** [12] - 15:6, 28:23, 34:23, 34:25, 38:6, 38:10, 41:1, 65:8, 65:20, 72:6, 86:12, 94:7
**quick** [1] - 66:5
**quickly** [1] - 13:21
**quite** [2] - 42:13, 66:6
**quote** [2] - 48:24, 91:1
**quote-unquote** [1] - 48:24
**QURAISHI** [2] - 1:20, 4:2

## R

**radar** [1] - 94:13
**Rahling** [1] - 2:19
**rainbow** [2] - 17:16, 63:8
**raise** [4] - 57:18, 65:23, 72:22
**raised** [1] - 17:3
**ramping** [1] - 41:17
**rather** [2] - 68:19, 94:14
**rational** [1] - 30:4
**Raymond** [1] - 3:12
**reach** [1] - 41:10
**reaching** [2] - 13:15, 17:25
**read** [5] - 50:19, 73:10, 75:17, 92:17
**readily** [2] - 49:7, 49:11
**ready** [11] - 45:7, 46:13, 46:20, 46:21, 48:14, 56:24, 58:15, 58:17, 61:11, 90:2, 91:25
**real** [1] - 36:6
**realize** [1] - 51:10
**really** [16] - 14:9, 16:19, 16:20, 19:11, 19:23, 21:15, 28:25, 29:16, 33:5, 46:1, 52:21, 54:14, 64:21, 92:5, 93:24, 94:3
**reason** [12] - 17:17, 25:25, 26:2, 27:23, 28:8, 28:16, 47:4, 58:8, 66:9, 66:19, 81:21, 93:22
**reasonable** [4] - 29:17, 52:13, 87:2, 91:9
**reasonably** [1] - 62:16

**reasons** [2] - 9:21, 91:5
**rebuttal** [3] - 8:5, 75:19, 75:22
**receive** [1] - 14:18
**received** [9] - 10:9, 12:3, 12:6, 12:12, 20:18, 23:16, 27:5, 29:3, 46:11
**recent** [1] - 33:22
**recess** [4] - 65:18, 65:21, 72:5, 90:15
**recognized** [2] - 15:4, 18:12
**recollection** [1] - 30:1
**record** [16] - 4:6, 4:8, 6:5, 6:7, 6:25, 8:22, 43:3, 71:14, 75:15, 75:20, 81:14, 81:22, 87:24, 88:5, 94:1, 95:5
**recorded** [1] - 1:25
**redaction** [1] - 6:14
**Reddy's** [6] - 2:11, 2:14, 2:17, 4:19, 4:20, 41:3
**refer** [1] - 75:7
**reference** [6] - 7:15, 12:17, 46:16, 48:24, 52:12, 82:10
**referenced** [1] - 84:15
**references** [2] - 42:11, 78:17
**referred** [1] - 75:9
**refers** [1] - 35:20
**refuse** [2] - 60:19, 60:20
**regard** [1] - 54:7
**regarding** [5] - 7:18, 14:21, 49:20, 71:11, 91:3
**regardless** [1] - 79:18
**regulatory** [8] - 26:19, 30:13, 30:18, 40:5, 49:13, 66:22, 67:16, 68:4
**regulatory-wise** [1] - 68:4
**rehearing** [3] - 12:21, 13:3, 13:21
**rejected** [5] - 21:8, 26:16, 28:20, 35:22, 36:9
**rejoinder** [1] - 33:12
**rejoinders** [1] - 27:9
**related** [2] - 4:11, 13:1
**relationship** [45] - 29:14, 35:16, 36:8, 36:11, 42:25, 43:1, 43:16, 43:20, 49:18,

49:25, 50:16, 51:1, 55:18, 56:23, 58:1, 58:14, 78:13, 79:1, 79:9, 79:12, 79:14, 79:20, 80:8, 80:18, 80:24, 81:2, 81:18, 82:11, 82:14, 83:21, 84:5, 84:19, 84:22, 86:18, 86:21, 86:25, 87:12, 87:16, 88:2, 88:4, 88:8, 91:15, 92:9, 92:25, 93:1
**relevant** [2] - 19:20, 24:7
**relief** [4] - 38:16, 74:5, 74:9, 74:13
**rely** [3] - 43:14, 43:25, 49:3
**remarks** [3] - 71:6, 71:7, 71:15
**remember** [7] - 28:10, 44:19, 45:11, 51:8, 52:24, 53:1, 54:5
**remove** [1] - 88:1
**reply** [1] - 6:6
**Reporter** [2] - 1:23, 95:12
**reporter** [1] - 4:24
**REPORTER'S** [1] - 95:1
**represent** [1] - 71:21
**representation** [1] - 82:4
**representing** [1] - 64:8
**request** [1] - 94:2
**require** [1] - 38:4
**required** [1] - 37:5
**requirement** [1] - 91:23
**reserve** [2] - 8:5, 72:9
**resold** [1] - 73:23
**resolution** [3] - 13:13, 25:19, 40:12
**resolve** [1] - 57:18
**resolved** [8] - 10:20, 20:16, 21:4, 32:22, 57:22, 57:23, 85:21, 85:23
**respect** [11] - 10:18, 22:17, 37:15, 37:25, 39:2, 44:2, 48:14, 54:24, 56:8, 58:3, 85:24
**responding** [1] - 34:25
**responsibility** [1] - 23:9
**rest** [1] - 48:10
**restraint** [1] - 32:1

**restricts** [1] - 20:5
**restroom** [1] - 90:10
**result** [1] - 9:19
**results** [1] - 64:12
**RETIRED** [1] - 1:5
**reveal** [1] - 57:5
**reverse** [1] - 33:18
**reversed** [1] - 70:23
**review** [3] - 6:12, 6:17, 71:18
**rewrite** [1] - 74:17
**ridiculous** [2] - 28:9, 28:25
**rights** [2] - 38:3, 73:15
**ripe** [5] - 17:13, 17:18, 63:24, 64:5
**rise** [3] - 4:4, 90:16, 94:16
**rivals** [1] - 20:4
**Riverfront** [1] - 3:11
**RMR** [1] - 95:11
**Road** [1] - 2:3
**ROBERTS** [9] - 2:18, 2:19, 71:20, 71:23, 72:8, 72:11, 72:18, 73:14, 75:1
**Roberts** [4] - 5:16, 71:20, 72:7, 74:24
**Rock** [1] - 2:20
**Rodriguez** [1] - 4:21
**RODRIGUEZ** [3] - 2:16, 4:20, 5:1
**room** [1] - 81:12
**ROSATI** [2] - 2:8, 2:12
**Rosati** [1] - 5:2
**Roseland** [1] - 2:3
**rug** [1] - 15:23
**Rule** [1] - 14:12
**rules** [1] - 12:1
**run** [1] - 38:22

## S

**Saddle** [1] - 2:24
**said-she** [1] - 61:7
**sale** [1] - 73:20
**sales** [5] - 23:16, 44:25, 51:20, 68:18, 76:19
**SAS** [2] - 1:14, 1:15
**sat** [1] - 44:7
**Saul** [1] - 5:21
**SAUL** [1] - 3:10
**scale** [1] - 51:18
**scenarios** [1] - 18:25
**Schuykill** [1] - 34:4
**scope** [3] - 51:11, 51:14, 84:13
**scramble** [1] - 48:20

**seal** [1] - 71:7
**sealed** [4] - 6:7, 6:8, 6:17, 71:17
**seated** [2] - 4:5, 90:17
**second** [14] - 23:18, 23:21, 24:3, 42:13, 44:22, 68:4, 69:24, 70:10, 76:8, 77:18, 85:22, 87:18, 90:1
**Second** [4] - 54:1, 54:15, 70:22, 70:23
**section** [1] - 67:16
**secure** [5] - 15:16, 17:6, 25:21, 48:6, 48:7
**secured** [8] - 16:11, 24:16, 24:18, 46:4, 51:25, 52:4, 52:19
**securing** [5] - 15:22, 16:5, 16:20, 24:25, 48:8
**see** [22] - 15:10, 22:9, 45:25, 58:25, 59:1, 59:2, 62:23, 63:4, 64:20, 65:12, 66:6, 66:19, 67:18, 67:22, 69:15, 71:22, 72:2, 72:5, 73:7, 81:23, 93:24, 94:7
**seek** [1] - 91:19
**sell** [5] - 12:7, 41:9, 41:10, 46:15, 47:11
**selling** [3] - 8:20, 51:9, 85:4
**send** [1] - 22:4
**sense** [7] - 29:17, 45:24, 47:6, 49:12, 59:13, 64:7
**sent** [1] - 46:18
**sentence** [1] - 69:8
**separate** [1] - 6:22
**September** [21] - 1:18, 4:2, 10:11, 12:9, 12:10, 12:18, 13:7, 13:17, 21:6, 30:9, 30:17, 40:3, 41:15, 45:7, 46:12, 49:7, 52:15, 53:11, 78:6, 80:12, 95:11
**serious** [2] - 39:2, 93:6
**set** [7] - 17:23, 23:10, 35:21, 35:23, 56:8, 89:15, 89:16
**Seth** [2] - 5:2, 57:15
**SETH** [1] - 2:9
**sets** [1] - 62:21
**setting** [1] - 30:8
**seven** [7] - 11:20, 15:21, 18:1, 30:23,

30:24, 31:25, 76:19
**seventh** [1] - 62:14
**several** [1] - 71:6
**severely** [1] - 20:4
**SHAPIRO** [1] - 2:5
**Shapiro** [1] - 5:10
**sheet** [4] - 35:21, 35:25, 55:20, 55:24
**shopping** [2] - 69:9, 75:5
**short** [2] - 60:15, 90:15
**short-term** [1] - 60:15
**shot** [1] - 40:22
**should've** [1] - 22:7
**show** [15] - 8:17, 9:16, 10:18, 11:10, 11:12, 11:20, 13:24, 20:14, 20:19, 20:21, 20:22, 33:3, 34:12, 81:13, 87:8
**showing** [2] - 50:16, 70:23
**shows** [1] - 23:8
**side** [4] - 58:3, 67:7, 75:2, 90:18
**signed** [1] - 86:1
**significance** [1] - 64:18
**significant** [7] - 11:13, 17:5, 27:2, 27:7, 46:14, 57:17, 91:19
**SILBER** [2] - 2:9, 57:15
**Silber** [2] - 5:2, 57:15
**similarly** [2] - 23:3, 85:23
**simply** [6] - 7:16, 8:10, 8:16, 40:15, 47:19, 76:12
**single** [1] - 32:6
**sit** [1] - 69:13
**sitting** [1] - 64:3
**situation** [3] - 10:16, 14:24, 32:4, 45:14
**situations** [1] - 66:15
**six** [2] - 23:16, 30:25
**sixth** [2] - 62:8, 62:9
**slower** [1] - 50:20
**small** [5] - 8:3, 30:21, 38:12, 61:23, 76:6
**smallest** [1] - 23:25
**Sobol** [8] - 5:7, 5:9, 5:10, 57:9, 65:14, 66:2, 66:3, 71:19
**SOBOL** [11] - 2:5, 2:5, 5:9, 47:7, 66:3, 66:19, 69:9, 69:14, 71:6, 89:15, 89:18
**Sobol's** [1] - 75:5

**sole** [4] - 9:5, 16:5, 19:11, 52:18
**solely** [2] - 19:1, 81:2
**someone** [6] - 80:1, 81:15, 82:24, 83:1, 83:18, 91:22
**sometimes** [1] - 75:18
**somewhat** [1] - 67:24
**SONSINI** [2] - 2:8, 2:12
**Sonsini** [3] - 4:18, 5:2, 57:16
**soon** [2] - 10:20, 66:2
**sooner** [2] - 30:18, 94:14
**sophisticated** [1] - 52:8
**sorry** [5] - 15:5, 45:3, 53:19, 54:3, 56:25
**sort** [21] - 11:17, 13:1, 13:24, 22:15, 23:22, 24:8, 24:10, 25:7, 25:15, 26:19, 31:1, 31:6, 34:19, 35:13, 36:11, 36:15, 36:20, 40:9, 78:3, 78:9, 79:7
**Soule** [2] - 1:23, 95:11
**sounds** [2] - 24:19, 68:20
**sources** [2] - 70:21, 92:23
**space** [1] - 12:16
**speaking** [1] - 7:21
**specific** [10] - 14:2, 14:4, 19:7, 37:25, 39:10, 39:17, 39:24, 43:11, 80:19, 89:2
**specifically** [1] - 83:12
**spent** [1] - 17:5
**spirit** [1] - 75:5
**Square** [1] - 2:6
**squarely** [1] - 31:17
**stability** [1] - 18:16
**staff** [2] - 50:19, 65:22
**stage** [11] - 15:8, 15:11, 16:18, 17:11, 17:18, 20:22, 21:19, 42:22, 64:6, 79:17, 79:18
**stand** [2] - 61:2, 89:18
**standard** [4] - 11:12, 13:23, 15:3, 18:6
**standing** [8] - 20:5, 37:15, 37:19, 37:21, 72:22, 72:24, 72:25, 74:19
**start** [10] - 4:15, 13:15, 15:15, 30:18, 41:4, 49:4, 49:6, 49:14,

51:9, 90:25
**started** [2] - 41:16, 77:20
**starting** [2] - 45:9, 51:9
**State** [1] - 1:17
**state** [18] - 8:12, 32:14, 37:2, 37:4, 37:9, 37:10, 37:22, 37:25, 38:1, 38:2, 38:6, 38:15, 38:16, 44:15, 61:8, 67:12, 73:18, 75:6
**statement** [2] - 22:15, 82:20
**statements** [2] - 20:20, 91:1
**States** [3] - 4:2, 73:18, 76:2
**STATES** [2] - 1:1, 1:20
**states** [4] - 37:18, 38:2, 38:4, 73:10
**statutes** [2] - 37:11
**statutory** [3] - 38:20, 38:23, 66:22
**stay** [1] - 55:23
**stenography** [1] - 1:25
**step** [2] - 15:8, 61:18
**steps** [1] - 43:1
**still** [3] - 47:13, 47:14, 86:14
**stood** [1] - 58:15
**stop** [2] - 69:9, 75:5
**story** [6] - 56:22, 57:3, 57:20, 62:20, 74:16
**straightforward** [1] - 68:8
**strategy** [1] - 71:24
**Street** [3] - 1:17, 2:13, 3:7
**stretch** [1] - 81:8
**strike** [1] - 65:20
**strong** [3] - 20:7, 80:4, 92:16
**stuck** [1] - 58:8
**studies** [1] - 76:12
**stuff** [2] - 67:16, 71:8
**submissions** [1] - 43:12
**submit** [3] - 17:21, 24:6, 40:7
**submits** [1] - 39:4
**submitted** [1] - 7:6
**subparagraph** [1] - 74:1
**subsequent** [1] - 43:10
**subsequently** [1] - 73:23
**substantial** [21] -

11:13, 20:1, 20:4, 20:7, 20:14, 23:11, 25:16, 31:15, 32:6, 33:10, 34:13, 66:10, 66:11, 68:11, 68:20, 69:3, 69:22, 69:23, 70:2, 70:3, 85:18
**substantially** [1] - 44:24
**substitution** [1] - 67:12
**sue** [1] - 38:24
**sued** [1] - 56:15
**suffered** [1] - 44:4
**sufficient** [13] - 11:3, 12:15, 13:9, 24:22, 32:11, 32:16, 35:25, 44:9, 44:13, 52:14, 52:18, 57:20, 78:1
**sufficiently** [3] - 43:4, 87:10, 92:15
**suggested** [2] - 57:17, 76:12
**suggestion** [2] - 81:20, 91:10
**suit** [3] - 26:8, 38:20, 58:17
**Suite** [2] - 2:23, 3:12
**suits** [1] - 38:3
**Sulfate** [1] - 75:8
**summary** [8] - 17:14, 17:16, 63:2, 63:6, 63:25, 64:5, 65:5, 70:24
**supplied** [1] - 12:24
**supplier** [48] - 9:3, 11:16, 12:14, 12:17, 12:25, 13:10, 14:18, 14:19, 24:12, 24:13, 24:16, 24:18, 24:19, 24:21, 24:24, 24:25, 26:16, 29:4, 30:7, 30:10, 30:12, 30:15, 34:15, 34:16, 41:18, 45:19, 46:16, 46:19, 48:5, 48:6, 49:2, 49:21, 50:2, 52:3, 52:19, 54:10, 58:5, 58:9, 58:18, 61:21, 61:25, 68:6, 71:9, 78:5, 83:12, 91:24
**suppliers** [73] - 8:18, 9:1, 10:1, 10:4, 10:10, 10:12, 12:11, 12:13, 13:7, 13:8, 13:15, 13:16, 13:21, 14:4, 14:6, 14:8, 14:13, 14:15, 14:20, 15:16, 15:22, 16:5, 16:6, 16:10, 16:21,

16:24, 17:6, 18:20, 18:23, 19:9, 19:14, 19:18, 20:17, 21:6, 24:20, 25:4, 28:21, 29:7, 29:10, 32:18, 40:3, 44:1, 44:5, 44:6, 45:17, 45:22, 45:23, 45:24, 46:4, 46:10, 48:20, 49:7, 49:11, 52:1, 52:4, 52:9, 53:6, 54:11, 58:11, 59:15, 59:17, 61:11, 61:20, 62:7, 63:21, 70:9, 73:17, 86:3, 91:2, 91:4, 91:11

**supply** [51] - 8:14, 8:18, 9:18, 9:20, 10:17, 10:19, 11:3, 12:23, 13:2, 13:12, 14:13, 14:17, 14:21, 19:13, 21:15, 21:17, 21:25, 22:19, 25:5, 25:13, 25:18, 25:21, 26:3, 26:9, 32:11, 32:16, 34:17, 34:18, 42:20, 49:3, 49:5, 50:6, 51:12, 52:18, 53:4, 53:24, 58:6, 59:18, 60:13, 62:4, 62:17, 77:6, 78:6, 78:9, 81:11, 84:2, 85:11, 86:3, 91:17, 91:21

**supplying** [7] - 8:18, 10:21, 29:6, 29:7, 56:2, 62:12, 91:3

**support** [12] - 12:15, 13:9, 13:22, 23:14, 24:9, 27:25, 28:14, 36:19, 77:15, 78:1, 84:23

**supported** [3] - 22:17, 31:3, 77:11

**supposed** [5] - 15:19, 15:21, 36:17, 36:18, 67:7

**supposedly** [1] - 78:20

**Supreme** [3] - 20:9, 34:5, 61:4

**surprise** [1] - 78:15

**survive** [2] - 36:24, 89:6

**sustain** [1] - 61:5

**swing** [1] - 87:17

**switch** [5] - 14:22, 35:2, 44:25, 45:1, 55:13

**system** [1] - 66:22

## T

**table** [1] - 64:3
**tack** [5] - 47:18, 80:6, 81:1, 82:2, 90:7
**tacked** [1] - 55:14
**tactics** [1] - 65:3
**tainted** [1] - 55:18
**talks** [1] - 6:23
**tantamount** [1] - 47:21
**tarnished** [1] - 55:19
**team** [1] - 7:22
**teeth** [1] - 92:10
**temporary** [1] - 31:15
**ten** [16] - 31:11, 31:20, 32:19, 45:10, 53:10, 53:11, 65:21, 72:5, 86:2, 86:5, 86:10, 89:19, 89:21, 90:10, 90:12
**term** [8] - 5:16, 21:11, 35:20, 35:25, 55:20, 55:24, 60:15, 93:22
**terms** [8] - 11:21, 18:9, 18:15, 55:4, 55:24, 60:23, 61:6, 81:5
**test** [2] - 20:3, 55:9
**tested** [1] - 52:6
**THE** [167] - 1:1, 1:20, 4:4, 4:5, 4:23, 5:4, 5:12, 5:18, 5:24, 6:16, 6:21, 7:7, 7:11, 7:17, 7:21, 7:24, 8:7, 8:21, 9:12, 9:22, 10:22, 10:25, 11:23, 12:24, 14:1, 15:5, 18:17, 20:19, 21:10, 22:21, 24:16, 25:20, 26:1, 26:23, 27:12, 27:23, 28:2, 28:22, 29:9, 29:24, 32:8, 33:17, 34:24, 38:9, 39:7, 39:17, 40:19, 40:25, 41:21, 41:23, 41:25, 42:19, 42:21, 43:11, 43:14, 43:22, 44:5, 44:12, 45:16, 45:19, 46:2, 46:8, 46:23, 47:3, 47:9, 47:13, 47:17, 48:4, 48:13, 48:16, 49:16, 49:24, 50:8, 50:11, 50:14, 50:18, 50:24, 51:6, 51:14, 51:21, 52:17, 53:13, 53:17, 55:13, 55:23, 56:2, 56:5, 56:10, 56:18, 57:6, 57:10, 57:19, 58:22, 59:4, 59:20, 60:10, 60:18, 60:21, 60:24, 61:15, 61:18, 61:24, 62:6, 62:18, 63:4, 63:11, 63:17, 63:23, 64:17, 65:9, 65:11, 66:18, 69:6, 69:11, 71:5, 71:16, 71:22, 71:24, 72:10, 72:13, 73:12, 74:24, 75:2, 75:11, 75:14, 78:24, 79:4, 79:11, 80:2, 80:16, 80:20, 81:14, 81:18, 81:21, 82:19, 83:2, 83:10, 83:15, 83:20, 84:4, 84:12, 86:13, 87:4, 87:9, 87:22, 88:12, 88:15, 88:21, 88:25, 89:11, 89:14, 89:16, 89:20, 89:23, 89:25, 90:4, 90:12, 90:16, 90:17, 90:23, 91:8, 91:13, 92:2, 92:13, 93:15, 93:18, 94:16
**themselves** [2] - 21:2, 40:8
**theory** [1] - 35:11
**thereabouts** [1] - 68:16
**thereby** [1] - 55:11
**therefore** [4] - 61:23, 62:21, 67:10, 68:9
**they've** [5] - 20:23, 23:6, 52:8, 79:19, 91:16
**thinking** [1] - 63:18
**Third** [18] - 15:3, 18:10, 18:11, 18:12, 18:24, 19:19, 19:22, 20:3, 33:15, 33:23, 34:4, 37:20, 54:1, 54:14, 69:20, 69:21, 70:25, 85:8
**third** [4] - 4:11, 44:22, 70:3, 78:10
**THOMAS** [1] - 2:5
**thoughts** [2] - 65:19, 65:22
**thousand** [1] - 77:8
**three** [10] - 4:7, 47:23, 47:24, 48:1, 60:12, 60:13, 60:16, 69:23, 81:10, 92:25
**three-point** [2] - 47:23, 47:24
**three-year** [1] - 92:25
**throughout** [3] - 52:25, 59:2, 59:16
**throw** [1] - 63:1

**Tim** [1] - 5:22
**timeline** [3] - 6:22, 11:10, 30:14
**timelines** [1] - 85:24
**timely** [4] - 12:15, 13:9, 15:25, 78:1
**timetable** [1] - 6:22
**timing** [1] - 5:25
**TIMOTHY** [1] - 3:7
**title** [1] - 73:16
**today** [16] - 4:6, 5:22, 18:7, 19:24, 28:17, 33:13, 43:9, 65:17, 65:20, 87:5, 90:8, 92:13, 92:18, 93:5, 93:19
**today's** [2] - 71:17, 79:22
**together** [1] - 7:5
**Tom** [2] - 5:7, 5:9
**tons** [4] - 42:16, 42:17, 47:2, 71:11
**took** [5] - 43:1, 46:6, 48:19, 49:5, 58:5
**top** [3] - 10:5, 33:7, 43:6
**torpedoed** [1] - 58:21
**tortious** [23] - 15:13, 34:21, 35:9, 35:15, 36:13, 36:22, 42:2, 42:8, 51:4, 58:3, 82:17, 83:18, 84:20, 86:16, 87:19, 88:24, 89:1, 89:6, 90:6, 90:21, 92:14, 93:8, 93:11
**tortiously** [4] - 36:4, 36:10, 36:20, 82:13
**total** [1] - 27:13
**totality** [1] - 91:14
**touch** [2] - 37:6, 72:18
**touched** [1] - 77:23
**transcript** [6] - 1:25, 6:12, 6:16, 50:21, 71:17, 95:4
**transcription** [1] - 1:25
**transfers** [1] - 73:15
**transitory** [2] - 31:6, 31:13
**translate** [1] - 76:13
**translated** [1] - 78:21
**transmitted** [1] - 79:25
**Trenton** [1] - 1:18
**trial** [5] - 12:1, 17:19, 63:24, 64:4, 69:14
**tried** [2] - 23:15, 26:15
**tries** [1] - 23:22
**trim** [1] - 69:24
**Trinko** [1] - 34:7

**true** [11] - 9:6, 15:20, 28:23, 29:5, 52:7, 52:23, 79:16, 79:17, 79:22, 81:13, 82:20
**try** [7] - 23:12, 23:15, 24:7, 40:23, 66:5, 69:9, 85:18
**trying** [18] - 17:6, 21:22, 37:17, 40:22, 47:18, 50:2, 56:22, 57:2, 57:13, 58:9, 59:5, 60:2, 73:1, 74:12, 74:17, 80:25, 88:8, 92:10
**tuna** [1] - 66:13
**turn** [1] - 34:21
**turned** [4] - 10:14, 28:15, 28:16, 91:4
**turning** [3] - 15:3, 36:5, 37:1
**two** [30] - 6:4, 7:11, 10:8, 10:10, 12:11, 12:13, 13:7, 13:21, 14:10, 14:17, 16:16, 20:17, 22:16, 22:20, 27:4, 27:9, 32:18, 34:16, 36:11, 40:3, 45:17, 47:25, 67:11, 70:9, 70:13, 73:9, 74:3, 80:9, 86:3
**Twombly** [1] - 34:5
**type** [2] - 21:12, 37:25
**types** [2] - 19:25, 64:15
**typically** [2] - 44:23, 44:25

## U

**U.S** [2] - 1:17, 42:16
**Uber** [1] - 33:22
**ultimately** [8] - 41:10, 44:1, 47:4, 47:17, 47:19, 48:4, 48:6, 55:4
**uncompetitive** [1] - 47:16
**uncontested** [1] - 70:4
**under** [20] - 9:6, 11:11, 13:25, 15:24, 19:19, 29:15, 31:13, 31:18, 32:5, 33:20, 34:9, 34:20, 37:10, 38:15, 38:18, 71:7, 73:17, 85:6, 85:19, 91:19
**understood** [4] - 26:23, 35:12, 48:16, 57:19, 89:10
**UNIFORMED** [2] - 1:3, 1:5

**unique** [2] - 35:7, 72:21
**unit** [1] - 68:18
**United** [3] - 4:2, 73:18, 76:2
**UNITED** [2] - 1:1, 1:20
**unjust** [4] - 37:11, 38:14, 38:17, 38:22
**unlawful** [1] - 18:10
**unlawfully** [1] - 73:20
**unless** [2] - 65:7, 92:21
**unnamed** [2] - 30:10, 30:15
**unprofitable** [1] - 47:24
**unquote** [1] - 48:24
**unreasonable** [5] - 27:24, 29:23, 39:19, 47:5, 47:21
**up** [67] - 8:14, 8:17, 9:18, 10:11, 10:12, 10:13, 10:17, 10:19, 12:11, 12:13, 12:18, 13:3, 13:7, 13:11, 13:12, 13:16, 13:21, 14:15, 14:17, 16:1, 20:17, 21:5, 21:8, 24:12, 25:18, 26:15, 30:10, 30:16, 32:18, 34:15, 34:16, 34:17, 40:3, 40:20, 41:17, 47:2, 48:8, 52:10, 53:1, 58:18, 59:17, 59:22, 59:24, 60:10, 61:12, 61:20, 63:21, 65:11, 66:1, 67:22, 69:14, 70:8, 70:9, 71:11, 71:13, 71:14, 76:16, 77:24, 81:10, 81:14, 85:25, 86:1, 86:3, 89:18, 93:7
**upheld** [1] - 18:13
**upstream** [1] - 54:9
**USA** [1] - 1:12
**uses** [1] - 70:21

## V

**various** [5] - 50:15, 77:13, 91:2, 91:5
**Vascepa®** [6] - 8:15, 8:20, 53:1, 73:21, 73:23, 76:19
**vast** [1] - 76:10
**version** [1] - 53:2
**versus** [1] - 51:7
**viability** [1] - 70:21
**view** [3] - 18:11, 68:11, 91:11

**viewed** [1] - 31:13
**violate** [1] - 18:21
**violated** [7] - 19:8, 78:20, 79:25, 80:3, 81:16, 83:9, 88:16
**violation** [9] - 8:24, 9:7, 9:9, 19:3, 81:4, 82:5, 84:9, 87:25, 88:5
**violations** [1] - 27:17
**visit** [1] - 45:25
**volume** [7] - 9:4, 10:5, 11:5, 16:11, 21:23, 23:3, 24:22
**Vyera** [2] - 26:25, 86:7

## W

**wait** [4] - 39:7, 45:6, 49:12, 49:13
**waited** [1] - 49:8
**waiting** [2] - 89:18, 89:21
**walk** [3] - 11:20, 59:23, 60:4
**walked** [1] - 50:5
**walks** [1] - 42:14
**wants** [5] - 24:7, 31:5, 40:21, 63:23, 64:4
**Washington** [4] - 2:14, 3:8, 4:22, 5:1
**water** [1] - 57:13
**Wax** [1] - 32:2
**ways** [1] - 80:9
**week** [1] - 64:4
**welcome** [1] - 5:4
**well-pled** [5] - 27:25, 28:14, 78:19, 79:3, 84:17
**West** [1] - 2:22
**West-Plaza** [1] - 2:22
**whatsoever** [1] - 8:24
**whole** [4] - 32:2, 49:8, 74:16, 84:20
**wide** [1] - 32:6
**wildly** [1] - 70:19
**WILLIAM** [1] - 3:11
**Williamsburg** [1] - 32:2
**willing** [1] - 58:15
**Wilson** [3] - 4:18, 5:2, 57:15
**WILSON** [2] - 2:8, 2:12
**win** [1] - 15:16
**Windels** [1] - 4:21
**WINDELS** [1] - 2:15
**wise** [1] - 68:4
**woah** [1] - 72:10
**word** [7] - 24:17, 24:18, 31:2, 42:24,

70:21, 89:3, 93:13
**words** [2] - 18:22, 60:6
**world** [1] - 12:16
**worry** [2] - 15:7, 44:14
**worse** [1] - 21:23
**worth** [4] - 14:14, 18:7, 38:13, 94:13
**would've** [2] - 85:22, 88:4
**wreck** [1] - 74:8
**writ** [1] - 69:25
**write** [1] - 64:10
**written** [2] - 43:12, 55:20
**wrongful** [1] - 65:5

## Y

**year** [7] - 32:2, 60:15, 68:16, 71:2, 86:9, 92:25
**years** [6] - 15:21, 60:12, 60:13, 60:16, 81:10, 84:3
**yesterday** [1] - 7:10
**York** [3] - 2:11, 3:4, 37:16
**younger** [1] - 93:23

## Z

**ZAHID** [2] - 1:20, 4:2
**zero** [2] - 88:6