NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DR. REDDY'S LABORATORIES, INC.** | **Civil Action No. 21-10309 (RK)(TJB)** |
| **Plaintiff,** | |
| **v.** | **MEMORANDUM OPINION** |
| | **(FILED UNDER SEAL)** |
| **AMARIN PHARMA, INC., et al.** | |
| **Defendants.** | |

**BONGIOVANNI, United States Magistrate Judge**

Currently pending before the Court is Plaintiff Dr. Reddy's Laboratories, Inc.'s ("Plaintiff" or "DRL") motion for leave to file its first amended complaint ("Motion to Amend"). (Docket Entry No. 129). Through same, Plaintiff seeks to replead its tortious interference with contract or economic benefit claim under New Jersey law against Defendants Amarin Pharma, Inc., Amarin Pharmaceuticals Ireland Limited, and Amarin Corporation PLC (collectively, "Defendants" or "Amarin"). (Pl.'s Br. in Supp. of Mot. to Am., at 1; Docket Entry No. 130) ("Pl.'s Mov. Br."). Defendants oppose Plaintiff's Motion to Amend on the grounds that Plaintiff fails to allege (1) that DRL had a supply contract with KD Pharma Group SA and KD Pharma-Pharma Bexbach GmbH (collectively, "KD Pharma") and (2) that Amarin had actual knowledge regarding that supply contract and intentionally interfered with same by entering into its own supply contract with KD Pharma. (Defs.' Br. in Opp'n of Pl.'s Mot. to Am., at 1; Docket Entry No. 132) ("Defs' Opp'n Br."). In turn, Defendants maintain that Plaintiff's proposed amendments are futile. The Court has fully reviewed the arguments made in support of and in opposition to Plaintiff's motion.

The Court considers Plaintiff's motion without argument pursuant to L.Civ.R. 78.1(b). For the reasons set forth more fully below, Plaintiff's motion to amend is **GRANTED**.

## I.     BACKGROUND AND PROCEDURAL HISTORY

The Court presumes a familiarity with the nature and history of this litigation. As a result, the Court focuses on the facts most relevant to Plaintiff's pending Motion to Amend.

On April 27, 2021, Plaintiff commenced the instant action under the Sherman Act and New Jersey law, naming Amarin as defendants. (Compl.; Docket Entry No. 1). This action arises out of Amarin's alleged anticompetitive conduct to delay and prevent generic competition to its branded Vascepa (icosapent ethyl) product. (*Id.* at ¶ 1.)

In its Complaint, Plaintiff asserts that it developed its generic icosapent ethyl drug product, prevailed twice in patent litigation with Amarin, obtained the necessary regulatory approval to market its generic drug, and prepared for product launch. (*Id.* at ¶ 2.) In preparing for its drug product's launch, Plaintiff alleges that Amarin had foreclosed all the suppliers of the icosapent ethyl "active pharmaceutical ingredient" ("API") who have sufficient capacity to support a commercial launch in a timely manner, including KD Pharma, Novasep Holding SAS, Nisshin Pharma, Inc., BASF Group, and Chemport Inc. (*Id.* at ¶¶ 3-5.) Plaintiff states that it initially contacted KD Pharma, its long-standing icosapent ethyl supplier, to supply the icosapent ethyl API needed for launch; however, KD Pharma refused to supply the icosapent ethyl API to Plaintiff, as Amarin had entered into a de facto exclusive agreement with KD Pharma regarding icosapent ethyl API for its Vascepa product. (*Id.* at ¶ 3.) Specifically, Plaintiff alleges that as a part of the agreement with KD Pharma, Amarin issued "binding orders" that KD Pharma supply 400 metric tons of icosapent ethyl API per year for three years, with stiff penalties should KD Pharma fail to fulfill its obligations. (*Id.*) When KD Pharma refused to supply the necessary icosapent ethyl API

to Plaintiff, Plaintiff contacted the aforementioned viable suppliers in an attempt to obtain enough supplies to launch its generic drug product as soon as possible. (*Id.* at ¶ 5.) Yet, Plaintiff claims that Amarin entered into exclusive or de facto exclusive agreement with all of the foregoing suppliers—the only suppliers who have sufficient capacity to support a commercial launch without having to first expand their capacity. (*Id.*)

Despite Plaintiff's best efforts to find an alternative supplier, Plaintiff alleges that it suffered a delayed launch of its drug product; a launch that was hindered by neither any legal nor regulatory hurdle but rather by Amarin's anticompetitive strategy to effectively block access to specific high-capacity suppliers of icosapent ethyl API. (*Id.* at ¶¶ 7, 102-08.) Plaintiff contends that: but for Amarin's anticompetitive conduct regarding the supply of icosapent ethyl API, Plaintiff would have been ready, willing, and able to launch its product in August 2020, upon receiving regulatory approval. (*Id.* at ¶ 8.) Plaintiff consequently alleges six counts in its Complaint: Count One for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, for monopolization (*id.* at ¶¶ 109-22); Count Two for attempt to monopolize (*id.* at ¶¶ 123-38); Count Three for violation of Section 1 of the Sherman Act, 18 U.S.C. § 1, for conspiring, combining, and/or agreeing to restrain trade (*id.* at ¶¶ 139-52); Count Four for violations of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-3 (agreement in restraint of trade) and 56:9-4 (monopolization) (*id.* at ¶¶ 153-62); Count Five for unfair competition under New Jersey common law (*id.* at ¶¶ 163-65); and Count Six for tortious interference with contract or prospective economic benefit under New Jersey common law (*id.* at ¶¶ 166-81).

On December 10, 2021, Amarin filed a Motion to Dismiss, seeking to dismiss Plaintiff's antitrust claims and tortious interference with contract or prospective economic benefit claim(s) (*see* Docket Entry No. 49); Plaintiff opposed (*see* Docket Entry No. 52), to which Amarin replied

(*see* Docket Entry No. 53); and the Court conducted oral argument on September 27, 2022, as to the foregoing (Docket Entry Nos. 77 and 78).[1]   After considering the parties' submissions and oral arguments, the District Court granted, in part, and denied, in part, Amarin's Motion to Dismiss.  (Oral Op. of 10/27/2022; Docket Entry No. 81); (Op. Tr. of 11/28/2022; Docket Entry No. 95).

Particularly relevant, in its Oral Opinion regarding Plaintiff's tortious interference claim(s), the Court noted that:

> The Court recognizes that both related torts require knowledge of the plaintiff's expectancy. The Complaint in this case alleges that Amarin was aware of the agreement between Plaintiff and KD Pharma (Compl. ¶ 171). Plaintiff alludes to Amarin discovering the existence of the relationship through discovery in Amarin's patent litigation with Plaintiff even though a protective order was in place surrounding the litigation. (*Id.*) This would imply that Amarin obtained this information in violation of the protective order. Plaintiff retracted this position during oral argument when it clarified that it "[does not] claim any kind of breach of confidentiality" (Transcript of Oral Argument at 79;3-4) and neither pleads nor suggests that the protective order was violated. (*Id.* at 79:11-17.)  Without any further facts to support that Amarin knew of the existence of a relationship between Plaintiff and KD Pharma, the Complaint does not plead sufficient facts to support a claim under either theory of tortious interference.

(Op. Tr. of 11/28/2022, 11:19-25, 12:1-11; Docket Entry No. 95).  The District Court dismissed Plaintiff's tortious interference claim(s) without prejudice and afforded Plaintiff an opportunity to amend its pleading with respect to its tortious interference claim(s) within 30 days of the entry of the Order.  (*Id.* at 12:20-22); (Order of 10/27/2022; Docket Entry No. 82).  The District Court denied Amarin's Motion to Dismiss as to Plaintiff's antitrust claims.  (*Id.* at 12:19-20); (Order of 10/27/2022; Docket Entry No. 82).

---

[1] The Court refrains from expounding on Amarin's Motion to Dismiss and its subsequent filings. For additional detail, the Court defers to the parties' filings, Docket Entry Nos. 49, 52 and 53, and the District Court's Oral Opinion, Docket Entry No. 95.

On November 15, 2023, Plaintiff filed its present Motion to Amend (Docket Entry No. 129); Amarin opposed (Docket Entry No. 132), to which Plaintiff replied (Docket Entry No. 133) and Amarin, with leave, sur-replied (Docket Entry No. 135).  During the pendency of its motion, Plaintiff requested and was granted leave to file a supplemental letter in support of its Motion to Amend (Docket Entry No. 151), to which Amarin, in accordance with the Court's instruction (Docket Entry No. 152), responded (Docket Entry No. 153).

### SUMMARY OF ARGUMENTS

#### A.  Plaintiff's (DRL's) Arguments

Through its proposed amended complaint, Plaintiff seeks to add newly discovered facts and reassert its tortious interference with contract or prospective economic benefit claim(s) as to Amarin.  (Pl.'s Mov. Br., at 1).  Plaintiff states that with the benefit of discovery produced by Amarin after the District Court rendered Its Order and Opinion regarding Amarin's Motion to Dismiss, "DRL has uncovered evidence that Amarin did, in fact, have contemporaneous knowledge of DRL's supply relationship with KD Pharma, but nevertheless decided to tortiously interfere with DRL's supply arrangement, thereby delaying DRL's market entry and allowing Amarin to stifle generic competition while continuing to earn monopoly profits."  (*Id.*)

Plaintiff maintains that its motion is timely, or, in any event, provides valid justification for any perceived delay of its proposed amendment; its motion is brought in good faith; and its motion will not prejudice Amarin.  (*Id.* at 4-5.)  While the District Court instructed Plaintiff to amend its complaint within 30 days of the entry of the October 27, 2022 Order, Plaintiff was unable to amend within the prescribed deadline as Amarin only began document production six months later in April 2023; document production which yielded the documents that Plaintiff now relies on in support of its proposed amendments.  (*Id.* at 5.)  Further, Plaintiff argues that its proposed

amendment is not an "eleventh-hour amendment" that would require "additional discovery" or "create risk that trials scheduled" will be delayed, as fact discovery is still proceeding; document productions are ongoing; no depositions have been scheduled or taken; the proposed amendment centers around the same operative facts as Plaintiff's antitrust claims for which Amarin is already obliged to produce discovery; and a scheduling order has not yet been approved by the Court.[2] (*Id.* at 5-6.) Plaintiff states that discovery has revealed that when Amarin entered negotiations with KD Pharma to secure its API supply, Amarin intended to condition the supply agreement upon KD Pharma's termination of its pre-existing contractual obligation to DRL. (*Id.* at 8.)

Plaintiff also contends that its proposed amendment is not futile. Plaintiff argues that Amarin's futility arguments regarding the nonexistence of a supply contract are unpersuasive, as: (1) a tortious interference claim with a prospective economic benefit does not require a contract (Pl.'s Reply Br., at 3; Docket Entry No. 133) ("Pl.'s Reply Br."), and (2) whether the relevant documents constitute a binding contract is a question of fact best decided after discovery finishes, thereby making any determination as to same premature (*id.* at 4).

Moreover, Plaintiff states that the DRL-KD Pharma agreement—specifically, the DRL-KD Pharma 2013 Term Sheet—includes provisions detailing the rights and obligations of the parties typical of "commercial contracts."[3] (*Id.* at 6.) According to Plaintiff, these terms were not

---

[2] Of note, the Court entered a Scheduling Order on April 12, 2024 (Docket Entry No. 157) in *21-10309 (RK) Dr. Reddy's Laboratories Inc. v. Amarin Pharma, Inc., et al.*; *21-12061 (RK) In re: Vascepa Antitrust Litigation Indirect Purchaser Plaintiffs*; *21-12747 (RK) In re: Vascepa Antitrust Litigation Direct Purchaser Plaintiffs*; and *23-1016 (RK) Hikma Pharmaceuticals USA, Inc. v. Amarin Pharma, Inc., et al.*, in an effort to coordinate discovery and filing deadlines in the foregoing, related matters. Pursuant to the Scheduling Order, "Any motion to amend the pleadings or to add parties must be filed by **September 1, 2024** (emphasis in original)." (Scheduling Order of 04/12/2024, at 1; Docket Entry No. 157).

[3] *See, e.g.,* provisions for terminating the agreement, the governing law and dispute resolution procedures, confidentiality requirements, indemnification, limitations of liability and damages in the event of a breach, means for giving notices, limitations on assigning the agreement, a force

without effect, as Plaintiff and KD Pharma acted consistently with and as required by the terms set forth in the Term Sheet, in turn, demonstrating both parties' manifest intent to be bound by same. (*Id.* at 7.) Plaintiff maintains that KD Pharma understood the DRL-KD Pharma Term Sheet to be a binding agreement. As evidence of KD Pharma's understanding, Plaintiff cites to three KD Pharma emails dated February 2019, March 2020, and April 2020 respectively, in which KD Pharma utilizes the terms "agreements," "supply agreement," and "contract" in discussing the DRL-KD Pharma relationship. (Pl.'s Suppl. Letter, at 2; Docket Entry No. 151) (citing Ex. 3, Docket Entry No. 151-3; Ex. 4, Docket Entry No. 151-4; and Ex. 5, Docket Entry No. 151-5). Further, it is Plaintiff's position that the nature of the DRL-KD Pharma agreement as an enforceable supply contract is not undermined by the Term Sheet's forecasting provisions, as such provisions are typical of the industry. (Pl.'s Reply Br, at 7-8).

Therefore, while maintaining that such a determination is premature at this stage, Plaintiff holds that it had an enforceable supply contract with KD Pharma and now asserts a non-futile claim of tortious interference with contract as to Amarin. (*Id.* at 8-9.)

As to its tortious interference claim with prospective economic benefit, Plaintiff argues that: (1) Amarin has failed to oppose Plaintiff's separate claim for tortious interference with prospective economic benefit, and (2) in any event, it—including the DRL-KD Pharma agreement—has established: (i) a reasonable expectation of prospective economic benefit from KD Pharma, namely the sufficient supply of icosapent ethyl API for its commercial product (*id.* at 10-11.); and (ii) that this reasonable expectation of prospective economic benefit was directly interfered with by Amarin's exclusive agreement with KD Pharma (Pl.'s Suppl. Letter, at 1-2;

majeure contingency, severability, the entirety of the agreement, execution in counterparts, and other similar contract terms and conditions. (Pl.'s Reply Br., at 6).

7

Docket Entry No. 151) (citing Ex. 1, Docket Entry No. 151-1; and Ex. 2, Docket Entry No. 151-2). Plaintiff holds that it has satisfied the pleadings requirement for its claim for tortious interference with prospective economic benefit.

As to Amarin's knowledge of DRL's alleged contract and relationship with KD Pharma, Plaintiff states that its proposed amended complaint and supporting documents offer sufficient facts and evidence to reveal Amarin's knowledge of the DRL-KD Pharma relationship. (Pl.'s Reply Br., at 12). Specifically, Plaintiff alleges the following:



[O]n July [16,]2013, Amarin learned from ▮▮▮▮▮▮▮▮ [*Id.* at 12] [citing Ex. 2; Docket Entry No. 133-2]. On July 25, 2013, Amarin executives ▮▮▮▮▮▮ because an executive was "▮▮▮▮▮▮ [*Id.* at 12] [citing Ex. 3; Docket Entry No. 133-3]. [I]n February 2014, Amarin again ▮▮▮▮▮▮ [*Id.* at 12-13] [citing Ex. 4; Docket Entry No. 133-4]. By 2015, Amarin knew that ▮▮▮▮▮▮ [*Id.* at 13] [citing Ex. 5; Docket Entry No. 133-5].

In 2017, as KD Pharma was nearing regulatory approval, Amarin's chief negotiator, acting on Amarin's knowledge, informed Amarin's CEO of a solution to ▮▮▮▮▮▮ (Pl.'s Mov. Br., at 8) (citing Ex. 5; Docket Entry No. 130-5); (Pl. Reply Br., at 13) (citing Pl.'s Mov. Br., Ex. 5; Docket Entry No. 130-5). The solution included: ▮▮▮▮▮▮ (Pl.'s Mov. Br., at 9) (citing Ex. 6; Docket Entry No. 130-6).

In December 2017, Amarin and KD Pharma reached a final agreement. (*Id.*) (citing Ex. 7; Docket Entry No. 130-7). Amarin and KD Pharma agreed: ▮▮▮▮▮▮



(*Id.* at 9.)

This agreement was amended on November 19, 2018 ("First Amendment") and April 11, 2019 ("Second Amendment"). (*Id.*)  In January 2019, prior to effectuating the Second Amendment, Amarin wrote to KD Pharma: (1) demanding that KD Pharma ████████████████████████ ████████████████████████████████ and (2) requesting for ████████████ ████████████████████████████████████████████████████████████ ████████████████████ (*Id.*) (citing Ex. 11; Docket Entry No. 130-11).  KD Pharma replied that it would ████████████████████████████ (*Id.*)  Considering Amarin's alleged knowledge, Plaintiff asserts that Amarin implicitly referenced the DRL-KD Pharma relationship when it mentioned ████████████████████████████ (Pl.'s Reply Br., at 13).

According to Plaintiff, this is further supported by Amarin's internal documents, which reveal Amarin's knowledge of ████████████████████████████████ ████████ ████████████████ ████████████████████ (*Id.* at 13-14.)

Plaintiff therefore holds that its proposed amendment—its amended claim for tortious interference with contract or prospective economic benefit—is non-futile, as the amended record sufficiently supports that Amarin knowingly, intentionally, and maliciously interfered with DRL's prospective economic benefit derived from DRL's supply arrangement with KD Pharma.

### B. Amarin's Arguments

In opposition, Amarin argues that Plaintiff's Motion to Amend is futile.[4]   Amarin contends that Plaintiff's repleaded claim for tortious interference with contract or prospective economic benefit fails at the outset, because Plaintiff does not and cannot allege it had a supply contract with KD Pharma. (Defs' Opp'n Br., at 1; Docket Entry No. 132).

Amarin notes that Plaintiff's proposed amended complaint only states that DRL had a Term Sheet with KD Pharma.  (*Id.*)  According to Amarin, the proposed amended complaint proffers no factual allegations establishing that the Term Sheet was in fact a binding supply contract between DRL and KD Pharma but rather submits conclusory classifications that the DRL-KD Pharma arrangement was "a contractual relationship." (*Id.* at 7.)  Amarin argues that the ███████████ ████████████████████████████████████████████████████████████████ (*See id.* at 8.)   The Term Sheet █████████████████████████████████████ ██████████████████. (*Id.*) (citing Defs.' Opp'n Br., Ex. A, at 1; Docket Entry No. 132-1).  It is Amarin's position that such provisions demonstrate that the ████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████ (*Id.* at 8-9.)

Amarin contends that its position is bolstered upon further review of the Term Sheet, as same: (1) fails to include essential terms that are necessary for it to be a binding contract for API supply, i.e., a price for future API purchases (*id.* at 10) (citing Defs.' Opp'n Br., Ex. A, at 4; Docket

---

[4] In a footnote, Amarin also briefly addresses whether Plaintiff engaged in undue delay.  Amarin states: "Because [the] amendment is futile, the Court need not reach this separate issue of delay. But as discussed in text, DRL has in fact engaged in undue delay—the document it relies on for its purported amendment was produced in May, it was prepared to file its motion in August, and it now seeks amendment more than a year after Judge Quraishi dismissed its tortious interference claim." (Defs' Opp'n Br., at 5 n.1; Docket Entry No. 132).  The issue of undue delay is addressed briefly *infra*.

Entry No. 132-1); (2) ███████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████ (*id.* at 10-11) (citing Defs.' Opp'n Br.,

at 4; Docket Entry No. 132-1); and (3) ████████████████████████████

██████████████████████████████████████ (*id.* at 11) (citing Defs.' Opp'n

Br., Ex. A, at 3-4; Docket Entry No. 132-1).  Moreover, Amarin claims that Plaintiff's internal

documents likewise reveal that DRL and KD Pharma ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ (*Id.* at 13) (citing to Defs.' Opp'n Br., Ex. B at 1, Ex. C at 1; Docket

Entry No. 132-1).

Absent a showing that DRL and KD Pharma reached a subsequent agreement on API

supply, Amarin holds that the Term Sheet fails to establish that DRL had a binding supply contract

with KD Pharma.  Moreover, Amarin contends that, even if a supply contract existed between

DRL and KD Pharma, the proposed amended complaint remains futile, as Plaintiff provides no

facts to support that Amarin knew of the existence of a relationship between DRL and KD Pharma

prior to the effectuation of the Amarin-KD Pharma 2017 Agreement.  (*Id.* at 14.)  According to

Amarin, Plaintiff's contention that Amarin knew of the DRL-KD Pharma relationship is seemingly

premised on two documents: (1) an email submitted to Amarin from ████████████████

regarding ██████████████████████████ (Ex. 4; Docket Entry No. 130-4) (██

██████████████████), and (2) an email from ██████ to Amarin, regarding ███████████

████████████████ (Ex. 4; Docket Entry No. 133-4) ███████████████████ (Defs.'

Opp'n Br., at 16-17); (Defs.' Sur-Reply Br., at 1-2; Docket Entry No. 135) ("Defs.' Sur-Reply

Br.").

     As to ███████████████, Amarin argues that same fails to establish Amarin's

purported knowledge, as the report was produced by a third-party competitive intelligence

consultant, ████████████ on January 19, 2021, without listing DRL or KD Pharma as the

source of its information. (Defs.' Opp'n Br., at 16-17). Amarin holds that █████████████

is irrelevant to what Amarin knew in December 2017—when Amarin allegedly interfered with the

DRL-KD Pharma relationship—as it is second-hand knowledge produced three years after the date

of the Amarin-KD Pharma 2017 agreement. (*Id.* at 17.)

     As to ████████████, Amarin concedes that the document pre-dates Amarin's 2017

agreement with KD Pharma (Defs.' Sur-Reply Br., at 1), yet argues that same fails to demonstrate

Amarin's alleged knowledge of the DRL-KD Pharma relationship in 2017 as:

> The document does not state that KD Pharma and DRL had a supply
> contract, nor does it provide any information about the nature of the
> relationship between KD Pharma and DRL. The document therefore
> provides no support for an allegation that Amarin knew of a "specific
> contract" between KD Pharma and DRL and acted "with the intent to
> interfere with that contract. (citations omitted).

(*Id.* at 1-2.)

     Amarin argues that all of Plaintiff's documents, including its supplemental submissions,

fail to alter two core propositions that defeat Plaintiff's Motion to Amend: "(1) DRL has not

plausibly alleged that it had a *supply contract* with KD Pharma; and (2) DRL has not plausibly

alleged that Amarin had *actual knowledge* of any purported supply contract." (Defs.' Suppl.

Letter, at 1; Docket Entry No. 153) (emphasis in original) ("Defs.' Suppl. Letter"); *(see* Defs.' Sur-

Reply Br., at 1) ("[The] newly submitted documents do not alter the conclusion that DRL has not

plausibly alleged that it had a supply contract with KD Pharma or that Amarin had actual

knowledge of such a contract.").  Amarin asserts that these documents fail to discuss with specificity that DRL and KD Pharma had a supply contract and that Amarin had knowledge of any such contract.  (Defs.' Opp'n Br., at 15); (Defs.' Sur-Reply Br., at 1-2); (Defs.' Suppl. Letter, at 1-2).  "At most, DRL's new allegations plead that Amarin was generally aware that KD Pharma had previously worked with certain unnamed generic manufacturers regarding icosapent ethyl API."  (Defs.' Opp'n Br., at 18).

Lastly, Amarin contends that Plaintiff's allegation of interference is undermined by the fact that the proposed amended complaint reflects an effort by Amarin to respect any preexisting API supply arrangements that may have existed between competitors and KD Pharma. (Defs.' Opp'n Br., at 19).  Pursuant to the Amarin-KD Pharma contract, KD Pharma was authorized ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████  (*Id.* at 19-20) (citing Pl.'s Mov. Br., at Ex. 7, § 3.6).  Amarin maintains that such authorization indicates its affirmative steps taken to avoid interfering with preexisting contractual relationships and thus, any claim of deliberate interference should be rejected.  (*Id.* at 20.)

## II.  DISCUSSION

### A.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 15(a)(2) "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  The decision to grant leave to amend is left within the discretion of the district court.  *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 144 n.10 (3d Cir. 2009).  To ensure that claims will be decided on the merits rather than on technicalities, the Third Circuit has

13

shown a strong liberality in allowing amendments under Rule 15. *Dole v. Arco Chemical Co.*, 921 F.2d 484, 487 (3d Cir. 1990). Pursuant to the factors set out in *Foman v. Davis,* leave to amend must be granted in the absence of (1) undue delay; (2) bad faith or dilatory motive; (3) undue prejudice to the opposing party; and (4) futility of amendment. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (citing *Foman*, 371 U.S. at 182). However, where there is an absence of undue delay, bad faith, prejudice or futility, a motion for leave to amend a pleading should be liberally granted. *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004).

### B.  Undue Delay, Bad Faith, and Dilatory Motive

While the District Court instructed Plaintiff to amend its complaint within 30 days of the entry of the October 27, 2022 Order, the Court does not find that Plaintiff has engaged in undue delay, dilatory conduct, and/or has acted in bad faith.

In deciding whether to grant leave to amend, "prejudice to the non-moving party is the touchstone for the denial of the amendment." *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989) (quoting *Cornell & Co., Inc. v. Occupational Health and Safety Review Comm'n*, 573 F.2d 820, 823 (3d Cir. 1978)). Delay alone, however, does not justify denying a motion to amend. *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001). Rather, it is only where delay becomes "'undue,' placing an unwarranted burden on the court, or . . . 'prejudicial,' placing an unfair burden on the opposing party" that denial of a motion to amend is appropriate. *Adams v. Gould Inc.,* 739 F.2d 858, 868 (3d Cir. 1984). While the undue prejudice criterion looks to the effect of amendment on defendants, undue delay assesses the plaintiff's reason for not seeking to amend sooner. *See id.*

Similar to the "undue delay" inquiry, "[t]he question of bad faith requires the Court to focus on the party's reasons for not amending sooner." *Zelma v. Choice Energy, LLC*, Civ. No. 19-17535,

2020 WL 5201341 at *2, (D.N.J. Sep. 1, 2020) (citing *Adams v. Gould, Inc.*, 739 F.2d 858, 868 (3d Cir. 1984) ("The question of undue delay, as well as the question of bad faith, requires that we focus on the plaintiffs' motives for not amending . . . earlier . . . .")).

As noted above, during the pendency of Plaintiff's Motion to Amend, the Court entered a Scheduling Order on April 12, 2024, setting a deadline to file any motion to amend the pleadings or to add parties—September 1, 2024. (Scheduling Order of 04/12/2024, at 1; Docket Entry No. 157). Although the Scheduling Order was not in effect when Plaintiff filed its motion in November 2023, Plaintiff has ultimately moved to amend its Complaint within the now-governing filing deadline. This fact militates against finding that Plaintiff has engaged in undue delay.

Moreover, as Plaintiff states:

> DRL sought leave to amend when it was practicable to do so after document production and review began, and the temporary pause in litigation to pursue mediation this past Fall [Fall 2023] ended. There was no "undue" delay by DRL, and in any event, any delay alone is "insufficient to deny a request for leave to amend."

(Pl.'s Reply Br., at 5 n.3). The Court agrees. Amarin itself recognizes that the documents relied upon by Plaintiff for its proposed amendments were produced months after the District Court rendered its October 27, 2022 Order and Opinion, specifically in May 2023. (Defs.' Opp'n Br., at 4 and 5 n.1). After these documents were produced, the parties, pursuant to the Court's direction, continued to meet-and-confer regarding issues—including discovery issues and scheduling proposals—and submit same for the Court's consideration. (Text Order of 06/07/2023; Docket Entry No. 115); (*see* Defs.' Letter of 06/20/2023; Docket Entry No. 116); (*see also* Pl.'s Letter of 06/20/2023; Docket Entry No. 117). Notably, during this time, the Court did not enter a scheduling order nor was a prior scheduling order in effect. Then, on August 23, 2023, the District Court directed the parties to mediation with the Honorable Chief Judge Jose Linares, U.S.D.J. (ret.).

15

(Text Order of 08/23/2023; Docket Entry No. 125). On October 25 and October 26, 2023 respectively, Plaintiff and Amarin, in part, notified the Court that the mediation was unsuccessful. (Pl.'s Letter of 10/25/2023; Docket Entry No. 127); (Defs.' Letter of 10/26/2023; Docket Entry No. 128). Soon thereafter, on November 15, 2023, Plaintiff filed its present Motion to Amend.

Considering this procedural history, the Court finds that Plaintiff: (i) was unable to comply with the District Court's prescribed 30-day filing deadline through no fault of its own or of any party; (ii) operated in good faith throughout the months preceding the filing of its Motion to Amend, complying with the Court's directives which impacted the course of the litigation; and (iii) moved for leave to file an amended complaint by the April 12, 2024 Scheduling Order's filing deadline, September 1, 2024.

The Court therefore holds that Plaintiff has not engaged in undue delay, dilatory conduct, and/or acted in bad faith.

### C. Futility

"Although leave to amend the pleadings under Fed. R. Civ. P. 15 is granted liberally, the court may deny a motion to amend" based on "futility of the amendment." *Gibbs v. Massey*, No. 07-3604, 2009 U.S. Dist. LEXIS 23578, 2009 WL 838138, at *3 (D.N.J. Mar. 26, 2009) (internal quotation marks omitted). "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997); *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996)). "To determine whether a proposed amendment is futile the Court applies the same standard as a motion to dismiss under Rule 12(b)(6)." *Gibbs*, 2009 WL 838138, at *3 (citing *Medpointe Healthcare, Inc. v. Hi-Tech Pharmacal Co., Inc.*, 380 F. Supp. 2d 457, 462 (D.N.J. 2005)).

"The Court therefore [must] accept all factual allegations as true 'as well as the reasonable

inferences that can be drawn from them.'" *Id.* (quoting *Brown v. Phillip Morris, Inc.*, 250 F.3d 789,

796 (3d Cir. 2001)). "[D]ismissal is appropriate only if, accepting all of the facts alleged in the

[pleading] as true, the p[arty] has failed to plead 'enough facts to state a claim to relief that is

plausible on its face[.]'" *Duran v. Equifirst Corp.*, Civil Action No. 2:09-cv-03856, 2010 WL

918444, *2 (D.N.J. March 12, 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127

S. Ct. 1955, 167 L.Ed.2d 929 (2007)). Put simply, the alleged facts must be sufficient to "allow[]

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

### i. Preliminary Consideration: Plaintiff's Documents Submitted in Support of its Motion to Amend, and Amarin's Documents Submitted in Support of its Opposition.

As a preliminary matter, the Court addresses whether it may consider the documents

submitted by Plaintiff in support of its Motion to Amend and the documents submitted by Amarin

in support of its Opposition. Amarin argues that the Court should not rely on documents neither

cited nor quoted in Plaintiff's proposed amended complaint for the purposes of assessing the

futility of same because such documents are not included in the proposed amended complaint's

allegations. (Defs.' Opp'n Br., at 16). In reply, Plaintiff contends that, "Although Amarin asks

the Court to ignore incriminating document(s) because [they are] not cited in DRL's proposed

amended complaint, this Court has often considered documents relied upon by a Plaintiff to

support its motion to amend." (Pl.'s Reply Br., at 14 n.5) (citations omitted).

"In determining futility, the Court considers only the pleading, exhibits attached to the

pleading, matters of public record, and undisputedly authentic documents if the party's claims are

based upon the same." *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192,

1196 (3d Cir. 1993); *see also Patrick v. Equifax Info. Servs., LLC*, Civ. No. 23-4092, 2024 WL

2077036, at *8 n.7 (D.N.J. May 9, 2024)*; see also Love v. Does*, Civ. No. 17-1036, 2020 WL

5760447, at *3 (D.N.J. Sept. 28, 2020) (citing *Pension Benefit Guar. Corp.*, 998 F.2d at 1196); *see*

*also Robert v. Autopart Int'l*, No. 14-7266, 2016 WL 492762, at *3 (D.N.J. Feb. 8, 2016) (same).

Of note, Amarin does not contest the authenticity of Plaintiff's documents submitted in

support of its motion and has had an opportunity to respond to same through its opposition, sur-

reply, and supplemental letter. (*See generally,* Defs.' Opp'n Br.; Defs.' Sur-Reply Br.; and Defs.'

Suppl. Letter).  Further, in providing the documents, Plaintiff relies upon same to support and

establish its allegations asserted in its proposed amended complaint; allegations which Plaintiff's

proposed tortious interference claims, as well as Plaintiff's arguments made in support thereof, are

based upon.  The Court finds that Plaintiff's claims are therefore "based on" the documents, or

stated differently, the documents are "integral to . . . the complaint [and proposed amendments]."

*See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

The Court will consider the documents submitted by Plaintiff in support of its Motion to

Amend yet not cited to or quoted in its proposed amended complaint.

As to the documents submitted by Amarin in support of its Opposition, considering the

limited record to which the Court is bound in analyzing the futility of a proposed amendment, the

Court shall not consider Exhibit B of Amarin's Opposition. (Defs.' Opp'n Br., Ex. B; Docket Entry

No. 132-1).  There is no indication that Plaintiff's claims, factual allegations, or arguments in

support of its motion are based on said document.

However, the Court shall consider Exhibit A and Exhibit C of Amarin's Opposition.

Exhibit A, a copy of the DRL-KD Pharma 2013 Term Sheet, was also attached as an exhibit by

Plaintiff in its Reply. (*Compare* Defs.' Opp'n Br., Ex. A; Docket Entry No. 132-1, *with* Pl.'s Reply

Br., Ex. 1; Docket Entry No. 133-1). Exhibit C of Amarin's Opposition appears to be a part of a document relied upon by Plaintiff in its Reply, i.e., Ex. 6—███████████████████ ████████████████ (*Compare* Defs.' Opp'n Br., Ex. C; Docket Entry No. 132-1, *with* Pl.'s Reply Br., Ex. 6; Docket Entry No. 133-6). Yet, Plaintiff does not include Amarin's document—specific email correspondences—in its submission.

As Plaintiff's claims are "based on" those documents either in part or in their entirety, the Court shall consider same for the purpose of analyzing the futility of Plaintiff's proposed amendments. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426 ("The rationale underlying [judicial notice] is to prevent … the situation in which a plaintiff is able to maintain a claim … by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement" did not support the plaintiff's claim.").

### ii. Tortious Interference with Prospective Economic Benefit

Under New Jersey law, the five elements of a claim of tortious interference with a prospective economic benefit are: (1) a plaintiff's reasonable expectation of economic benefit or advantage, (2) the defendant's knowledge of that expectancy, (3) the defendant's wrongful, intentional interference with that expectancy, (4) in the absence of interference, the reasonable probability that the plaintiff would have received the anticipated economic benefit, and (5) damages resulting from the defendant's interference. *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 186 (3d Cir. 1992) (citing *Printing Mart–Morristown v. Sharp Elec. Corp.,* 116 N.J. 739, 751-52, 563 A.2d 31, 37 (N.J. 1989); *Read v. Profeta*, 397 F. Supp. 3d 597, 641–42 (D.N.J. 2019) (quoting *Florian Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F. Supp. 2d 521, 525 (D.N.J. 1998).

As to the first element (reasonable expectation of economic benefit or advantage), in New Jersey, a protected interest "need not equate with that found in an enforceable contract," but will arise where the plaintiff had "'some reasonable expectation of economic advantage.'" *Printing Mart–Morristown,* 116 N.J. at 751 (quoting *Harris v. Perl,* 41 N.J. 455, 462, 197 A.2d 359 (1964)). Taking the pleaded facts as true, Plaintiff's reasonable expectation of economic benefit from its business relationship with KD Pharma was the prospective sufficient supply of icosapent ethyl API from KD Pharma for the commercial launch of its generic commercial product. (Pl.'s Mov. Br., Ex. 2, Proposed Amended Complaint, at ¶¶177, 182; Docket Entry No. 130-2) ("Pl.'s PAC"). The DRL-KD Pharma 2013 Term Sheet and its provisions, when drawing all reasonable inferences, suggest that DRL and KD Pharma contemplated this prospective economic benefit for DRL. Specifically, the DRL-KD Pharma 2013 Term Sheet provides in part:



(Defs' Opp'n Br., Ex. A, at 1; Docket Entry No. 132-1);

(*Id.*);

(*Id.*)

The Term Sheet also provided

(*Id.*, Ex. A, at 3.) Further, as Plaintiff provides, it can be reasonably inferred that DRL and KD Pharma acted in accordance with the terms of their Term Sheet. (*See* Pl.'s Reply, Br., Ex. 6; Docket Entry No. 133-6); (*see also* Pl.'s Suppl. Letter, Ex. 3, Ex. 4, and Ex. 5; Docket Entry Nos. 151-3, 151-4, and 151-5).

20

Based upon the foregoing, Plaintiff has sufficiently plead enough facts to establish that it had a reasonable expectation of economic benefit.

As to the second element (knowledge) and third element (intentional and wrongful interference), these are fiercely contentious points of dispute.

Concerning Amarin's knowledge of Plaintiff's expectancy, the proposed amended complaint states:

- "By as early as 2015[,] Amarin was aware of KD Pharma's relationships with generic competitors, prior to Amarin entering into its own contractual relationship with KD Pharma in 2017." (Pl.'s PAC, at ¶¶ 76, 178).
- Amarin has been aware of generic competitors' intention to market a generic icosapent ethyl drug product since at least 2015 and has been aware of DRL's intention to do so since at least 2017. Accordingly, Amarin is aware of DRL's reasonable expectation of prospective economic benefit from sales of generic icosapent ethyl drug product. (Pl.'s PAC, at ¶ 185).

At this stage, "[t]he Court . . . [must] accept all factual allegations as true 'as well as the reasonable inferences that can be drawn from them.'" *Gibbs*, 2009 WL 838138, at *3 (quoting *Brown v. Phillip Morris, Inc.*, 250 F.3d 789, 796 (3d Cir. 2001)).  Given the standard of review to which the Court is bound in deciding Plaintiff's motion, Amarin's argument that Plaintiff provides no facts to support that Amarin knew of the existence of a relationship between DRL and KD Pharma prior to the effectuation of the Amarin-KD Pharma 2017 Agreement is lacking.

Based upon the documents submitted in support of Plaintiff's motion, it can be reasonably inferred that Amarin, prior to effectuating the Amarin-KD Pharma 2017 agreement, was aware that (i) DRL was attempting to launch a generic product of Vascepa, and (ii) that DRL had a business relationship and/or agreement with KD Pharma.  Specifically, through its accompanying documents, Plaintiff submits:

21

- On July 16, 2013, Amarin received an email from ████████████ In the email ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████ (Pl.'s Reply Br., Ex. 2; Docket Entry No. 133-2);

- On July 25, 2013, Amarin personnel internally communicated via an email chain bearing the subject title ████████████ ████████████████████████████████ ████████████████████████████████ ████████████ (*Id.*, Ex. 3; Docket Entry No. 133-3);

- On February 3, 2014, Amarin received an email from ████ bearing the subject title ████████████████ ████████████████████████████████ ████████████████████████████████ ████████████ (*Id.*, Ex. 4; Docket Entry No. 133-4);

- On February 9, 2015, Amarin emailed KD Pharma, ████ ████████████████████████████████ ████████████████████████████████ (*Id.*, Ex. 5; Docket Entry No. 133-5);

- On February 12, 2015, KD Pharma responded to Amarin's February 9, 2015 ████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ (*Id.*)

- On some date after Amarin-KD Pharma contract negotiations concluded but prior to the effectuation of the Amarin-KD Pharma 2017 Agreement,[5] Amarin provided an update on the status of the KD Pharma Supply Agreement in a document titled ████████████ ████████████████████████████████

---

[5] This timeframe can be reasonably established as the document mentions: ████ ████████████████████████████████ (Pl.'s Mov. Br., Ex. 5; Docket Entry No. 130-5).

22

████████████████████████████████████████████████ (Pl.'s Mov.
Br., Ex. 5; Docket Entry No. 130-5); and
- On December 8, 2017, Amarin and KD Pharma entered into an API
Supply Agreement. (*Id.*, Ex. 7; Docket Entry No. 130-7).

Consequently, accepting all factual allegations as true, a reasonable inference can be drawn that Amarin knew by 2015 and prior to execution of the 2017 agreement that: (i) DRL was attempting to launch a generic version of Vascepa; (ii) DRL, as the generic product manufacturer, was working directly with KD Pharma, as the API supplier, to effectuate the launch of DRL's generic product; and (iii) KD Pharma was undergoing the FDA approval process for partnering with a generic icosapent ethyl manufacturer, with Amarin understanding that this manufacturer was DRL.

Plaintiff has sufficiently plead enough facts to draw the reasonable inference that Amarin had knowledge of Plaintiff's reasonable expectation of economic benefit from its business relationship with KD Pharma.

Concerning Amarin's alleged interference, Plaintiff is required to show "the intentional doing of a wrongful act without justification or excuse." *Avaya Inc., RP v. Telecom Labs, Inc.,* 838 F.3d 354, 383 (3d Cir. 2016) (citing *Printing Mart*, 116 N.J. at 756, 563 A.2d 31, at 39 (citation omitted)). "Wrongful conduct, always viewed in the specific context of the case presented, is generally defined by reference to custom in the industry." *Avaya Inc.,* 838 F.3d at 383. It is conduct that "would not be sanctioned by 'the rules of the game,' for where a Plaintiff's loss of business is merely the incident of healthy competition, there is no compensable tort injury." *Metro. Foods, Inc. v. Kelsch*, Civ. No. 11-3306, 2012 WL 956178, at *5 (D.N.J. Feb. 14, 2012) (citing *Lamorte Burns & Co. v. Walters,* 167 N.J. 285, 306, 770 A.2d 1158 (2001)); *see Printing Mart*, 116 N.J. at 757, 563 A.2d 31, at 40. "A benign, or pro-competitive, motive does not absolve

23

misconduct." *Avaya Inc.,* 838 F.3d at 383. "While competition may constitute justification, a defendant-competitor claiming a business-related excuse must justify not only its motive and purpose but also the means used." *Id.* (citing *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 282 N.J.Super. 140, 199, 659 A.2d 904 (N.J. Super. Ct. App. Div. 1995)).

Plaintiff's proposed amended complaint alleges:

- Upon receiving knowledge that KD Pharma had successful inspection of the FDA, Amarin feared that ███████████████████ ███████████████████████████████████████ ███████████ (Pl.'s PAC, at ¶ 76);
- Amarin rushed to reach an agreement with KD Pharma, and made certain that KD Pharma would not be available to supply any other generic in the United States market (*Id.* at ¶ 77);
- In negotiating its agreement with KD Pharma, Amarin revealed that it did not need KD Pharma's API. As it told KD Pharma in March 2017, ██████████████████████████████████ (*id.* at ¶ 78);
- In December 2017[,] Amarin and KD Pharma entered into a supply agreement. This agreement ████████ ██████ ████████████████████████████████████████ █████████████████; this latter provision confirms that Amarin did not, in fact, require KD Pharma's entire capacity. (*Id.* at ¶ 79);
- Amarin and KD Pharma signed an Amendment on November 19, 2018 and a Second Amendment on April 11, 2019. In this Second Amendment[,] Amarin further restricted KD Pharma's ability to supply any potential competitor by █████████████████ ████████ Just before signing this Second Amendment, Amarin . . . wrote to KD Pharma with two █████████ ████████ ██████████████████████████████████████ ██████████████████████████████████████ ███████████ KD Pharma obliged and confirmed same. (*Id.* at ¶ 80);
- Amarin's five exclusive API supply contracts are contrary to industry practice. [I]t is industry practice for a manufacturer, including a brand manufacturer like Amarin, to have one to two API suppliers, even though more may be available, because it is costly and takes a long time to qualify and ensure quality control at the API suppliers. Thus, Amarin's agreements with at least five suppliers, including KD

Pharma, are contrary to industry practice and appear economically irrational. (*Id.,* at ¶ 82); and

- Amarin's several exclusive or de facto exclusive agreements with suppliers since 2012 and its exclusive agreement with KD Pharma cannot be justified by the usual rationale for manufacturers to enter into exclusive supply contracts – i.e. to ensure adequate supplies. Amarin's public statements in December 2018 confirmed that it had enough API supply for at least two years, which was worth $1 billion in Vascepa sales. Moreover, the entire market for Vascepa in the United States is estimated to require 450 metric tons of icosapent ethyl API per year. Amarin's binding orders with KD Pharma at 400 metric tons / year for the next three years is further evidence of Amarin's efforts to lock up icosapent ethyl API supplies, given that it already has four exclusive suppliers lined up, each a leading supplier of icosapent ethyl API. (*Id.* at ¶ 83.)

Taking the pleaded facts as true, Plaintiff's proposed amended complaint plausibly asserts that Amarin, acting with knowledge and contrary to industry standards, intentionally interfered with DRL's relationship with KD Pharma without justification or excuse by entering into the Amarin-KD Pharma supply contract.

Amarin's argument that Plaintiff's allegation of interference is undermined by the fact that the proposed amended complaint reflects an effort by Amarin to respect any preexisting API supply arrangements that may have existed between competitors and KD Pharma is unpersuasive.[6]

As alleged in the proposed amended complaint, DRL suffered a delayed launch of its generic product by at least 10 months due to the Amarin-KD Pharma 2017 agreement and the subsequent amendments to same. (Pl.'s PAC ¶¶ 3-4, 89). This delay stemmed from the fact that Amarin entered into exclusive contracts and/or agreements with all potential high-capacity API suppliers, including KD Pharma, forcing DRL to look for a new API supplier; a new API supplier who either had limited API capacity or had not made the requisite regulatory filings. (*Id.* at ¶¶ 5,

---

[6] This effort includes Section 3.6 of the Amarin-KD Pharma 2017 Agreement (Pl.'s Mov. Br., Ex. 7, at 11 § 3.6; Docket Entry No. 130-7), and Section 5 of the Amarin-KD Pharma 2019 Second Amendment (*id.*, Ex. 10, at 3 § 5(iii); Docket Entry No. 130-10).

7.)  Eventually, BASF Group—a high-capacity API supplier—reversed course and indicated for the first time in September 2020 that it was willing to start supplying API supply to DRL. (*Id.* at ¶ 89.)  However, the earliest that DRL could launch using BASF's API was more than a year after when DRL would have originally launched in August 2020.  (*Id.*)

Assuming that DRL was permitted to and did obtain API from KD Pharma pursuant to Section 3.6 of the Amarin-KD Pharma agreement and/or Section 5 of the Second Amendment, applying the liberal standard to which this Court is bound, the notion that DRL was forced to locate and work with a new API supplier to obtain additional API supply for launch—thereby delaying the launch of its generic product for 10 months or more—still persists.  As noted, Amarin disputes that any intentional interference occurred, including that it "locked up" API supply forcing a delay to DRL's launch of its generic product.  As Amarin contends, its Agreement and its subsequent Amendments with KD Pharma reflect a clear effort to respect any preexisting agreements concerning API supply.  Yet, the question of whether the facts adequately demonstrate and establish Amarin's intent to respect any preexisting agreements—and more specifically, Amarin's intent to not interfere with DRL's prospective sufficient supply of icosapent ethyl API from KD Pharma for the commercial launch of DRL's generic commercial product—is a clear question of fact which will not be resolved at this stage in deciding Plaintiff's Motion to Amend.

Accordingly, Plaintiff has sufficiently plead enough facts to draw the reasonable inference that Amarin wrongfully and intentionally interfered with its reasonable expectancy.

Lastly, as to the fourth element (probability of receiving economic benefit absent interference) and fifth element (damages), Plaintiff's proposed amended complaint states: "But-for Amarin's tortious interference, KD Pharma would have been available to supply DRL the API

it required to make a full commercial launch when it received approval from the FDA." (Pl.'s PAC, at ¶ 81).

 Plaintiff, through its proposed amended complaint and supporting documentation, submits:

(i) From 2013 through 2020, DRL and KD Pharma maintained a business relationship centered around Icosapent Ethyl API supply for DRL's generic product launch, as suggested by DRL-KD Pharma communications. (Pl.'s PAC, at ¶¶ 65-67); (*see* Pl.'s Reply Br., Ex. 6; Docket Entry No. 133-6); (*see also* Pl.'s Suppl. Letter., Ex. 1, Docket Entry No. 151-1; Ex. 2, Docket Entry No. 151-2; Ex. 3, Docket Entry No. 151-3; and Ex. 4, Docket Entry No. 151-4);

(ii) Pursuant to this business relationship and the 2013 DRL-KD Pharma Term Sheet, KD Pharma understood that it had an agreement with DRL, which KD Pharma acted in accordance with throughout the tenure of the DRL-KD Pharma business relationship (Pl.'s Suppl. Letter, Ex. 3, Docket Entry No. 151-3; and Ex. 5, at 14; Docket Entry No. 151-5); (*see* Pl.'s Reply Br., Ex. 6; Docket Entry No. 133-6);

(iii) KD Pharma's subsequent relationship with Amarin had the potential to and did in fact interfere with KD Pharma's ability to supply the necessary API for DRL's commercial product launch, as KD Pharma refused to supply DRL with API for 36 months despite the DRL-KD Pharma Term Sheet, DRL's offer/alternate offer of a highly profitable price and there being no legitimate reason for KD Pharma's refusal to engage with DRL.  (Pl.'s PAC, at ¶¶ 2-9, 67-74, 77-80); (*see* Pl.'s Suppl. Letter, Ex. 3; Docket Entry No. 151-3) (discussing ███████████ ████████████████████████████; (*see also* Pl.'s Suppl. Letter Ex. 5, at 14; Docket Entry No 151-5) (recognizing ████████████████████████████ ████);

(iv) Due to the foregoing, DRL's generic product launch was ultimately delayed by at least 10 months, resulting in DRL's lost sales of its generic icosapent ethyl drug product, and profits on those sales (Pl.'s PAC, at ¶¶ 7-8, 63, 85, 88-90, 182-84, and 188-89).

Based on the foregoing, accepting the factual allegations as true, Plaintiff has sufficiently plead enough facts to draw the reasonable inference that DRL likely would have received its anticipated expectancy—i.e., the sufficient supply of icosapent ethyl API from KD Pharma for the commercial launch of its generic commercial product—but for Amarin's alleged interference, and DRL suffered damages—i.e., lost sales of its generic icosapent ethyl drug product, and profits on those sales—due to Amarin's alleged interference.

In sum, applying the liberal standard to which the Court is bound in deciding Plaintiff's motion, the Court finds that Plaintiff has plead enough facts to state a claim of tortious interference with prospective economic benefit that is plausible on its face. Plaintiff's request for leave to amend its complaint is **GRANTED**, insofar as it seeks to state a claim of tortious interference with a prospective economic benefit.

### iii. Tortious Interference with Contract

Under New Jersey law, the elements for a claim of tortious interference with contract are identical to the elements for a claim of tortious interference with prospective economic benefit or advantage, except that the tortious interference with contract claim requires proof of an existing contract. (Op. Tr. of 11/28/2022, 11:14-18; Docket Entry No. 95) (citing *DeJoy v. Comcast Cable Commc'ns,* 941 F. Supp. 468, 476−77 (D.N.J. 1996)); *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.,* 256 F. Supp. 2d 249, 288 (D.N.J. 2003) (citing *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.,* 912 F.Supp. 747, 771 (D.N.J. 1995) (citation omitted)).

The parties fiercely contest: whether a contract existed between DRL and KD Pharma, and if so, whether Amarin had the requisite knowledge of the contractual relationship to rise to the level of intentional interference with DRL's contractual rights. Accordingly, the Court focuses on same in the analysis that follows, noting that all other elements of the claim have been satisfied for the same reasons provided above in discussing Plaintiff's tortious interference with prospective economic benefit claim.

As to whether a DRL-KD Pharma contract existed, the parties each have dedicated much ink to either qualifying or disqualifying the DRL-KD Pharma 2013 Term Sheet as a binding contract and/or supply agreement. However, as Plaintiff argues, "Whether the documents signed by DRL and KD Pharma and their course of conduct constitute a binding 'contract' is a question of fact best decided after discovery finishes." (Pl.'s Reply Br., at 4; Docket Entry No. 133) (citing *Omert v. Freundt & Assocs. Ins. Servs.*, Civ. No. 16-2529 NLH-AMD, 2018 WL 6696130, at *4 (D.N.J. Dec. 20, 2018) (citation omitted)). The Court agrees. *See McDonnell v. Engine Distributors*, 314 F. App'x 509, 511 (3d Cir. 2009) (citing *Burlew v. Hepps*, 6 N.J. Super. 16, 19 (App. Div. 1949)) ("The formation of an enforceable contract is a question of fact"); *see also ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 665 (3d Cir. 1998) (stating that "the interpretation of contractual language to discern contractual intent is a factual question").

Taking the pleaded facts as true, Plaintiff plausibly asserts that:

(i) It effectuated a Term Sheet with KD Pharma in 2013, giving rise to a business relationship (Pl.'s PAC, at ¶¶ 65-67), (*see* Pl.'s Reply Br., Ex. 1, Docket Entry No. 133-1; and Ex. 6, Docket Entry No. 133-6); (*see also* Pl.'s Suppl. Letter, Ex. 1, Docket Entry No. 151-1; Ex. 2, Docket Entry No. 151-2; Ex. 3, Docket Entry No. 151-3; and Ex. 4, Docket Entry No. 151-4);

29

(ii) KD Pharma acted in accordance with the provisions of the Term Sheet after the effectuation of same, as suggested by DRL-KD Pharma communications. (Pl.'s PAC, at ¶ 66); (*see* Pl.'s Reply, Br., Ex. 6; Docket Entry No. 133-6); (*see also* Pl.'s Suppl. Letter, Ex. 3, Docket Entry No. 151-3; Ex. 4, Docket Entry No. 151-4; and Ex. 5, Docket Entry No. 151-5); and

(iii) KD Pharma understood the Term Sheet to be a supply agreement and/or contract (*see* Pl.'s Suppl. Letter, at 2) (citing Ex. 3, Docket Entry No. 151-3; Ex. 4, Docket Entry No. 151-4; and Ex. 5; Docket Entry No. 151-5) (stating that KD Pharma has a "frame supply agreement" or "contract" with DRL).

While Amarin argues that both DRL and KD Pharma affirmatively recognize through their own admissions that no binding contract existed, whether the 2013 Term Sheet—by its express provisions and omissions—is in fact a binding contract, and/or whether the course of dealings and conduct between and by DRL and KD Pharma sufficiently demonstrate their intention or lack thereof to be bound by the Term Sheet, are questions of fact that shall not be addressed at this stage. Plaintiff has sufficiently plead enough facts, that when accepted as true, establish the reasonable inference that DRL had a contractual relationship with KD Pharma.

As to whether Amarin knew of and intentionally interfered with DRL's alleged contractual rights, "[a]ctual knowledge of the contract with which a defendant supposedly interfered is a prerequisite to making out a claim for tortious interference." *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 422 (3d Cir. 2013). "[W]ithout knowledge of the specific contractual right, [a party] cannot be deemed to have intentionally interfered with that right." *Id.* "From this precept, it is axiomatic that a defendant cannot be liable for interfering with a contract of which he or she was unaware." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1170 (3d Cir. 1993) (citing

30

*Trump Taj Mahal Assocs. v. Construzioni Aeronautiche Giovanni Agusta, S.p.A.,* 761 F.Supp. 1143, 1164 (D.N.J. 1991)).

However, as courts in this jurisdiction have found, knowledge of a contract may be implied and reasonably inferred from the underlying facts when analyzing a complaint pursuant to the Rule 12(b)(6) legal standard. *See Florian Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F. Supp. 2d 521, 525 (D.N.J. 1998) (finding that although the amended complaint failed to specifically assert the defendant's knowledge of existing or anticipated contracts, such knowledge was reasonable to infer from the underlying facts at the motion-to-dismiss stage); *see also Mayer v. Mayer*, Civ. No. 23- 2272 GC-JBD, 2024 WL 1283826, at *7 (D.N.J. Mar. 26, 2024) (citing *Florian*, 11 F.Supp. 2d at 525 (citation omitted)).

Amarin's argument that Plaintiff provides no facts to support that Amarin knew of the existence of a contract between DRL and KD Pharma prior to the effectuation of the Amarin-KD Pharma 2017 Agreement is lacking at this stage. Considering the aforementioned facts regarding Amarin's knowledge of DRL's relationship with KD Pharma, same, when accepted as true, support the reasonable inference that Amarin knew that DRL and KD Pharma had a supply agreement for icosapent ethyl API supply. (*See* Section III (C)(i) *supra* pp. 22-23) (discussing Amarin's knowledge of Plaintiff's expectancy).

To add, the evidence, according to Plaintiff, reasonably shows that:

(i) The Amarin-KD Pharma 2017 Agreement permitted KD Pharma ███████████████

████████████████████████████████████████████████████████

███████████████████████████████ (Pl.'s Mov. Br, Ex. 7, at 11 § 3.6; Docket Entry No. 130-7);



(ii) In 2019, Amarin and KD Pharma acknowledged that KD Pharma supplied ███████ ████████████████████████████████████████████████████████ (*id.*, Ex. 10, at 3 § 5(iii); Docket Entry No. 130-10); and

(iii) In 2019, Amarin also contacted KD Pharma, requesting confirmation that KD Pharma ███████████████████████████████████ (*id.*, Ex. 11.)

As Plaintiff alleges, the ████████████████████████ is a reference by Amarin to KD Pharma's pre-existing relationship to supply API to DRL and one other customer (Pl.'s Reply Br., at 13); a reasonable inference when accepting the pleaded facts as true. While the Court appreciates Amarin's argument that the foregoing evidence fails to show that Amarin knew of a DRL-KD Pharma contract prior to the effectuation of the Amarin-KD Pharma 2017 agreement, whether Amarin bore such knowledge prior to 2017 and whether such knowledge included specific knowledge of a DRL-KD Pharma contract, are questions of fact.

Again, whether DRL-KD Pharma Term Sheet amounts to a binding contract; whether Amarin had actual knowledge of the contract including Plaintiff's contractual rights; when/if Amarin obtained such knowledge; and whether Amarin's conduct amounts to intentional interference, are questions of fact. At this stage, "the Court may not resolve factual disputes or make credibility determinations." *Selvaggi v. Borough of Point Pleasant Beach*, Civ. No. 22-708, 2024 WL 303677, at *8 (D.N.J. Jan. 26, 2024) (citing *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015) ("The district court may not make findings of fact and, insofar as there is a factual dispute, the court may not resolve it.")). Rather, as stated, the Court is concerned with if, accepting all of the facts alleged as true, Plaintiff has plead enough facts to state a claim to relief that is plausible on its face. Under this liberal standard of review, the Court finds that Plaintiff has satisfied its burden of proof.

Plaintiff's request for leave to amend its complaint is **GRANTED**, insofar as it seeks to state a claim of tortious interference with contract.

### D. Undue Prejudice

Finally, the Court briefly addresses whether Amarin will be unduly prejudiced if Plaintiff is granted leave to amend its complaint.

As noted, prejudice to the non-moving party constitutes "the touchstone for the denial of leave to amend." *Heyl & Patterson Int'l, Inc. v. F.D. Rich Hous. of V.I., Inc.*, 663 F.2d 419, 425 (3d Cir.1981) (quoting *Cornell & Co., Inc. v. Occupational Safety & Health Review Comm'n*, 573 F.2d 820, 823 (3d Cir.1978)). The burden of establishing prejudice rests with the non-moving party, who must demonstrate that permitting the moving party to amend the pleading "would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir.2004); *see also Textron Fin.-N.J., Inc. v. Herring Land Group, LLC*, No. 06–2585, 2009 WL 690933, at *4 (D.N.J. Mar.11, 2009).

As Plaintiff contends, Amarin will not suffer undue prejudice as: the proposed amendment is not an "eleventh-hour amendment" that would require "additional discovery" or "create risk that trials scheduled" will be delayed, as fact discovery is still proceeding; document productions are ongoing; no depositions have been scheduled or taken; and the proposed amendment centers around the same operative facts as Plaintiff's antitrust claims for which Amarin is already obliged to produce discovery. (Pl.'s Mov. Br., at 5-6). The Court agrees.

Therefore, for the foregoing reasons, the Court finds that Plaintiff's proposed amendments are non-futile, non-prejudicial, will not cause undue delay, and were not brought in bad faith.

## III.    CONCLUSION

For the reasons stated above, Plaintiff's Motion to Amend is **GRANTED.**  An appropriate

Order follows.


Dated:  June 28, 2024

s/Tonianne J. Bongiovanni
**HONORABLE TONIANNE J. BONGIOVANNI**
**UNITED STATES MAGISTRATE JUDGE**